Hearing Date:  **January 12, 2015**
Opposition Deadline:  **December 1, 2014**
Reply Deadline: **December 16, 2014**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE RESCAP LIQUIDATING TRUST MORTGAGE PURCHASE LITIGATION | Case No. 12-12020 (MG) (Ch. 11) Adv. Proc. No. 14-07900 (MG) |

*This document relates to*:

Residential Funding Co. v. HSBC Mortg. Corp. (USA), Adv. Proc. No. 14-01915 (MG)

Residential Funding Co. v. GreenPoint Mortg. Funding, Inc., Adv. Proc. No. 14-01916 (MG)

ResCap Liquidating Trust v. Summit Fin. Mortg. LLC, Adv. Proc. No. 14-01996 (MG)

Residential Funding Co. v. SunTrust Mortg. Inc., Adv. Proc. No. 13-1820 (MG)

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* REGARDING STATISTICAL SAMPLING**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

BACKGROUND .......................................................................................................... 1

ARGUMENT ............................................................................................................... 8

I.     Defendants Must Be Able To Challenge Whether, How, and to What Extent
       Plaintiff May Use a Breach Rate Calculated for a Sample of Loans in Subsequent
       Analyses, Including To Determine Liability and Damages................................ 9

II.    Defendants Should Be Required Only to Make Certain Objections Within a Time
       Certain of Plaintiff's Disclosure of a Sample. .................................................. 16

       A.     Defendants' Objections Regarding Sample Size and Margin of Error,
              Other Than in Connection With Establishing a Breach Rate, Must Be
              Preserved Until after Plaintiff Discloses the Purposes for Which Its
              Sample Is To Be Used............................................................................. 16

       B.     Defendants Properly Reserve Their Right To Challenge Factual
              Determinations Regarding Whether Loans in Plaintiff's Proposed
              Population Meet Plaintiff's Criteria for Inclusion in the Population. ...... 19

III.   The Court Should Adopt Defendants' Position on Ancillary Issues. ............... 20

CONCLUSION........................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475 (S.D.N.Y. 2013) ...............................................................................................................13

*Deutsche Bank National Trust Co. v. WMC Mortgage*, 2014 WL 3824333 (D. Conn. Aug. 4, 2014)..............................................................................14, 15

*FHFA v. JPMorgan Chase & Co.*, 2012 WL 6000885 (S.D.N.Y. Dec. 3, 2012) ........................15

*In re Mass. Life Ins. Co. Litig.*, No. 11-cv-30039 (D. Mass. Mar. 5, 2013) ..................................15

*In re Wash. Mut. Mortg. Backed Sec. Litig.*, 2012 WL 2995046 (W.D. Wash. July 23, 2012) ............................................................................................15, 16

*Louzon v. Ford Motor Co.*, 718 F.3d 556 (6th Cir. 2013) ..........................................................19

*Luce v. United States*, 469 U.S. 38 (1984)...............................................................................18, 19

*MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Securities, Inc.*, No. 12-cv-07322 (S.D.N.Y. Apr. 1, 2013)....................................................13

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 958 N.Y.S.2d 647 (Sup. Ct. N.Y. Cnty. 2010)..................................................................................13, 15

*NCUA v. Morgan Stanley & Co.*, No. 13-cv-6705 (DLC) (S.D.N.Y. Apr. 30, 2014) ...........................................................................................................15

*NCUA v. RBS Sec., Inc.*, 2014 WL 1745448 (D. Kan. Apr. 30, 2014)........................................15

*Palmieri v. Defaria*, 88 F.3d 136 (2d Cir. 1996) .........................................................................18

*Pavone v. Puglisi*, 2013 U.S. Dist. LEXIS 9140 (S.D.N.Y. Jan. 23, 2013) ..................................19

*Syncora Guarantee Inc. v. EMC Mortgage Corp.*, No. 09 Civ. 3106 PAC, 2011 WL 1135007 (S.D.N.Y. Mar. 25, 2011) .................................................................13

*Ventura Assocs. v. Int'l Outsourcing Servs., Inc.*, 2009 U.S. Dist. LEXIS 21541 (S.D.N.Y. Mar. 16, 2009) .......................................................................19

Plaintiff's Motion sets forth its sampling proposal as if it were written on a clean slate.  It clearly was not.  Defendants agreed not to challenge under *Daubert* Plaintiff's use of sampling for the sole purpose articulated by Plaintiff—to determine a global breach rate across a defined population.  After months of negotiations, the parties had narrowed to a handful the issues in dispute, and the Court had offered guidance on those issues to facilitate agreement.  Rather than recite those negotiations, explain the areas of agreement, and identify for the Court the specific issues in dispute, Plaintiff instead filed a Motion that reads as though none of that history had occurred.  The parties' negotiations and agreements, however, frame, inform, and narrow the present dispute significantly.  Defendants' positions on these issues are consistent with all of the Court's observations at the October 14 Status Conference concerning sampling, and the Court should adopt them.

## BACKGROUND

On July 30, 2014, Plaintiff provided Defendants with its proposed sampling methodology.  That methodology was set forth in a short letter containing two paragraphs of substance, unsupported by any expert declaration.  The entirety of the proposal consisted of:  (1) drawing a random, representative sample of 150 loans and 100 back-up loans from a defined population of loans (what Plaintiff unilaterally deemed the "Relevant Population");[1] and (2) using that sample "to provide an unbiased view of the breach rates in the Relevant Population" with a maximum 8% margin of error at the 95% confidence interval, and to "help assess each

---

[1]  Plaintiff's defined population consists of loans that were:  "(a) sold by [a] Sampling Defendant to [RFC] or its relevant predecessors, (b) included in a securitization as to which RFC settled claims in its bankruptcy, and (c) incurred actual liquidated losses, or expected losses (i.e., delinquent or with statuses of foreclosure, bankruptcy, or REO)."  Ex. A (7/30/14 Nesser Ltr.) at 2.

Sampling Defendant's liability and damages." Ex. A (7/30/14 Nesser Ltr.) at 3.[2]  Plaintiff's

sampling proposal contained *no other substantive content*; it omitted virtually all of the details

necessary to meaningfully assess the proposed methodology.  Notably, Plaintiff gave no

explanation or details regarding how it intended to use any breach rate generated from a sample

of loans "to help assess each Sampling Defendant's liability and damages."

Over the ensuing three months, Defendants conferred in good faith with Plaintiff through

letters, an in-person meeting attended by experts, and telephonic conferences to seek further

details and clarification of Plaintiff's proposal.  *See* Exs. A-Q.  Plaintiff provided additional

information largely concerning how it intended to define the "Relevant Population" of loans and

draw its sample and back-up loans.  *See*, *e.g.*, Ex. E (8/16/14 Nesser Ltr.) at 2-3; Ex. G (8/22/14

Nesser Ltr.) at 4.

Other than giving rudimentary information concerning the mechanics of drawing a

sample, however, Plaintiff refused, or was not prepared, to offer any additional details.  For

example, in response to repeated requests for information concerning how Plaintiff intended to

use any breach rate generated from sampled loans to assess liability and damages, Plaintiff

remained silent, asserting time and again that the question was "premature" and "beyond the

scope of Plaintiff's proposed sampling methodology."  Ex. E (8/16/14 Nesser Ltr.) at 3.[3]

---

[2] Unless otherwise noted, the exhibits cited herein are attached to the Declaration of Matthew V.
Johnson.

[3] *See also* Ex. E (8/16/14 Nesser Ltr.) at 3 ("your question of 'how' Plaintiff intends to use the
proposed samples to help assess liability and damages is premature"); Ex. H (8/25/14 Nesser
Ltr.) at 4 ("This question concerns the ultimate relief Plaintiff intends to pursue against multiple
defendants and the damages Plaintiff may assert.  Consequently, this question is beyond the
scope of Plaintiff's proposed sampling methodology"); *id*. at 5 ("This question" posed—how a
Breach Rate will be linked to an amount of loss and imputed to a population—"is beyond the
scope of Plaintiff's proposed sampling methodology; it relates to Plaintiff's re-underwriting and
damages methodology.").

Plaintiff similarly asserted that other important issues also were "beyond the scope of Plaintiff's proposed sampling methodology" and "cannot be determined" at this time, including how, if at all, sampling results would apply to loans outside the "Relevant Population," and the methodology that would be used to extrapolate sample results to the "Relevant Population." *See*, *e.g.*, Ex. E (8/16/14 Nesser Ltr.) at 3; *see also* Ex. G (8/22/14 Nesser Ltr.) at 3 ("I have already told you that Plaintiff's sampling methodology covers only loans in the Relevant Populations. Other questions about how Plaintiff intends to prove its claims are outside the scope and thus premature."). A September 11, 2014 in-person meet-and-confer between the parties and their respective sampling experts did not provide any further information or guidance on these issues.

On September 18, 2014, Defendants wrote to Plaintiff to set forth the terms on which Defendants could agree to Plaintiff's sampling proposal. Ex. J (9/18/14 Johnson Ltr.). Defendants began by re-stating the limitations that Plaintiff itself had imposed, including that Plaintiff was *not* addressing with its sampling proposal: (1) "[w]hether and how the sample results may be used for purposes of establishing liability or damages with respect to the proposed population;" (2) "[t]he application of Plaintiff's samples in any way to Plaintiff's claims associated with the loans outside of the proposed population;" or (3) "[t]he specific methodology used for extrapolation of the results of the re-underwriting of the samples across the proposed populations." *Id.* at 3. Defendants advised that they would condition their assent to Plaintiff's sampling proposal on Defendants' ability to reserve their rights with respect to the issues that Plaintiff had emphasized were "premature" and "beyond the scope" of its sampling proposal. Specifically, Defendants conditioned their assent to Plaintiff's proposal on Defendants' right to challenge:

- "whether, how, and to what extent any purported 'breach rates' for the proposed populations can be used for purposes of establishing liability and/or damages;"

3

- "the application of Plaintiff's proposed samples to Plaintiff's claims associated with any loans outside of the proposed populations;" and

- "the methodology Plaintiff ultimately uses for extrapolating the results of its re-underwriting analyses across the proposed populations."

*Id*. at 4. Defendants also included several additional reservations that any litigant would insist on to rebut evidence Plaintiff could adduce through sampling, including that Defendants could:

- "challenge the *weight* a fact-finder should afford (i) any purported 'breach rates' for the proposed samples, and (ii) the 'margin of error' used in extrapolating the breach rates for the proposed samples to the proposed populations;" and

- "employ different sampling methodologies (and different samples) to rebut any purported 'breach rates' and 'margins of error' that Plaintiff seeks to establish."

*Id*. (emphasis added). Defendants indicated that, if Plaintiff considered agreeing to these reservations of rights, Defendants would consider not opposing Plaintiff's proposal "that a sample of 150 randomly selected loans drawn from the proposed populations of each Sampling Defendant, yielding a maximum margin of error at the 95% confidence interval of +/- 8 percentage points for binary questions, is admissible to support a claim of a breach rate for the proposed population of loans for each Sampling Defendant." *Id*.

In subsequent meet-and-confers, Plaintiff insisted on yet additional concessions, many of which Defendants agreed to. For example, Defendants agreed to stipulate that they would not challenge on *Daubert* grounds Plaintiff's introduction of its sampling methodology "to support Plaintiff's claim of a breach rate for the Relevant Population of loans . . . ." Ex. L (9/29/14 Johnson Proposed Stip.) at 7 (¶ 12). Defendants also agreed to assert, within a defined period of time, certain objections to Plaintiff's samples based on the information provided by Plaintiff at the time of disclosure. And Defendants further agreed to stipulate, with minor revisions, to the first ten paragraphs set forth in Plaintiff's proposed stipulation concerning the nature and

4

potential benefits of sampling when performed correctly. *Compare* Ex. K (9/19/14 Nesser

Proposed Stip.) at 3-4 (¶¶ 1-10) *with* Ex. L (9/29/14 Johnson Proposed Stip.) at 5-6 (¶¶ 1-10), Ex.

M (10/17/14 Alden Proposed Stip.) at 3-4 (¶¶ 1-10), Ex. O (10/21/14 Johnson Proposed Stip.) at

3-4 (¶¶ 1-10).

Ultimately, the parties agreed to the vast majority of terms for a proposed Stipulation but,

unfortunately, could not bridge a few key areas of disagreement, including:  (1) Defendants'

reservation of rights regarding the use of Plaintiff's sampling results to prove liability and

damages; and (2) two particular objections that Plaintiff contends Defendants must raise within a

specified time after Plaintiff discloses the sample.

That is how matters stood as of October 14, 2014, when the Court held a Case

Management Conference to discuss Plaintiff's proposal.  During that conference, the Court

offered important guidance on both of the disputed issues.

*First*, with respect to Defendants' reservation of rights regarding liability and damages,

the Court could not have been more clear, stating that it was "not going to bless [Plaintiff's]

undisclosed theory of damages," Ex. T (10/14/14 Hr'g Tr.) at 84:3-4, particularly given

Plaintiff's admission that it had not "laid out for the defendants exactly how [its] experts are

going to take the global breach rate and use it to compute damages," *Id.* at 71:1-5.  The Court

added that it "fully understand[s] that [Defendants] aren't going to agree—*and nor do I think at

this stage of the case they should agree*—that the global defect breach rate calculated in the

manner that will be done, leads inexorably to a determination of liability and damages."  *Id.* at

62:22-63:1 (emphasis added); *see also id.* at 72:21-23 ("until you told them how you're going to

use it, how is it that you expect them to say, we have no objection to their using it for any reason

they want?"); *id.* at 83:12-17 (Plaintiff "ha[sn't] laid out the steps they intend to use to get from a

5

breach rate to a damage calculation.  Without knowing that, I don't expect the defendants to agree that what your expert's going to do with a breach rate is proper.  You're asking them to sign on in a totally abstract fashion"); *id*. at 83:17-19 ("I'm not going to rule in the abstract how you use it for damages, when you haven't told me or them how you're going to use it for damages").

*Second*, with respect to specific objections to an identified sample, the Court explained that, although it would "impose a reasonable time limit on the defendants to come forward" to avoid surprise later in the litigation, *id*. at 84:8-13, it would not "cut off the defendants from presenting their theory of the case, whether that includes alternative expert analyses, et cetera." *Id*. at 83:6-8.  The Court encouraged the parties "to try and pin down the real schedule by which this would all take place."  *Id*. at 77:24-25.  The Court also ordered Plaintiff to provide a Status Report regarding the parties' further discussions.  *Id*. at 87:23-88:4, 91:14-20.

Following the Status Conference, the parties again conferred, made some further progress, but still could not reach a final agreement.  *See* Ex. M (10/17/14 Alden Proposed Stip.) at 2-7; Ex. N (10/17/14 Johnson Proposed Stip.) at 18-23; Ex. O (10/21/14 Johnson Proposed Stip.) at 2-7; Ex. P (10/28/14 Alden Proposed Stip.) at 3-17; Ex. Q (11/3/14 Johnson Proposed Stip.) at 8-14.

With respect to Defendants' reservation of rights concerning the use of a breach rate to establish liability and damages, Defendants informed Plaintiff that this reservation was "fundamental to the stipulation," was "based on Plaintiff's own language," and was consistent with the Court's statements at the Status Conference.  Ex. Q (11/3/14 Johnson Ltr.) at 6. Plaintiff offered no refutation, but still refused to acknowledge Defendants' rights.

With respect to objections Defendants would raise during a time certain, Defendants agreed that (1) "[w]ithin 45 days after Plaintiff discloses its Main Samples, Back-Up Samples, the results of its tests for representativeness, and any replacement loans," Defendants would assert any "objections based on the information provided at the time of the disclosure" that (a) "any Samples are not representative of the Relevant Populations," (b) "any Main Sample (or any Back-Up Sample) was not drawn in the manner described" in the Stipulation, (c) "any loans in the  Main Sample (or any Back-Up Sample) are not members of a corresponding Relevant Population," and (d) "the Sampling Protocol has not been implemented as set forth" in the Stipulation, and (2) "no later than 15 days after the end of the meet and confer period," Defendants would "disclose different sampling methodologies (and different samples)."  Ex. O (10/21/14 Johnson Proposed Stip.) at 5 (¶ 13).

Defendants further explained that their right to challenge whether specific loans *outside* the sample met Plaintiff's criteria for inclusion in the population also must be preserved.  *Id.* ¶ 16.  Defendants articulated that they need to be able to challenge the inclusion of particular loans in Plaintiff's designated population, because it may be that the loan "was not actually sold to RFC, or did not actually sustain an actual or expected loss, or was not included in securitizations that were the subject of claims resolved by settlements in the bankruptcy, or does not belong in the Population for some other reason."  Ex. Q (11/3/14 Johnson Ltr.) at 7.  Again, Plaintiff refused to agree.

Rather than proposing revisions that might lead to further compromise, Plaintiff doubled-down after the October 14 court conference by pushing positions even more extreme than what it previously had proposed.  For example, in addition to refusing to acknowledge Defendants' reservation of rights concerning liability and damages, Plaintiff insisted for the first time that

7

Defendants raise any objection that "the Samples are not of sufficient size" or "the margin of error is too great" immediately after Plaintiff disclosed a sample. Ex. P (10/28/14 Alden Proposed Stip. Redline) at 14 (¶ 13). Plaintiff also insisted for the first time that, should the parties not resolve an objection following Plaintiff's disclosure of a sample, the parties raise the objection with the Court "by way of early motion and no objection will be raised on the basis of prematurity." *Id*. at 14–15 (¶ 14).

On November 3, 2014, Defendants sent Plaintiff a revised Stipulation, together with a four-page letter outlining Defendants' positions and rationale, in a further attempt to reach agreement. Ex. Q (11/3/14 Johnson Ltr.) at 4-7. Rather than respond, Plaintiff filed its Motion without any notice. The Motion nowhere explained the issues that actually remained in dispute, was unaccompanied by the Status Report that the Court had ordered, Ex. T (10/14/14 Hr'g Tr.) at 87:23-88:4, 91:14-20, and attached for the first time a 15-page Declaration from an expert statistician that had not previously been shared with Defendants.

## ARGUMENT

From reading Plaintiff's Motion, one never would know that there had been a three-month meet-and-confer process during which Defendants agreed to the majority of the issues concerning sampling. As the Court is aware from the October 14 Status Conference, Defendants already have agreed not to challenge under *Daubert* Plaintiff's assertion that a sample of 150 randomly selected loans drawn from a proposed population, yielding a maximum margin of error of +/- 8% at the 95% confidence interval for binary questions, can be employed to determine a breach rate for a proposed population of loans. The vast majority of Plaintiff's Motion, addressing *ab initio* the benefits of sampling, reads as though there was no agreement on these basic issues.

In fact, two primary issues require this Court's resolution.

8

*First*, Plaintiff's own statements, this Court's observations, common sense, and the case law make clear that Defendants properly may reserve their rights to challenge whether, how, and to what extent Plaintiff may use a breach rate calculated from a sample of loans in subsequent analyses, including with respect to liability and damages. Any stipulation or order on sampling should contain that reservation, particularly where, as here, Plaintiff repeatedly has emphasized that any discussion of such use is "premature" and "beyond the scope" of its sampling proposal.

*Second*, although Defendants are happy to raise certain objections to the sampled loans within a reasonable time frame, objections that "the samples are not of sufficient size" and "the margin of error is too great" are *not* properly among those objections. Those issues turn on the purposes for which a sample is used, and Plaintiff's silence on that score precludes Defendants from raising those objections now. Further, Defendants should not be required to identify and raise at the time a sample is disclosed challenges to Plaintiff's factual determinations regarding whether every particular loan in the broader population meets Plaintiff's criteria for inclusion. Defendants each have hundreds or thousands of loans in their proposed populations, and it would be unduly burdensome and inconsistent with the goal of sampling to require Defendants at this early juncture to conduct an analysis of each loan in Plaintiff's proposed population of loans.

Defendants respectfully request that the Court either deny Plaintiff's Motion or enter the Stipulation proposed by Defendants as Exhibit R.

**I.      Defendants Must Be Able To Challenge Whether, How, and to What Extent Plaintiff May Use a Breach Rate Calculated for a Sample of Loans in Subsequent Analyses, Including To Determine Liability and Damages.**

The primary disputed issue is whether Defendants may reserve their right to challenge whether, how, and to what extent Plaintiff may use a breach rate calculated through sampling, including to determine liability and damages. Plaintiff repeatedly has acknowledged that consideration of these issues is "premature" and "beyond the scope" of its sampling proposal.

Plaintiff nonetheless asks the Court to hold the exact opposite and enter an Order "holding that Plaintiff may attempt to establish liability and determine damages by use of a statistically valid random sample of loans." Mem. at 18-19. Plaintiff's request is contrary to its own statements, ignores this Court's observations at the October 14 Status Conference, lacks common sense, and conflicts with the approach taken by other courts. It should be rejected.

*First*, Plaintiff's position is contrary to its repeated statements concerning the scope of its sampling proposal. Plaintiff consistently has advised Defendants that discussion of the use of its sampling results to prove liability and damages is "premature" and "beyond the scope" of its sampling proposal, asserting that it is not prepared to disclose the purposes for which any breach rate will be used. Ex. E (8/16/14 Nesser Ltr.) at 3; Ex. H (8/25/14 Nesser Ltr.) at 2, 4, 5; *see also* Ex. T (10/14/14 Hr'g Tr.) at 71:1-5, 72:6-16. Plaintiff made these statements on August 16, 2014, on August 25, 2014, and again on October 14, 2014. Plaintiff's request that the Court rule that its sampling results may be used to prove liability and damages ignores its own statements.

*Second*, Plaintiff's request also ignores the Court's guidance on this issue at the October 14 Status Conference. The Court advised that it "fully understand[s] that [Defendants] aren't going to agree—*and nor do I think at this stage of the case they should agree*—that the global defect breach rate calculated in the manner that will be done, leads inexorably to a determination of liability and damages." Ex. T (10/14/14 Hr'g Tr.) at 62:21-63:1 (emphasis added). The Court warned Plaintiff that it was "asking [Defendants] to sign on in a totally abstract fashion," and that the Court would not "expect the defendants to agree that what [Plaintiff's] expert's going to do with a breach rate is proper." *Id*. at 83:14-17.

*Third*, Plaintiff's position lacks basic common sense. It is impossible to assess, let alone endorse, a party's proposed sampling methodology for uses that have not been specifically

10

articulated.  Attached is a Declaration from Defendants' expert statistician, Dr. Arnold Barnett,

the George Eastman Professor of Management Science and Professor of Statistics at

Massachusetts Institute of Technology's Sloane School of Management.  As Dr. Barnett

explains, to evaluate whether a particular sampling methodology can assist in assessing liability

and damages, it is necessary to know how that methodology will be used in each of those

respects.  Declaration of Dr. Barnett (submitted herewith) ¶¶ 11-12.

Here, the sole articulated use of Plaintiff's proposed sampling methodology is to

determine a *breach rate* across all of a particular Defendant's loans that were (a) sold to RFC, (b)

included in a securitization as to which RFC settled claims in its bankruptcy, and (c) incurred

actual liquidated losses or expected losses.  Defendants have agreed not to challenge Plaintiff's

use of sampling for this articulated purpose.  However, Plaintiff has declined to disclose how any

sampling results otherwise would be used, including to assess liability or damages.  To the

contrary, Plaintiff steadfastly has asserted that its use of sampling results to assess liability and

damages is "premature" and "beyond the scope" of its proposal.  The reason Plaintiff takes that

position is clear:  it does not yet know how it will prove liability and damages, or how a breach

rate will factor into either calculus, a fact Plaintiff has acknowledged to multiple courts.  For

example, at a hearing in September 2014 before Judge Castel in one of the cases currently before

this Court (*GreenPoint*), Plaintiff admitted that it is still trying to figure out how it will determine

liability and calculate damages:

> THE COURT:  How is the amount of indemnification claim against Greenpoint arising
> out of a tranche of a securitization, how is that going to be determined? . . . . The answer
> may be it's very simple.  There is another piece of paper and it has Greenpoint at, you
> know, 36.07 percent of that amount.  If there is such a piece of paper or document, that
> would be something I would want to know about.
>
> MR. NESSER:  There is no such piece of paper.

THE COURT:  In your understanding how is it going to be determined?

MR. NESSER:  Your Honor, I am being as straightforward as I can possibly be in telling you that issues concerning the method by which we are going to be making settlement demands, the appropriate calculation of each defendant's portion of those liabilities, whether that should be allocated, if so how it should be allocated, those are issues that we are actively right now discussing at Quinn Emanuel and with our client.

Ex. S (*RFC v. GreenPoint Mortg. Funding*, No. 14-5452 (S.D.N.Y. Sept. 17, 2014) (Hr'g Tr.) at

14-15.

Similarly, at the October 2014 Status Conference before this Court a month later,

Plaintiff advised that it has not disclosed how it intends to use any breach rate to determine

damages, and gave no indication that it would disclose that information in the near future:

THE COURT: You've acknowledged you haven't laid out for the defendants exactly how your experts are going to take the global breach rate and use it compute damages.  I'm correct on that, right?

MR. NESSER: Yes.

*** 

THE COURT: Okay. So without your filling that gap, how could you ask me to do more than grant a motion approving your sampling methodology in connection with, after re-underwriting the loans, determining a global breach rate for each of the defendants' loans?

MR. NESSER: I think what we would do -- and in part, this issue has arisen as a consequence of the meet-and-confer process. And actually I think the way I would envision it happening is I would make a motion and I would say I would like to have the following sampling protocol approved, I would like to have a decision that the sampling protocol is sufficient to determine a breach rate.  I would then like to have a determination that that breach rate would be admissible in this action, notwithstanding any objections.

Ex. T (10/14/14 Hr'g Tr.) at 71:1-5, 72:6-16.

Plaintiff's position in its Motion is no different; its Motion is silent on the issue, nowhere

indicating how Plaintiff intends to use any sampling results other than to establish a *breach rate*

across a population.  Although Plaintiff alludes to its desire to use sampling results as an "input"

when assessing liability and damages, Mem. at 9, 15-17, nowhere does it explain how that may

be done or the methodology it may use.  Plaintiff cites to paragraph 16 of its newly-produced

expert Declaration to support its assertion that sampling results will be an "input" into a

determination of liability of damages, *id.*, but the expert provides no elaboration, nowhere

articulating how sampling can or will be used to determine liability or damages.[4]  While

Defendants do not fault Plaintiff for remaining silent on its plans for proving liability and

damages, neither should Plaintiff be permitted to exploit that silence to its advantage.

*Fourth*, the case law does not support Plaintiff.  In its Motion, Plaintiff generally cites

mortgage-backed security cases largely involving "repurchase claims," where sampling was

performed on a trust-by-trust basis to assess liability and damages within a specific trust.  Mem.

at 13-14.[5]  Those cases did not involve, as these cases do, an unprecedented attempt to take a

global breach rate for a population and apply that rate back to a small number of loans in scores

of multi-originator trusts with different loan populations, all in the context of a bankruptcy

settlement that allocated cents on the dollar in "allowed claims" to investors in those trusts.

---

[4] Indeed, even the expert's conclusory assertion that sampling results may be used as an "input"
for damages, Snow Aff. ¶¶ 37, 38, 44, 47, is unsupported.  Mr. Snow asserts that sampling
allows calculation of "associated monetary losses," citing a 2012 textbook titled *Sampling* by
Steven K. Thompson, at page 3.  *Id*. ¶ 16 & n.8.  Attached as Exhibit Z is page 3 of Mr.
Thompson's book, as well as the chapter containing that page.  It makes no mention of the use of
sampling results to calculate "monetary losses."  Ex. Z.  The contention of Plaintiff and its expert
that sampling results can be an "input" into an unexplained liability and damages analysis is
wholly unsupported.  *See* Barnett Decl. ¶ 14.

[5] "[R]epurchase claims" is how Plaintiff itself, Mem. at 13-14, describes the cases of *MBIA Ins.
Corp. v. Countrywide Home Loans, Inc.*, 958 N.Y.S.2d 647 (Sup. Ct. N.Y. Cnty. 2010), *Assured
Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475 (S.D.N.Y. 2013), *Syncora
Guarantee Inc. v. EMC Mortgage Corp.*, No. 09 Civ. 3106 PAC, 2011 WL 1135007 (S.D.N.Y.
Mar. 25, 2011), and *MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate
Securities, Inc.*, No. 12-cv-07322 (S.D.N.Y. Apr. 1, 2013) (Ex. V).

As Plaintiff has acknowledged, the present cases are not straightforward repurchase cases, and determining liability and damages in them is far more complex.  For example, in the *UBS* case, Plaintiff described "the very settlements as to which RFC is now seeing indemnification" as arising from "one of the most complex bankruptcies in history."  *RFC v. UBS Real Estate Sec., Inc.*, No. 14-3039, Dkt. No. 7, *1, 17 (S.D.N.Y. May 30, 2014) (Ex. X). In *GreenPoint*, Plaintiff emphasized the complexity of determining liability and damages:

> RFC's claims will require a sophisticated understanding, application, and enforcement of the underlying liabilities and losses RFC incurred pursuant to Judge Glenn's orders.  As one example, the bankruptcy settlements resolved claims that multiple creditors asserted against RFC in respect of the same securitizations—claims that may need to be segregated and allocated to determine which creditor is entitled to a recovery here and how much.  As another example, the bankruptcy settlements resolved claims that multiple creditors asserted not only against RFC but also against other Debtors, and the manner in which these multi-debtor claims were settled varied.

*RFC v. GreenPoint Mortg. Funding*, No. 14-5452, Dkt. No. 9 (S.D.N.Y. Aug. 4, 2014) (Ex. Y) at *18.  As reflected in Plaintiff's silence on how it may use any sampling results to determine liability and damages, the determination of liability and damages in these cases will be an extremely complicated task, and will necessarily differ from the more straight-forward methodology employed in the cases Plaintiff cites involving repurchase claims.

Finally, even in the more straightforward repurchase cases where proof of breach rate is tantamount to proof of liability, courts allow defendants to reserve their rights regarding the manner in which the plaintiff could use sampling results to prove liability and damages, the weight accorded to sampling evidence, and flaws in plaintiff's sampling methodology.  For example, in *Deutsche Bank National Trust Co. v. WMC Mortgage*, 2014 WL 3824333, *8 (D. Conn. Aug. 4, 2014), cited by Plaintiff, Mem. at 2, the plaintiff requested an order prior to expert

14

discovery permitting the use of sampling to prove liability and damages.  The court refused,

observing that "[a] trial judge's order 'expressly permitting' the use of evidence at trial requires

precise knowledge on the judge's part of what the evidence is, and whether it passes muster

under F. R. Evid. 403, 702, 703, or other rules governing admissibility."  2014 WL 3824333, at

*9.  "I am satisfied that statistical sampling is, in *principle*, an acceptable way of proving liability

and damages in an RMBS case such as this one.  Whether in *practice* particular proffered

statistical sampling evidence is admissible and persuasive are quite different questions . . . ." *Id.*

at *10 (emphases in original).

Similarly, in *MBIA Insurance Corp. v. Countrywide Home Loans, Inc.*, 958 N.Y.S.2d 647

(N.Y. Sup. Ct. 2010), also cited by Plaintiff, Mem. at 3, the court held that plaintiff's sampling

methodology was admissible, but declined to find "Plaintiff's method is without flaw or

unsusceptible to challenge." *Id.* at *5.  Rather, the court held that the weight to be afforded to

the plaintiff's sampling evidence "will be decided by the trier of fact." 958 N.Y.S.2d 647, at

*5-6.  "Sampling itself is not proof, but merely a vehicle to present evidence." *Id.* at *6.  Case

after case cited by Plaintiff is to the same effect, recognizing the efficiencies of sampling but

preserving the defendant's right to challenge the use of a plaintiff's sampling results.[6]

---

[6] *See, e.g.*, *NCUA v. Morgan Stanley & Co.*, No. 13-cv-6705 (DLC) (S.D.N.Y. Apr. 30, 2014)
(Ex. W) ("This Order is without prejudice to Defendants' right to advance at future stages of this
litigation: (a) any arguments relating to the weight of Plaintiff's proof; (b) any *Daubert* challenge
to the admissibility of any future expert testimony offered by Plaintiff"); *NCUA v. RBS Sec., Inc.*,
2014 WL 1745448, *2 (D. Kan. Apr. 30, 2014) ("[I]f discovery reveals that some aspect of Dr.
Cowan's testimony will not be helpful for some reason, defendants will be free to seek to
exclude that testimony before trial."); *In re Mass. Life Ins. Co. Litig.*, No. 11-cv-30039 (D. Mass.
Mar. 5, 2013) (Ex. U) ("[S]hould the court approve Plaintiff's sampling methodology, it would
not foreclose Defendants from challenging on *Daubert* grounds the opinions thereafter offered
by Plaintiff's experts based on the samples"); *FHFA v. JPMorgan Chase & Co.*, 2012 WL
6000885, *11 (S.D.N.Y. Dec. 3, 2012) (Defendants will be permitted "to raise. . . . arguments in
disputing the weight to be afforded to the plaintiff's final samples"); *In re Wash. Mut. Mortg.*

Plaintiff's objection to Defendants' reservation of rights concerning the issues of liability and damages is meritless and should be rejected.

**II.   Defendants Should Be Required Only to Make Certain Objections Within a Time Certain of Plaintiff's Disclosure of a Sample.**

   **A.   Defendants' Objections Regarding Sample Size and Margin of Error, Other Than in Connection With Establishing a Breach Rate, Must Be Preserved Until after Plaintiff Discloses the Purposes for Which Its Sample Is To Be Used.**

Consistent with the Court's comments at the October 14 Status Conference, Defendants have agreed to raise objections to Plaintiff's proposed sample promptly following the disclosure of that sample, where such objections fairly can be determined at this early stage of the case. Defendants thus have agreed that, 45 days after Plaintiff discloses its main samples, back-up samples, the results of representativeness testing, and any replacement loans, Defendants will provide written objections that:  (1) "any Samples are not representative of the Relevant Populations;" (2) "any Main Sample (or any Back-Up Sample) was not drawn in the manner described" in the Stipulation; (3) "any loans in the Main Sample (or any Back-Up Sample) are not members of a corresponding Relevant Population;" and (4) "the Sampling Protocol has not been implemented as set forth" in the Stipulation.  Ex. O (10/21/14 Johnson Proposed Stip.) at 5 (¶ 13).

Plaintiff insists, however, that Defendants raise other objections that cannot fairly be determined at this stage, including objections that "samples are not of sufficient size" and "the margin of error is too great."  Ex. P (10/28/14 Alden Proposed Stip. Redline) at 14 (¶ 13).  That is unworkable.  Objections that a sample is not of "sufficient size" or the margin of error "too great" beg the question—"sufficient" for what, and "too great" for what?  *See* Barnett Decl. ¶ 10.

_____

*Backed Sec. Litig.*, 2012 WL 2995046, *6 (W.D. Wash. July 23, 2012) ("It is up to the jury to decide how much weight to give [Plaintiff's sampling] analysis").

Until Defendants know the purposes for which sampling results will be used, such objections are not capable of determination.  To be clear, Defendants will not challenge the size of Plaintiff's sample as "sufficient" to establish *a breach rate* for the purported population within the designated margin of error and confidence interval.  Ex. Q (11/3/14 Johnson Proposed Stip.) at 11 (¶ 12).  To the extent Plaintiff seeks a concession that the samples are "of sufficient size" and the margin of error not "too great" for some *other* purpose, however, that is a different matter to which Defendants cannot stipulate based on the sampling proposal put forth.

Moreover, the size and form of Plaintiff's proposed population may very well change over time, including based on decisions issued by the Court on motions to dismiss, for summary judgment, and *in limine*.  For example, this Court may hold that Plaintiff's claims for loans not purchased by RFC are not at issue, or that claims for loans that RFC purchased after a certain date are time-barred, or that claims with respect to certain loans for which RFC failed to provide a timely notice of breach are barred.  The Court could exclude loans on these, and other, bases at various stages of these cases.  It would be most unfair to bar Defendants from raising objections regarding the sufficiency of a sample size or margin of error based on developments in the litigation that affect the scope of Plaintiff's claims.

Objections to the sufficiency of the sample size and margin of error also may affect the *weight* that a fact-finder should accord sampling evidence, and there is no basis for requiring Defendants to raise those arguments now, where the only issue *in limine* is admissibility.  A stipulation to not raise a challenge to a particular methodology under *Daubert* should not require a party to waive its right to argue about the weight a fact-finder should give to that methodology.

The issue is even broader than these two additional items that Plaintiff tries to lump into the objections bucket.  At the very end of the parties' three-month long negotiations, Plaintiff

17

suggested that the list of issues that Defendants raise within a time certain be exemplary rather

than exhaustive, inserting the word "including" at the front of the list of objections that

Defendants promptly must raise to a sample.  Ex. P (10/28/14 Alden Proposed Stip. Redline) at

14 (¶ 13); Ex. Q (11/3/14 Johnson Ltr.) at 5.  Such ambiguity, however, fails to provide clear

guidance to the parties concerning their obligations.  Where, as here, Plaintiff moves *in limine* in

order to obtain some level of certainty concerning its sampling method, Ex. T (10/14/14 Hr'g

Tr.) at 41:12-16, Defendants are entitled to no less.  There is no dispute that, on the basis of the

information Plaintiff has agreed to provide, Defendants will be able to assert whether any

samples are representative of Plaintiff's proposed population, the sample was drawn as Plaintiff

described, any loans in the sample are members of Plaintiff's proposed population, and the

sampling protocol was implemented as Plaintiff had promised.  These are the objections

Defendants should be required to provide within a reasonable time period.

Defendants are willing to agree not to bring a *Daubert* challenge to a sampling protocol

proposed to determine a breach rate across a proposed population, and to raise promptly the

objections set forth above based on the information Plaintiff provides.  The *in limine* process,

however, is not appropriately used to secure waivers of substantive rights, as Plaintiff seeks to do

here.  The "purpose of an in limine motion," the Second Circuit has held, "is to aid the trial

process by enabling the Court to rule in advance of trial on the relevance of certain forecasted

evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption

of, the trial."  *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (internal quotation marks

omitted); *Luce v. United States*, 469 U.S. 38, 40 n.2 (1984) (motions *in limine* "in a broad sense"

refer to any motion "to exclude anticipated prejudicial evidence before the evidence is actually

offered").  A "court's ruling regarding a motion in limine is 'subject to change when the case

18

unfolds.'" *Ventura Assocs. v. Int'l Outsourcing Servs., Inc.*, 2009 U.S. Dist. LEXIS 21541, *4

(S.D.N.Y. Mar. 16, 2009) (quoting *Luce*, 469 U.S. at 41).  Accordingly, a motion *in limine* "is

not a proper vehicle for a party to ask the Court to weigh the sufficiency of the evidence to

support a particular claim or defense, because '[t]hat is the function of a motion for summary

judgment, with its accompanying and crucial procedural safeguards.'"  *Pavone v. Puglisi*, 2013

U.S. Dist. LEXIS 9140, *3-4 (S.D.N.Y. Jan. 23, 2013) (citations omitted); *Louzon v. Ford Motor

Co.*, 718 F.3d 556, 561 (6th Cir. 2013) (motion *in limine* not appropriate vehicle to resolve

factual disputes).  Plaintiff's use of the *in limine* process to attempt to secure waivers of

substantive rights is not appropriate.

**B.      Defendants Properly Reserve Their Right To Challenge Factual
          Determinations Regarding Whether Loans in Plaintiff's Proposed Population
          Meet Plaintiff's Criteria for Inclusion in the Population.**

Plaintiff also insists that, shortly after receiving Plaintiff's sample, Defendants raise all

challenges to Plaintiff's factual determinations regarding whether particular loans *not* in the

sample but in the proposed populations meet Plaintiff's criteria for inclusion.  Ex. P (10/28/14

Alden Proposed Stip. Redline) at 15 (¶ 17).  This request is enormously burdensome and

inconsistent with the basic purpose of early approval of a sampling methodology.

As the Court is aware, Plaintiff has advised that it believes that the "Relevant Population"

for each Defendant consists of 4,532 loans for SunTrust, 1,054 loans for HSBC, 966 loans for

Summit, and 728 loans for GreenPoint.  A review of the 150-loan sample will not allow

Defendants to determine whether loans in the "Relevant Population" meet Plaintiff's criteria for

inclusion in the proposed population.  *See* Barnett Decl. ¶¶ 21-22.  Defendants should not be

required, within 45 days of receiving Plaintiff's 150-loan sample, to analyze each loan in those

larger populations to determine whether there is any basis to challenge Plaintiff's factual

determination that each of those hundreds or thousands of other loans meets Plaintiff's criteria

19

for inclusion in the "Relevant Population." For example, it may well be that, with discovery, Defendants determine that some loans in Plaintiff's proposed population "did not actually sustain an actual or expected loss, or was not included in securitizations that were the subject of claims resolved by settlements in the bankruptcy, or does not belong in the Population for some other reason." Ex. Q (11/3/14 Johnson Ltr.) at 7. Defendants should be permitted to challenge the inclusion of those loans in Plaintiff's proposed population.

Imposing an immediate obligation on Defendants to analyze large numbers of loans outside of the sample also is inconsistent with Plaintiff's stated purpose for early approval of sampling, which is to "generate a set of loans upon which the parties can focus their efforts in discovery." Mem. at 17. Forcing Defendants to undertake at the outset a factual analysis of each of the other thousands of loans in plaintiff's proposed "Relevant Populations" is directly contrary to that goal.

## III.   The Court Should Adopt Defendants' Positions on Ancillary Issues.

Finally, the parties disagree on a handful of ancillary issues, most of which were first raised by Plaintiff at the end of October—three months after it made its sampling proposal, after the October 14 Status Conference, and just weeks before it filed its Motion. These issues are focused not on the sampling methodology itself, but on extracting collateral concessions or securing waivers after sampling occurs. Using an *in limine* motion for this purpose is not appropriate, and Plaintiff should not be permitted to inject these issues into the protocol.

*First*, Plaintiff at the last minute insisted that, if the parties cannot agree on a particular objection to the sample, the objection must be raised "by way of early motion and no objection will be raised on the basis of prematurity." Ex. P (10/28/14 Alden Proposed Stip. Redline) at 14-15 (¶ 14); *see* Ex. Q (11/3/14 Johnson Ltr.) at 6. This is not the appropriate subject of an *in limine* motion. Attempting to force the filing of motions that have not been made, strike

20

supporting arguments that have not been urged, and waive objections that have not been lodged,

all for a sample that has not been identified, is far afield from a sampling protocol. In fact, it

may turn out that certain issues are premature for resolution, including because Plaintiff has not

disclosed necessary information, such as with Plaintiff's liability and damages theories, or

because the Court later issues decisions that reduce the size of the proposed population, thereby

affecting the sample, its composition, its representativeness, and its compliance with margins of

error and confidence intervals. *See* Barnett Decl. ¶ 13. Trying to obtain waivers of legal

arguments ahead of time that are three steps removed from the issue being decided here is not

appropriately part of a sampling methodology.

*Second*, Plaintiff at the last minute added that any objection not asserted within a

specified time "be waived and may not be asserted in these actions absent Court order." Ex. P

(10/28/14 Alden Proposed Stip. Redline) at 14-15 (¶ 14). Defendants proposed that such

objections "not be asserted absent an order by the Court based on *good cause shown*." Ex. Q

(11/3/14 Johnson Proposed Stip.) at 12 (¶ 14) (emphasis added); Ex. Q (11/3/14 Johnson Ltr.) at

6. Defendants' incorporation of a "good cause" standard provides a reasonable and commonly-

used standard for the Court to apply.

*Third*, Plaintiff insists Defendants raise certain objections within 30 days, not the 45 days

Defendants propose. Thirty days, however, is infeasible. Defendants' determination of

objections following Plaintiff's sampling disclosures is a multi-step process, requiring

Defendants to: (1) consider whether Plaintiff's expert has correctly applied Plaintiff's sampling

protocol; (2) consult with their own experts; (3) evaluate the characteristics of the 150-loan

sample; (4) determine whether each of the 150 loans is representative of the larger population of

loans; and (5) prepare and submit written objections. *See* Barnett Decl. ¶ 20. Thirty days is not a

reasonable period of time for this amount of work, and the additional 15 days requested by Defendants will have no appreciable effect on the efficient resolution of this litigation.  Ex. Q (11/3/14 Johnson Ltr.) at 5.  Where, as here, it has taken the parties more than 90 days diligently to confer just about the contours of Plaintiff's sampling *proposal*, to require substantive evaluation of the actual sampled loans in 30 as opposed to 45 days, under threat of waiver, represents an arbitrarily abridged period.

*Fourth*, in addition to retaining the right to challenge the weight a fact-finder should afford a purported breach rate for a sample or population, Defendants are entitled to challenge the weight a fact-finder should afford the margin of error used in extrapolating that breach rate to a population.  In its latest communication, Plaintiff refused to acknowledge that.  *See* Ex. P (10/28/14 Alden Proposed Stip. Redline) at 16 (¶ 20) (striking Defendants' reservation of rights on this issue); Ex. Q (11/3/14 Johnson Proposed Stip.) at 13 (¶ 20); Ex. Q (11/3/14 Johnson Ltr.) at 6.  Stipulating to the admissibility of an opposing party's sampling protocol should not require a party to waive its right to argue about the weight a fact-finder should give to that methodology.

*Fifth*, Defendants had proposed that the parties stipulate that "*Data provided by Ocwen* will be used to determine which loans experienced actual losses, and which loans had expected losses, as defined above." Ex. O (10/21/14 Johnson Proposed Stip.) at 4 (¶ 11) (emphasis added). At the last minute, Plaintiff proposed more ambiguous language, stating that "*Data (such as that provided by Ocwen). . . .*" Ex. P (10/28/14 Alden Proposed Stip.) at 12 (¶ 11).  Again, there is no cause for intentionally introducing ambiguity into a court order or stipulation.  Despite several requests, Plaintiff has not indicated what data, other than data provided by Ocwen, it may use. *See, e.g.*, Ex. Q (11/3/14 Johnson Ltr.) at 5.  Its last-minute proposal should be rejected.

22

The Court should reject Plaintiff's belated attempts to extract additional concessions on ancillary issues. Defendants' positions on each of these issues are reasonable, and the Court should adopt them.

### **CONCLUSION**

For the reasons set forth above, Defendants respectfully request that the Court either deny Plaintiff's Motion or issue an Order consistent with the Stipulation provided by Defendants and attached as Exhibit R.


Dated: December 1, 2014


Respectfully submitted,


_/s/ Matthew V. Johnson_ 

R. Hackney Wiegmann (hwiegmann@wc.com)
Andrew W. Rudge (arudge@wc.com)
Matthew V. Johnson (mjohnson@wc.com)
Jesse Smallwood (jsmallwood@wc.com)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000
(202) 434-5029 (fax)

*Attorneys for Defendant HSBC Mortgage Corp.(USA)*

_/s/ Cameron S. Matheson_ 

James A. Murphy (jmurphy@mmlawus.com)
Cameron S. Matheson (cmatheson@mmlawus.com)
Theodore R. Snyder (tsnyder@mmlawus.com)
MURPHY & MCGONIGLE, PC
1185 Avenue of the Americas
21st Floor
New York, NY 10036
(212) 880-9999

*Attorneys for Defendants GreenPoint Mortgage Funding, Inc., Summit Financial Mortgage LLC, and Summit Community Bank, Inc.*

 /s/  John Doherty
John P. Doherty (john.doherty@alston.com)
Jennifer Susan Kozar
James S. D'Ambra, Jr.
ALSTON & BIRD LLP
90 Park Avenue
New York, NY 10016
(212) 210-9400
(212) 210-9444 (fax)

*Attorneys for Defendant SunTrust Mortgage, Inc.*