**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | Case No. 12-12020 (MG) |
| Debtors. | |
| In re: | |
| RESCAP LIQUIDATING TRUST MORTGAGE PURCHASE LITIGATION | Adv. Proc. No. 14-07900 (MG) |
| RESIDENTIAL FUNDING COMPANY, LLC, | |
| Plaintiff, | |
| - against – | Adv. Proc. No. 14-01915 (MG) |
| HSBC MORTGAGE CORP. (USA), | |
| Defendant. | |
| RESIDENTIAL FUNDING COMPANY, LLC, | |
| Plaintiff, | |
| - against – | Adv. Proc. No. 14-01916 (MG) |
| GREENPOINT MORTGAGE FUNDING, INC., | |
| Defendant. | |
| RESIDENTIAL FUNDING COMPANY, LLC, | |
| Plaintiff, | |
| - against – | Adv. Proc. No. 14-01926 (MG) |
| UBS REAL ESTATE SECURITIES, INC., | |
| Defendant. | |

| | |
|---|---|
| RESIDENTIAL LIQUIDATING TRUST, | |
| Plaintiff, | |
| - against – | Adv. Proc. No. 14-01996 (MG) |
| SUMMIT FINANCIAL MORTGAGE LLC *et ano.*, | |
| Defendants. | |
| RESIDENTIAL LIQUIDATING TRUST, | |
| Plaintiff, | |
| - against – | Adv. Proc. No. 14-02004 (MG) |
| MORTGAGE INVESTORS GROUP, INC., *et al.*, | |
| Defendants. | |
| RESIDENTIAL LIQUIDATING TRUST, | |
| Plaintiff, | |
| - against – | Adv. Proc. No. 13-01820 (MG) |
| SUNTRUST MORTGAGE, INC., | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**

*A P P E A R A N C E S:*

QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Attorneys for Plaintiff*
51 Madison Avenue, 22nd Floor
New York, New York 10010
By:    Peter E. Calamari, Esq.
       David Elsberg, Esq.
       Isaac Nesser, Esq.
       Yelena Konanova, Esq.

WILLIAMS & CONNOLLY LLP
*Attorneys for Defendant HSBC Mortgage Corp. (USA)*
725 Twelfth Street, N.W.
Washington, DC 20005
By:     R. Hackney Wiegmann, Esq.
        Andrew W. Rudge, Esq.
        Matthew V. Johnson, Esq.
        Jesse Smallwood, Esq.

MURPHY & MCGONIGLE, PC
*Attorneys for Defendants GreenPoint Mortgage Funding, Inc.,*
*Summit Financial Mortgage LLC, and Summit Community Bank, Inc.*
1185 Avenue of the Americas, 21st Floor
New York, New York 10036
By:     James A. Murphy, Esq.
        Cameron S. Matheson, Esq.
        Theodore R. Snyder, Esq.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Attorneys for Defendant UBS Real Estate Securities, Inc.*
Four Times Square
New York, New York 10036
By:     Scott D. Musoff, Esq.
        Robert A. Fumerton, Esq.
        Alexander C. Drylewski, Esq.

PALMER, LOMBARDI & DONOHUE, LLP
*Attorneys for Defendant Mortgage Investors Group, Inc.*
515 South Flower Street
Suite 2100
Los Angeles, California 90071
By:     Roland P. Reynolds, Esq.

ALSTON & BIRD LLP
*Attorneys for Defendant SunTrust Mortgage, Inc.*
90 Park Avenue
New York, New York 10016
By:     John P. Doherty, Esq.
        Jennifer Susan Kozar, Esq.
        James S. D'Ambra, Jr., Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are four motions to dismiss filed by defendants GreenPoint Mortgage

Funding, Inc. ("GreenPoint"), Summit Financial Mortgage LLC ("Summit Financial"), Summit

Community Bank, Inc. ("Summit Community" and, together with Summit Financial, "Summit"),

Suntrust Mortgage, Inc. ("Suntrust"), HSBC Mortgage Corp. (USA) ("HSBC"), UBS Real Estate

Securities, Inc. ("UBS"), and Mortgage Investors Group, Inc. ("MIG") (collectively, the

"Defendants") in the above-captioned adversary proceedings (the "Adversary Proceedings")[1]

commenced by the ResCap Liquidating Trust (the "Trust" or "Plaintiff"), as successor to

Residential Funding Company, LLC f/k/a Residential Funding Corporation ("RFC").  These

Adversary Proceedings arise out of the Defendants' sale of allegedly defective residential

mortgage loans to RFC, which RFC in turn sold to whole loan purchasers or pooled and sold into

residential mortgage-backed securitization ("RMBS") trusts.  RFC subsequently faced numerous

lawsuits alleging that the loans RFC had securitized were defective, and, after RFC and its

debtor-affiliates (the "Debtors") filed their chapter 11 cases in May 2012, hundreds of proofs of

claim were filed against RFC, alleging billions of dollars of damages.  RFC resolved its RMBS-

related liabilities in a global settlement (the "Bankruptcy Settlement"), which was central to the

Debtors' confirmed chapter 11 plan (the "Plan").[2]  Now, through these Adversary Proceedings,

the Trust seeks damages and indemnification for all liabilities and losses incurred by RFC as a

---

[1]    Pursuant to the first case management and scheduling order (the "First CMO," Adv. Proc. No. 14-07900,
ECF Doc. # 1), for administrative purposes, any filing affecting two or more of these Adversary Proceedings is to be
filed on a central docket captioned *In re ResCap Mortgage Purchase Litigation*, Adv. Proc. No. 14-07900 (MG) (the
"Central Docket").  The respective dockets for the Adversary Proceedings will be cited as follows:  Central ECF
Doc. # _, GreenPoint ECF Doc. # _, HSBC ECF Doc. # _, MIG ECF Doc. # _, Summit ECF Doc. # _, and UBS
ECF Doc. # _.  The docket for the chapter 11 cases, Case No. 12-12020, will be cited as Ch. 11 ECF Doc. # _.

[2]    The Plan refers to *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and
the Official Committee of Unsecured Creditors* (Ch. 11 ECF Doc. # 6030), confirmed by the Court on December 11,
2013 (the "Confirmation Order," Ch. 11 ECF Doc. # 6065).  The Plan became effective on December 17, 2013.

result of the Defendants' alleged breaches of representations and warranties made in connection with their sale of mortgage loans to RFC.

The Defendants filed their motions to dismiss the Trust's Adversary Proceedings, raising the following issues:  (1) whether the Trust has standing to maintain claims against certain of the Defendants originally filed by RFC on the same date its claims were assigned to the Trust, thereby potentially divesting RFC of standing to file the original complaints; (2) whether the Plaintiff has standing to bring claims relating to securitized loans for which RFC allegedly entered into agreements assigning its rights to third parties; (3) whether the Plaintiff's general averment that all conditions precedent have been satisfied is sufficient to plead satisfaction of conditions precedent; (4) whether a "sole remedy" provision in the applicable loan sale agreement between RFC and one of the Defendants sets forth RFC's exclusive remedies in the event of breach, precluding the Plaintiff's claims for monetary damages; (5) whether the Plaintiff's breach of contract claims are timely under the applicable statutes of limitations; (6) whether the Plaintiff sufficiently pleads claims relating to loans identified on exhibits attached to each complaint, while only alleging specific defects regarding a subset of such loans; and (7) whether the Plaintiff's claims for indemnification of losses relating to securities and fraud-based claims against RFC are barred as a matter of law.  Certain of these same issues have been addressed by several different judges in the United States District Court for the District of Minnesota (the "Minnesota Court") in similar cases pending there, not with uniform outcomes, while others issues have not been decided in Minnesota.[3]

---

[3]    RFC commenced numerous similar actions against other defendants in the Minnesota Court. *See, e.g.,* *Residential Funding Co. v. Cmty. W. Bank, N.A.*, 2014 WL 5207485 (D. Minn. Oct. 14, 2014) (denying in part and granting in part motions to dismiss); *Residential Funding Co., LLC v. Stearns Lending, Inc.*, Civil No. 13-3516 (ADM/JJK), 2014 WL 4186486 (D. Minn. Aug. 22, 2014) (denying motion to dismiss); *Residential Funding Co., LLC v. Broadview Mortg. Corp.*, 2014 WL 4104819 (D. Minn. Aug. 19, 2014) (denying motions to dismiss).
       Additional similar adversary proceedings filed in this Court have been transferred to the Minnesota Court either by stipulation or, following withdrawal of the reference and the granting of motions to transfer, by the United

As set forth below, the Court concludes that: (1) regardless whether RFC assigned its claims to the Trust prior to filing its original complaints against certain of the Defendants, the Trust has standing as the "real party in interest" to bring these claims; (2) the Plaintiff has adequately alleged standing to assert claims relating to securitized loans because determining whether RFC assigned its rights in such loans to third parties requires factual findings that cannot be made on a motion to dismiss; (3) the Plaintiff's general allegation that all conditions precedent to asserting these claims have been satisfied is sufficient at this stage of the Adversary Proceedings; (4) it is premature to resolve the factual issue of whether a "sole remedy" provision bars the Plaintiff's monetary damages claims; (5) the Plaintiff's breach of contract claims for loans purchased by RFC before May 14, 2006 are untimely, but the Plaintiff's breach of contract claims for loans sold to RFC on or after May 14, 2006 are timely; (6) the Plaintiff adequately pleads its claims notwithstanding the lack of loan-by-loan defect allegations because the Plaintiff identifies each loan underlying its claims and generally pleads facts supporting a plausible inference that the Defendants' alleged breaches extend to the entire population of loans; and (7) the Plaintiff's indemnification claims are not barred as a matter of law because RFC's liability on the relevant claims has yet to be adjudicated.

---

States District Court for the Southern District of New York (the "Southern District"). *See, e.g.*, *ResCap Liquidating Trust v. Cadence Bank, N.A. (In re Residential Capital, LLC)*, Case No. 14-cv-5250 (RA) (S.D.N.Y. Sept. 16, 2014), ECF Doc. # 42 (stipulation and order transferring case to Minnesota Court); *ResCap Liquidating Trust v. Honor Bank*, Case No. 14-cv-5415 (LGS) (S.D.N.Y. Sept. 16, 2014), ECF Doc. # 26 (same); *ResCap Liquidating Trust v. Primary Capital Advisors, LLC (In re Residential Capital, LLC)*, Case No. 14-cv-5224 (LTS) (S.D.N.Y. Sept. 16, 2014), ECF Doc. # 31 (memorandum and order granting motion to withdraw reference and to transfer case to Minnesota Court); *ResCap Liquidating Trust v. CMG Mortg., Inc. (In re Residential Capital, LLC)*, Case No. 14-cv-4950 (WHP) (S.D.N.Y. Sept. 10, 2014), ECF Doc. # 21 (same).

   Summit, Suntrust, and UBS have also filed motions to withdraw the reference and transfer the cases to the Minnesota Court; those motions remain pending in the Southern District. *See ResCap Liquidating Trust v. Summit Fin. Mortg. LLC (In re Residential Capital, LLC)*, Case No. 14-cv-5453 (PGG) (S.D.N.Y. July 18, 2014), ECF Doc. # 1; *Residential Funding Co. v. Suntrust Mortg., Inc. (In re Residential Capital, LLC)*, Case No. 14-cv-6015 (RA) (S.D.N.Y. Aug. 1, 2014), ECF Doc. # 1; *Residential Funding Co. v. UBS Real Estate Sec., Inc. (In re Residential Capital, LLC)*, Case No. 14-cv-3039 (GBD) (S.D.N.Y. Apr. 29, 2014), ECF Doc. # 1.

Accordingly, the Court **DENIES** in part and **GRANTS** in part the Defendants' motions to dismiss.

# I.     BACKGROUND

## A.     Factual Background

Prior to filing for bankruptcy in May 2012, RFC was in the business of acquiring and securitizing residential mortgage loans.  (*See, e.g.*, HSBC Compl. ¶ 2, HSBC ECF Doc. # 27.)[4] To do so, RFC would purchase loans from lenders, such as the Defendants, and then either sell the loans to whole loan purchasers or pool the loans with other similar loans and sell them to RMBS trusts, which would subsequently sell certificates to investors.  (*Id.* ¶ 3.)  Altogether, the Defendants allegedly sold more than 42,300 loans to RFC.  (Pl.'s Opp. at 5.)  Through these loan sales, the Defendants made representations and warranties to RFC in various agreements governing the Defendants' sale of loans to RFC regarding the quality and characteristics of the loans.  (HSBC Compl. ¶ 5; Pl.'s Opp. at 4.)  Except for the sales by GreenPoint and UBS, the Defendants' representations and warranties were contained in the "Client Guide" that was incorporated into the applicable "Seller Contract" between RFC and each Defendant.  (*Id.*; *see, e.g.*, "Client Guide," HSBC Compl. Ex. B-1; "Seller Contract," *id.* Ex. A.)  GreenPoint's representations and warranties were set forth in the Master Loan Purchase and Warranties Agreement between RFC and GreenPoint, dated December 16, 2005 (the "GreenPoint Agreement," GreenPoint ECF Doc. # 20-1).  (*Id.*)  UBS's representations and warranties were set forth in the Master Seller's Purchase and Warranties Agreement between RFC and UBS, dated May 12, 2005 (the "UBS Agreement," UBS ECF Doc. # 33-1, and together with the Client Guide, the Seller Contract, and the GreenPoint Agreement, the "Agreements").  (*Id.*)

---

[4]     The general background allegations cited herein are largely identical across all amended complaints filed against the Defendants.

The Client Guide includes representations about the quality and characteristics of the loans (*see, e.g.*, HSBC Compl. ¶¶ 23(f), (h)–(j), (l)), and warrants underwriting compliance with industry standards and applicable law (*see, e.g.*, *id.* ¶¶ 23(a), (g)).  The Client Guide also provides that each Defendant "will comply with all provisions of th[e] Client Guide . . . , and will promptly notify GMAC-RFC of any occurrence, act, or omission regarding [Defendant], the Loan, the Mortgaged Property or the Mortgagor of which [Defendant] has knowledge, which . . . may materially affect [Defendant], the Loan, the Mortgaged Property or the Mortgagor."  (*See, e.g.*, *id.* ¶ 23(b) (citing Client Guide § A201(M)).)  A Defendant's failure to comply with its representations and warranties, or any other terms of the Client Guide, constitutes an "Event of Default."  (*See, e.g.*, *id.* ¶ 25 (citing Client Guide § A208).)  Upon the occurrence of an Event of Default, the Client Guide permits RFC to exercise any remedy allowed by law or equity (*see, e.g.*, *id.* ¶ 27 (citing Client Guide § A209)), including but not limited to, repurchase or substitution of the defective loan, as well as indemnification of losses resulting from the Defendant's breach (*see, e.g.*, *id.* ¶ 28 (citing Client Guide § A210)).  The Plaintiff alleges that RFC's remedies survived the sale of the loans (*see, e.g.*, *id.* ¶ 27 (citing Client Guide § A209(C)), and RFC "retained the sole discretion to declare an Event of Default, and to choose what remedy or remedies to pursue" (*see, e.g.*, *id.* ¶ 29).  The GreenPoint Agreement and the UBS Agreement allegedly contain similar such provisions.  (*See* GreenPoint Compl. ¶¶ 23 (describing representations and warranties made in GreenPoint Agreement), 27 (describing remedies under GreenPoint Agreement), 28–30 (describing indemnification provisions in GreenPoint Agreement), GreenPoint ECF Doc. # 20; UBS Compl. ¶¶ 25 (describing representations and warranties made in UBS Agreement), 27 (describing remedies under UBS

Agreement), 28 (describing indemnification provisions in UBS Agreement), UBS ECF Doc. # 33.)

The Plaintiff alleges that many of the loans sold to RFC by the Defendants defaulted or became seriously delinquent over time, at higher than average delinquency and default rates. (*See, e.g.*, HSBC Compl. ¶ 46.)  According to the Plaintiff, RFC conducted internal reviews and determined that thousands of the loans purchased from the Defendants violated the Defendants' representations or warranties.  (Pl.'s Opp. at 5 (citing HSBC Compl. ¶¶ 46–47).)  Specific examples of allegedly defective loans each Defendant sold to RFC are provided in each applicable complaint (collectively, the "Complaints").[5]  (*Id.* (citing Complaints).)  The Plaintiff also provides detailed lists of the allegedly defective loans sold to RFC, which specify the representations and warranties breached.  (*Id.* at 6 (citing exhibits to Complaints).)

## B.    Procedural Background

Beginning in 2008, RFC faced a significant number of lawsuits relating to allegedly defective loans that RFC purchased from the Defendants and other parties.  (*See id.*; Defs.' Mot. at 5.)  In May 2012, the Debtors filed their chapter 11 cases in this Court.  (Pl.'s Opp. at 6.) During the bankruptcy cases, numerous proofs of claims were filed relating to allegedly defective loans; RFC and its Debtor-affiliates settled many claims and lawsuits, granting allowed claims totaling in the billions of dollars and incurring attorneys' fees in the millions of dollars. (*Id.*)  This Bankruptcy Settlement was integral to the confirmation of the Plan.  (*See* Ch. 11 ECF Doc. # 6030).  The Plan became effective on December 17, 2013 (the "Effective Date"), at which

---

[5]       The Complaints include:  (1) the second amended complaint against GreenPoint (the "GreenPoint Complaint," GreenPoint ECF Doc. # 20); (2) the first amended complaint against HSBC (the "HSBC Complaint," HSBC ECF Doc. # 27); (3) the second amended complaint against MIG and non-moving defendants Mortgage Investors Group and American Real Estate Corporation (the "MIG Complaint," MIG ECF Doc. # 36); (4) the first amended complaint against Summit (the "Summit Complaint," Summit ECF Doc. # 30); (5) the second amended complaint against Suntrust (the "Suntrust Complaint," Suntrust ECF Doc. # 11); and (6) the second amended complaint against UBS (the "UBS Complaint," UBS ECF Doc. # 33).

time the Trust became the successor in interest to RFC and assignee of RFC's claims.  (*See* "Effective Date Notice," Ch. 11 ECF Doc. # 6137.)

Before the Effective Date, on the Effective Date, and on subsequent dates thereafter, the original actions that would become these Adversary Proceedings were filed by either RFC or the Trust.[6]  In the Complaints, the Plaintiff asserts two claims against each Defendant:  (1) a breach of contract claim for breaches of representations and warranties set forth in the Agreements; and (2) an indemnification claim for liabilities and losses RFC incurred as a result of those breaches. (*Id.*)

The Defendants filed five motions to dismiss individually,[7] and one motion to dismiss collectively (the "Defendants' Motion," Central ECF Doc. # 18).[8]  In response, the Plaintiff filed oppositions to each of the motions,[9] and the Defendants filed replies.[10]  The Court took the motions under submission following oral argument (the "Hearing").

---

[6]    The actions against Suntrust and UBS were commenced by RFC on the Effective Date.

[7]    Specifically, the Defendants' individual motions to dismiss were filed by (1) GreenPoint and Summit (the "GreenPoint/Summit Motion," Central ECF Doc. # 13); (2) HSBC (the "HSBC Motion," HSBC ECF Doc. # 31); (3) MIG (the "MIG Motion," MIG ECF Doc. # 21); (4) Suntrust (the "Suntrust Motion," Suntrust ECF Doc. # 19); and (5) UBS (the "UBS Motion," UBS ECF Doc. # 45).  The UBS Motion is supported by the declaration of Robert A. Fumerton (the "Fumerton Declaration," UBS ECF Doc. # 46).

[8]    The Defendants' Motion is supported by the declarations of N. Mahmood Ahmad (the "Ahmad Declaration," Central ECF Doc. # 17) and Theodore Snyder (the "Snyder Declaration," Central ECF Doc. # 14).

[9]    The oppositions include (1) the "GreenPoint/Summit Opposition," Central ECF Doc. # 30; (2) the "HSBC Opposition," HSBC ECF Doc. # 34; (3) the "MIG Opposition," MIG ECF Doc. # 24; (4) the "Suntrust Opposition," Suntrust ECF Doc. # 24; (5) the "UBS Opposition," UBS ECF Doc. # 54; and (6) the opposition to the Defendants' Motion (the "Plaintiff's Opposition," Central ECF Doc. # 29).  The Plaintiff's Opposition is supported by the declaration of Isaac Nesser (the "Nesser Declaration," Central ECF Doc. # 31).

[10]    The reply briefs include (1) the "GreenPoint/Summit Reply," Central ECF Doc. # 39; (2) the "HSBC Reply," HSBC ECF Doc. # 35; (3) the "MIG Reply," MIG ECF Doc. # 25; (4) the "Suntrust Reply," Suntrust ECF Doc. # 25; (5) the "UBS Reply," UBS ECF Doc. # 55; and (6) the reply memorandum of law in support of the Defendants' Motion (the "Defendants' Reply," Central ECF Doc. # 39).  The Defendants' Reply is supported by the supplemental declaration of N. Mahmood Ahmad (the "Ahmad Supplemental Declaration," Central ECF Doc. # 38).

After the Hearing the Plaintiff and HSBC stipulated that the Plaintiff may amend the

HSBC Complaint; this resolved HSBC's individual motion to dismiss.[11]  (*See* HSBC ECF Doc. #

37.)  The Plaintiff also filed a motion for leave to amend the MIG Complaint to add two

defendants related to MIG (MIG ECF Doc. # 27).  The Court granted the motion to amend (MIG

ECF Doc. # 35), rendering MIG's individual motion to dismiss, which was premised on the

Plaintiff's failure to sue the appropriate MIG entity, moot.  Accordingly, only four motions to

dismiss remain pending before the Court:  (1) the Defendants' Motion; (2) the

GreenPoint/Summit Motion; (3) the Suntrust Motion; and (4) the UBS Motion.

### C.    The Motions to Dismiss

#### 1.    *The Defendants' Motion*

The Defendants collectively move to dismiss for failure to state a claim pursuant to Rule

12(b)(6) of the Federal Rules of Civil Procedure (the "Federal Rules"), asserting three primary

bases.  First, the Defendants contend that the Plaintiff's indemnification claims are barred by

controlling Second Circuit precedent and Minnesota and New York law because they seek

indemnification for liabilities arising from the settlement of securities or fraud claims against

RFC.  (Defs.' Mot. at 2–3, 15.)  Second, the Defendants argue that the Plaintiff's breach of

contract claims are untimely under Delaware's three-year statute of limitations, which the

Defendants contend is applicable here under New York's borrowing statute.  (*Id.* at 3.)

According to the Defendants, RFC acquired virtually all of the loans in dispute before May 14,

2009—three years before RFC filed for chapter 11—rendering the claims time-barred and

precluding any arguable tolling resulting from RFC's bankruptcy filing.  (*Id.* at 4.)  The

Defendants further argue that the Minnesota Court dismissed the Plaintiff's claims as untimely in

---

[11]      While this stipulation provides that the Plaintiff may file an attached second amended complaint (*see*
HSBC ECF Doc. # 37), the Plaintiff has not yet filed a second amended complaint against HSBC.

similar cases, and such determinations collaterally estop the Plaintiff from asserting otherwise. (*Id.*) Finally, the Defendants contend that the Plaintiff's claims fail to satisfy the pleading requirements set forth in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). (*Id.*)

2. *The GreenPoint/Summit Motion*

GreenPoint and Summit move to dismiss on two grounds. First, they argue that the Trust, as successor to RFC, lacks standing to assert claims based on the securitized loans, as RFC validly assigned its rights to sue with respect to such loans.[12] (GreenPoint/Summit Mot. at 1.) Second, they contend that the GreenPoint Agreement contains a "sole remedy" provision governing claims of breaches of representations and warranties, which "limits [P]laintiff's remedy to performance under a repurchase protocol set forth in the contract." (*Id.* at 2.) Accordingly, GreenPoint and Summit assert that the Plaintiff's monetary damages claims should be dismissed, as precluded by this "sole remedy" provision. (*Id.*)

3. *The Suntrust Motion*

Suntrust moves to dismiss for lack of subject matter jurisdiction and failure to state a claim pursuant to Federal Rules 12(b)(1) and (6). (Suntrust Mot. at 1.) Additionally, Suntrust moves to strike the Suntrust Complaint pursuant to Federal Rule 12(f). (*Id.*) Suntrust makes four arguments. First, Suntrust contends that RFC lacked standing to commence the Adversary Proceeding against Suntrust because RFC had already assigned its rights to the Trust at that time, and in turn the Trust lacks standing to maintain the action against it. (*Id.*) According to Suntrust, RFC's attempt to name the Trust as the plaintiff in the Adversary Proceeding, in place of RFC, is a nullity. (*Id.*) Second, Suntrust contends that RFC failed to satisfy the Client Guide's

---

[12] While the GreenPoint/Summit Motion only pertains to the Plaintiff's claims with respect to securitized loans, GreenPoint and Summit reserve their rights to seek dismissal with respect to loans that were not securitized at a later stage of these proceedings. (*Id.* n.1.)

condition precedent to filing the Adversary Proceeding, requiring the provision of written notice

to Suntrust of representation and warranty breaches  (*Id.* at 7.)  Third, Suntrust argues that the

Plaintiff's indemnification claims must be dismissed because, aside from a $5 million payment

made to repurchase certain loans, RFC has not and will not sustain any out-of-pocket losses and

has been fully discharged from any and all claims against it.  (*Id.* at 8.)  Fourth, Suntrust argues

that the Suntrust Complaint must be stricken because it was filed without leave of the Court after

the case management and scheduling order deadline for amendments passed and unilaterally

named a new party—the Trust—as the Plaintiff.  (*Id.* at 10.)

        *4.*       *The UBS Motion*

UBS argues that the Adversary Proceeding against UBS should be dismissed for four

reasons.  First, like Suntrust, UBS contends that the Plaintiff lacks standing because RFC had

already assigned its rights to bring the claims to the Trust at the time the Adversary Proceeding

was commenced.  (UBS Mot. at 1.)  Second, UBS argues that the Plaintiff is collaterally

estopped from arguing that its claims are adequately pled.  (*Id.*)  According to UBS, the UBS

Complaint asserts claims relating to approximately 2,200 loans, but alleges specific breaches

with respect to only six loans.  (*Id.*)  Third, UBS contends that the Plaintiff failed to satisfy

certain conditions precedent to bringing the Adversary Proceeding, including the requirement

that RFC provide prompt written notice of a breach of a warranty or representation to UBS, who

then must be afforded an opportunity to cure such breach.  (*Id.* at 2.)  Finally, UBS argues that

the Plaintiff failed to adequately provide notice of third party claims allegedly requiring

indemnification, and therefore the Plaintiff's indemnification claim against UBS must be

dismissed.  (*Id.*)

## II.      DISCUSSION

### A.      Standing

The Court first addresses the Defendants' standing arguments because "[w]hen a claimant lacks standing, a court has no subject matter jurisdiction over the case." *Schachter v. U.S. Life Ins. Co. in City of N.Y.*, 77 F. App'x 41, 42 (2d Cir. 2003) (citation omitted). Two groups of Defendants challenge the Plaintiff's standing on separate grounds. Suntrust and UBS argue that RFC had already assigned its rights against them to the Trust on the date the original complaints were filed and therefore, the Trust lacks standing to maintain RFC's defectively commenced actions. (Suntrust Mot. at 2–5; UBS Mot. at 5–6.) GreenPoint, Summit, and Suntrust argue that the Plaintiff lacks standing to assert claims based on securitized loans because RFC assigned all of its rights, including the right to sue the Defendants, relating to such loans to third parties. (GreenPoint/Summit Mot. at 1; Suntrust Mot. at 6–7.) For the reasons that follow, the Court finds that the Plaintiff has adequately alleged standing to bring and maintain these Adversary Proceedings. Therefore, the Defendants' motions to dismiss for lack of standing are **DENIED**.

### 1.      *The Plaintiff's Standing as Successor to RFC*

Suntrust and UBS contend that the Plaintiff lacks standing because RFC had already assigned its rights to bring the claims against them to the Trust at the time RFC commenced the actions against Suntrust and UBS. (Suntrust Mot. at 2–5.)[13] According to Suntrust and UBS, RFC filed the original complaints against them on December 17, 2013, the Effective Date of the Debtors' Plan, thereby assigning all rights to pursue these claims to the Trust. (*See id.*) Suntrust and UBS argue that the Confirmation Order provides that on the Effective Date, the Trust had

---

[13]      Because the constitutional standing arguments are largely identical to the arguments made by UBS, citations are made solely to the Suntrust Motion.

"the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action." (*Id.* at 3 (emphasis omitted) (citing Conf. Order ¶ 49).) Because the Trust had the exclusive right to bring the causes of action against Suntrust and UBS as of the Effective Date, they argue, RFC did not have the capacity to commence the cases and the Adversary Proceedings should therefore be dismissed. (*Id.* at 4.) As such, Suntrust argues that "RFC's lack of standing is a jurisdictional defect that cannot be remedied." (*Id.* at 5 (citation omitted).)

The Plaintiff argues that it has standing to pursue the Adversary Proceedings because the Trust succeeded to RFC's claims against the Defendants after the original complaints against Suntrust and UBS were filed. (*See* Suntrust Opp. at 2.)[14] The plain language of the Plan provides that "the transfer of RFC's claims was to be made '[o]n the Effective Date, . . . in the form thereof existing on such date.'" (*Id.* (citing Plan, art. VI(C)).) Moreover, the provision of the Confirmation Order granting the Trust the "exclusive right" to initiate causes of action against the Defendants applied only after those causes of action had been transferred to the Trust on the Effective Date (*id.* (citing Conf. Order ¶ 49; Plan, art. I(A)(176); Plan Ex. 13 at 33)), and "the Plan and Confirmation Order allowed flexibility as to the timing of transfers '[o]n and after the Effective Date'" (*id.* (quoting Conf. Order ¶ 24)). Specifically, the Plaintiff asserts that the Plan provides for transfers *after* the Effective Date where transfer on the Effective Date was "impractical or inadvisable" (*id.* n.5 (citing Plan, art. VI(C))), and the Confirmation Order sets forth that the transfers will be made to the Trust "on the Effective Date, or as soon as reasonably practicable thereafter . . ." (*id.* (citing Conf. Order ¶ 24)). Accordingly, the Plaintiff argues that RFC's claims transferred to the Trust include the original complaints filed on the Effective Date

---

[14]     Because the constitutional standing arguments cited herein are largely identical to the arguments made in response to UBS, citations are made solely to the Suntrust Opposition.

(*id.* at 2), and "no further action was required to substitute in the Trust" pursuant to Federal Rule 25(c) (*id.* at 3). Alternatively, the Plaintiff argues that even if RFC's causes of action were not transferred to the Trust after the original complaints were filed, Federal Rule 17(a) permits the substitution of the Trust as the proper plaintiff to cure any standing deficiency. (*See id.*)

Federal Rule 12(b)(1) provides for dismissal of a case for lack of subject matter jurisdiction "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing FED. R. CIV. P. 12(b)(1)). "Article III of the Constitution limits the jurisdiction of federal courts to the resolution of 'cases' and 'controversies.'" *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008) (citing U.S. CONST. art. III, § 2). "In order to ensure that this 'bedrock' case-or-controversy requirement is met, courts require that plaintiffs establish their 'standing' as 'the proper part[ies] to bring' suit." *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)); *see Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12 Civ. 0722 (PAE), 2012 WL 4849146, at *3 (S.D.N.Y. Oct. 12, 2012) ("Standing is a proper ground upon which to challenge a court's subject matter jurisdiction . . . ." (citations omitted)).

While a plaintiff has the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists, *Makarova*, 201 F.3d at 113 (citing *Malik v. Meissner*, 82 F.3d 560, 562 (2d Cir. 1996)), a court resolving a motion to dismiss for lack of subject matter jurisdiction "may refer to evidence outside the pleadings," *id.* (citing *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)). "In a bankruptcy-related proceeding, the terms of a confirmed plan of reorganization are binding on parties to the plan and should be considered by a court when deciding a motion to dismiss." *Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80, 88 (S.D.N.Y. 2008) (citation omitted), *aff'd*, 379 F. App'x 10 (2d Cir. 2010). However,

as a plaintiff's "standing is to be determined as of the commencement of suit," *Fenstermaker v. Obama*, 354 F. App'x 452, 455 n.1 (2d Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 571 n.5 (1992)), "courts cannot consider any amendments to the initial complaint or any post-filing assignments to plaintiffs to determine whether plaintiffs have standing" *Clarex*, 2012 WL 4849146, at *4 (citing *Fenstermaker*, 354 F. App'x at 455 n.1).  Whether RFC had standing to bring the complaint against Suntrust and UBS on the Effective Date thus requires resolving the threshold issue of when RFC's assignment of its rights to sue to the Trust took effect.

The parties do not dispute that two events occurred on the Effective Date:  RFC filed complaints against Suntrust and UBS, and the Trust succeeded to RFC's rights to assert the claims alleged in those complaints.  No party has presented the Court, however, with evidence establishing the chronological sequence of these events.  The Effective Date Notice was filed on December 17, 2013 at approximately 4:15 p.m.  (*See generally* Ch. 11 ECF Doc. # 6137.)  The Effective Date Notice indicates that "[o]n December 17, 2013, pursuant to the satisfaction of the conditions set forth in Article X.B of the Plan, the Effective Date of the Plan occurred, and the Plan was substantially consummated."  (*Id.* ¶ 2.)  The original complaints filed against Suntrust and UBS indicate that they were filed on December 17, 2013, but there is no indication of the time at which they were filed on that date.  (*See* Suntrust ECF Doc. # 1; UBS ECF Doc. # 1-2, Ex. A.)  The documents presented to the Court thus provide little guidance for determining whether RFC had assigned the applicable causes of action to the Trust prior or subsequent to filing the original complaints against Suntrust and UBS.

Assuming, without deciding, that the applicable causes of action were transferred to the Trust before RFC commenced the actions against Suntrust and UBS, dismissal is not warranted

under the circumstances.  *See Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11,

19–21 (2d Cir. 1997) (holding that district court erred by dismissing action brought by purported

assignee of shareholders' claims on the basis that such assignment was defective, because "leave

to file the proposed amended complaint substituting the selling shareholders as plaintiffs to

pursue their own claims should have been granted under Rule 17(a)"); *see also In re Vivendi

Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 570, 584 (S.D.N.Y. 2009) ("*Advanced Magnetics*

stands for the proposition that a standing defect at the commencement of suit does not require

dismissal of the action with prejudice.").  Federal Rule 17(a) provides that "action[s] must be

prosecuted in the name of the real party in interest." FED. R. CIV. P. 17(a)(1).  Federal Rule 17(a)

also sets forth that a "court may not dismiss an action for failure to prosecute in the name of the

real party in interest until, after an objection, a reasonable time has been allowed for the real

party in interest to . . . be substituted into the action." *Id.* 17(a)(3).  After the real party in interest

is so substituted, "the action proceeds as if it had been originally commenced by the real party in

interest." *Id.*  Although a court may "dismiss an action where there was no semblance of any

reasonable basis for the naming of an incorrect party, there plainly should be no dismissal where

substitution of the real party in interest is necessary to avoid injustice." *Advanced Magnetics*,

106 F.3d at 20 (citations and internal quotation marks omitted).  The Second Circuit has further

dictated that "[a] Rule 17(a) substitution of plaintiffs should be liberally allowed when the

change is merely formal and in no way alters the original complaint's factual allegations as to the

events or the participants." *Id.*

    For example, in *Advanced Magnetics*, on appeal from a judgment dismissing certain

shareholder claims brought by an alleged assignee on the basis that the assignments of the claims

were not valid, the Second Circuit held that the district court erred by failing to grant the alleged

assignors' request for substitution pursuant to Federal Rule 17(a). *See id.* at 21. The Second

Circuit found that "[t]he complaint's only pertinent flaw was the identity of the party pursuing

those claims, and the proposed amended complaint . . . was, except for naming the [alleged

assignors] as the plaintiffs on their own claims, virtually identical to the original complaint." *Id.*

at 20. Noting that the plaintiff's defective standing arose from a legal mistake, there was no

evidence of the plaintiff's bad faith or intent to deceive or prejudice the defendants, and the

substitution would not be unfair to the defendants, the Second Circuit held that the alleged

assignors should have been granted leave for substitution under Federal Rule 17(a). *See id.* at

20–21.

As in *Advanced Magnetics*, substitution of the Trust as the real party in interest to pursue

these Adversary Proceedings is appropriate. First, even if RFC lacked standing to file the

original complaints against Suntrust and UBS, such defective standing would constitute an

honest mistake, since there is no indication that RFC or the Plaintiff acted in bad faith. *See id.* at

20 ("There plainly was a mistake as to the legal effectiveness of the documents to permit

[plaintiff] to sue as assignee. However, . . . we have been pointed to no evidence that would

indicate that the attempted assignments were undertaken in bad faith or in an effort to deceive or

prejudice the defendants."); *Wiwa v. Royal Dutch Petroleum Co.*, 2009 WL 464946, at *10

(S.D.N.Y. Feb. 25, 2009) ("Attorneys' mere ignorance, incompetence, or lack of diligence need

not preclude granting joinder." (citations omitted)). Additionally, the Court finds that neither

Suntrust nor UBS would be prejudiced by the substitution of the Trust as Plaintiff. The original

complaints filed by RFC provided Suntrust and UBS with sufficient notice of the claims against

them. *See Wiwa*, 2009 WL 464946, at *10 ("Where defendants had notice in the original

complaint of the nature of the claims against them, joinder does not unfairly prejudice them.").

The complaints were subsequently twice amended by the Trust, and both the Suntrust Complaint and the UBS Complaint now name the Trust as the Plaintiff.  (*See* Suntrust ECF Doc. # 11 (second amended complaint adding the Trust as the Plaintiff); UBS ECF Doc. # 33 (same).)

Suntrust argues that the Suntrust Complaint, which includes the amendments, is a "nullity" because it was filed on August 8, 2014, after the July 24, 2014 deadline for amendments set forth in the Court's second case management and scheduling order (the "Second CMO," Central ECF Doc. # 9) and without leave of this Court.[15]  (Suntrust Mot. at 2.) Additionally, the amendment not only "unilaterally changed" the Plaintiff to the Trust, but also "doubled the number of Loans at issue . . . ."[16]  (*Id.*)

Suntrust is correct that the Plaintiff technically contravened the language of the Second CMO by filing the Suntrust Complaint after the applicable deadline for amendments had passed. (*See* Second CMO, ¶ 3 (establishing July 24, 2014 as the deadline for filing amendments to complaints).)  "[O]nce a scheduling order has been entered in an action, which sets a deadline for amending a complaint, Rule 16(b) governs motions for leave to amend."  *Rapture Shipping Ltd. v. Allround Fuel Trading Chemoil B.V.*, No. 03 Civ. 738 (JFK), 2006 WL 3057294, at *2 (S.D.N.Y. Oct. 27, 2006) (citation omitted).  Pursuant to Federal Rule 16(b), a scheduling order "may be modified only for good cause and with the judge's consent."  FED. R. CIV. P. 16(b).  "To show good cause within the meaning of Rule 16(b), a party must demonstrate that the scheduling

---

[15]    The action against Suntrust was transferred to this Court from the district court after the entry of the First CMO.  (*See* CMO 2 at 4.)  Accordingly, the First CMO was made applicable to the Adversary Proceeding against Suntrust by CMO 2.  (*See id.*)

[16]    Suntrust first objected to the filing of the Suntrust Complaint and previewed its standing arguments in an August 11, 2014 letter to the Court.  (*See* Suntrust ECF Doc. # 12 at 1–3.)  The Trust responded in an August 17, 2014 letter, arguing that Suntrust was not prejudiced by the timing of the filing, because (1) the July 24, 2014 amendment deadline in the Second CMO did not apply to Suntrust because the deadline expired before the Suntrust action was transferred to this Court; (2) counsel to the Trust emailed Suntrust's counsel before the Second CMO was extended to Suntrust, anticipating that the issue concerning the filing of the Suntrust Complaint would be resolved, but Suntrust's counsel never replied; and (3) the Suntrust Complaint was filed just four days after entry of the Second CMO and eight days after the Adversary Proceeding against Suntrust had been commenced.  (*See* Suntrust ECF Doc. # 14 at 1.)

deadline could not be met despite the moving party's diligence. *Rapture Shipping*, 2006 WL 3057294, at *2 (citing *Grochowski v. Phoenix Constr.*, 318 F.3d 80, 86 (2d Cir. 2003)). Since the Suntrust Adversary Proceeding was commenced in this Court after the deadline for amendments had expired, it would have been impossible for the Plaintiff to amend its complaint any earlier than July 30, 2014, the date on which the Suntrust Adversary Proceeding was initiated. Furthermore, the Plaintiff filed the Suntrust Complaint eight days after the commencement of the Suntrust Adversary Proceeding.

The Court therefore finds that the Trust has shown good cause to file the Suntrust Complaint after the deadline set forth in the Second CMO. Additionally, the Court grants leave to substitute the Trust as the Plaintiff in the Adversary Proceedings against Suntrust and UBS, as the Trust is the real party in interest. The motions to dismiss the Adversary Proceedings against Suntrust and UBS for lack of standing are **DENIED**.

> 2.    *The Plaintiff's Standing to Assert Claims Relating to Securitized Loans*

GreenPoint, Summit, and Suntrust argue that the Plaintiff has no standing to assert claims based on securitized loans because RFC assigned all rights in the loans to third parties in connection with the securitization process. (GreenPoint/Summit Mot. at 1; Suntrust Mot. at 6–7.) According to these Defendants, the applicable contracts with RFC authorized RFC to assign its rights with respect to any loan. (GreenPoint/Summit Mot. at 3; *see* Suntrust Mot. at 6.) RFC purchased loans from these Defendants and thereafter securitized and transferred the loans to other entities. (GreenPoint/Summit Mot. at 4; Suntrust Mot. at 6–7.) During this securitization process, RFC assigned its interests in the loans to Residential Accredit Loans, Inc. ("RALI"), which thereafter assigned the loans to the trustee of a securitization trust pursuant to the terms of relevant pooling and servicing agreements. (GreenPoint/Summit Mot. at 5; *see* Suntrust Mot. at

7.)  GreenPoint and Summit reference a document publicly filed with the Securities and

Exchange Commission (the "SEC"), purportedly evidencing RFC's assignment of its rights in

certain securitized loans to RALI.[17]  (*See* GreenPoint/Summit Mot. at 4 (citing Snyder Decl. Ex.

A).)  The assignment provides:  "Concurrently with the execution and delivery hereof, RFC

hereby assigns to [RALI] without recourse all of its right, title and interest in and to the

Mortgage Loans, . . . ."  (*Id.* (citing Snyder Decl. Ex. A, ¶ 2).)  GreenPoint and Summit argue

that this language—purportedly identical to language contained in other publicly filed

assignment agreements relating to securitized loans—establishes RFC's assignment of its rights

to assert claims relating to securitized loans against the Defendants.  (*See id.* at 5.)

The Plaintiff contends that the Defendants' motions are procedurally improper, as they

each rely on one allegedly exemplary assignment agreement not included in the Plaintiff's

pleadings to establish that RFC assigned away all its rights against the Defendants with respect

to all securitized loans.  (GreenPoint/Summit Opp. at 2; Suntrust Opp. at 5–6.)  Moreover, the

Plaintiff argues that the RFC did not actually assign its rights to pursue the claims against these

Defendants pursuant to such agreements or to any similarly-phrased agreements.

(GreenPoint/Summit Opp. at 4 (citing Snyder Decl. Ex. A); Suntrust Opp. at 6 (citation

omitted).)  The Plaintiff argues that under these and similar agreements, RFC only assigned to

the applicable securitization trusts its rights in each applicable mortgage loan transaction "in the

typical sense of that term," not RFC's rights under the Client Guide.  (GreenPoint/Summit Opp.

at 5; Suntrust Opp. at 6.)  Additionally, the language in these and similar agreements expressly

reserves RFC's rights to the representations it received from the Defendants and the right to

---

[17]        Suntrust also references a similar assignment agreement publicly filed with the SEC.  (*See* Suntrust Mot.
at 7 (citation omitted).)

pursue remedies upon the Defendants' breach.  (GreenPoint/Summit Opp. at 6; Suntrust Opp. at 6–7.)

In *Community West Bank*, a similar case commenced by RFC against a mortgage loan seller, the Minnesota Court rejected the defendants' argument that RFC lacked standing to assert the claims at issue because it had assigned its rights in the underlying loans to third parties in connection with the securitization process.  *See Cmty. W. Bank*, 2014 WL 5207485, at *11.  The court denied the defendants' motion to dismiss for lack of standing, finding that RFC had satisfied its pleading burden with respect to standing.  *Id.*  Noting that the defendants, as here, relied on securitization agreements publicly filed with the SEC, the court held that the "securitization agreements [we]re not necessarily embraced by the pleadings, and therefore [did] not consider them" in ruling on the motion to dismiss.  *Id.*  The court stated, in dicta, that even if it "were to consider the third-party agreements, [it] would conclude that they raise factual issues that are not properly resolved at [such] pleading stage."  *Id.* at *12 (declining to hold as a matter of law that language referenced by defendant "as an example of the assignments[] deprives RFC of standing to assert rights under the Agreements").

This Court likewise concludes that the Plaintiff has adequately alleged standing to assert its rights against the Defendants with respect to securitized loans.  The Plaintiff's claims against the Defendants are based on alleged breaches of representations and warranties of the Agreements; other than asserting that the terms of the Agreements permit RFC to assign its rights with respect to securitized loans, the Defendants do not identify any portions of the Complaints or the documents embraced by the pleadings that refer to any assignment agreements RFC entered into with third parties.  Instead, the Defendants rely on a few publicly filed assignment agreements referenced in their motions to dismiss to argue that RFC transferred all

rights in securitized loans to third parties. *See Cmty. W. Bank*, 2014 WL 5207485, at *11 (finding that publicly filed assignment agreements purportedly establishing RFC's assignment of claims relating to securitized loans were not "necessarily embraced by the pleadings," where "Defendants ha[d] not pointed to any other provisions of RFC's complaints that arguably relate to the securitization agreements"). Additionally, the Defendants rely on the assignment agreements referenced in their motions to dismiss to prove a factual issue—that RFC assigned all of its interests in securitized loans, including the right to bring these claims, to third parties. While the Court is not prohibited from considering "legally required public disclosure documents filed with the SEC" in ruling on motions to dismiss, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)), consideration of such documents is limited to ascertaining "'what the documents stated,' and 'not to prove the truth of their contents,'" *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (emphasis omitted) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)).

At this stage in the Adversary Proceedings, the Court cannot conclude that the allegedly exemplar assignment agreements referenced by the Defendants establish that RFC transferred its rights in securitized loans to third parties. The terms of the assignment agreements relied upon by the Defendants do not unambiguously establish RFC's assignment of its claims relating to securitized loans, therefore raising a factual issue about the interpretation of such terms. *See Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 56 (2d Cir. 2012) ("[I]n the context of a motion to dismiss, 'if a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state [a] claim.'" (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d

168, 178 (2d Cir. 2004))).  Accordingly, the motions to dismiss the Plaintiff's claims relating to

securitized loans for lack of standing are **DENIED**.

### B.      Federal Rule 12(b)(6) Motion to Dismiss Standard

To survive a motion to dismiss under Federal Rule 12(b)(6), made applicable here by

Rule 7012 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), a complaint

need only allege "enough facts to state a claim for relief that is plausible on its face." *Vaughn v.*

*Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (emphasis omitted) (citing *Iqbal*,

556 U.S. at 678).  "Where a complaint pleads facts that are merely consistent with a defendant's

liability, it stops short of the line between possibility and plausibility of entitlement to relief."

*Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).  Plausibility "is not akin to

a probability requirement," but rather requires "more than a sheer possibility that a defendant has

acted unlawfully."  *Id.* (citation and internal quotation marks omitted).

Courts use a two-prong approach when considering a motion to dismiss.  *Pension Benefit*

*Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,

712 F.3d 705, 717 (2d Cir. 2013) (stating that motion to dismiss standard "creates a 'two-

pronged approach' . . .  based on '[t]wo working principles'" (quoting *Iqbal*, 556 U.S. at 678–

79)); *McHale v. Citibank, N.A. (In re 1031 Tax Grp., LLC)*, 420 B.R. 178, 189–90 (Bankr.

S.D.N.Y. 2009) ("Following the Supreme Court's recent decision in *Ashcroft v. Iqbal*, courts use

a two-prong approach when considering a motion to dismiss." (citations omitted)).  First, the

court must accept all factual allegations in the complaint as true, discounting legal conclusions

clothed in factual garb.  *See, e.g.*, *Iqbal*, 556 U.S. at 677–78; *Kiobel v. Royal Dutch Petroleum*

*Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded,

nonconclusory factual allegations in the complaint to be true" (citing *Iqbal*, 556 U.S. at 678)).

Second, the court must determine if these well-pleaded factual allegations state a "plausible

claim for relief." *Iqbal*, 556 U.S. at 679 (citation omitted).

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

(citation omitted). A claim is plausible when the factual allegations permit "the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citation

omitted). A complaint that pleads only facts that are "merely consistent with a defendant's

liability" does not meet the plausibility requirement. *Id.* (quoting *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 557 (2007)) (internal quotation marks omitted). "A pleading that offers 'labels

and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.*

(quoting *Twombly*, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Id.* (citation omitted). "The pleadings

must create the possibility of a right to relief that is more than speculative." *Spool v. World

Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citing *ATSI Commc'ns*, 493 F.3d

at 98).

## C.    Conditions Precedent

Suntrust and UBS argue that RFC failed to satisfy required conditions precedent to bring

the claims against them, including the requirement that RFC must provide these Defendants with

written notice of their alleged breaches, as set forth in the applicable Agreements. (*See* Suntrust

Mot. at 7; UBS Mot. at 2 (setting forth that the UBS Agreement also required RFC to provide

UBS an opportunity to cure any alleged breach before commencing suit).) The Plaintiff

contends that it adequately pled that all conditions precedent have been satisfied in accordance

with Federal Rule 9(c). (*See* Suntrust Opp. at 1; UBS Opp. at 1.)

Federal Rule 9(c) provides that "[i]n pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed." FED. R. CIV. P. 9(c). Only the denial of the occurrence or performance of a condition precedent must be made with particularity. *See id.* Courts in the Second Circuit are largely in agreement that "a general allegation that all conditions precedent have been met . . . is sufficient to satisfy Rule 9(c)." *Beautiful Home Textiles (USA), Inc. v. Burlington Coat Factory Warehouse Corp.*, No. 13 Civ. 1725 (LGS), 2013 WL 3835191, at *3 (S.D.N.Y. July 25, 2013) (citing *Mendez v. Bank of Am. Home Loans Servicing, LP*, 840 F. Supp. 2d 639, 648 (E.D.N.Y. 2012) (collecting cases)); *see Ackerly Media Grp., Inc. v. Sharp Elecs. Corp.*, 170 F. Supp. 2d 445, 453 (S.D.N.Y. 2001) (noting that while no Second Circuit decision has directly addressed the issue, "other circuits have made clear long ago that a general averment of performance is sufficient to withstand a motion to dismiss" (citing *Fitz-Patrick v. Commonwealth Oil Co.*, 285 F.23d 726, 729 (5th Cir. 1960); *Topping v. Fry*, 147 F.2d 715, 718 (7th Cir. 1945))); *Nov Int'l, Inc. v. Am. Express Bank, Ltd.*, No. 94 CIV. 8536 (DC), 1996 WL 39317, at *6 (S.D.N.Y. Jan. 31, 1996) ("[Plaintiff]'s general statement that it satisfied all conditions precedent is sufficient to overcome [defendant]'s motion to dismiss." (citing 5 Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1303 (1990))).

Suntrust argues that the *Iqbal*/*Twombly* pleading standards apply to Federal Rule 9(c), and therefore the Plaintiff must allege more than a general statement that all conditions precedent have been satisfied. (Suntrust Reply at 5 n.15 (quoting *Napster, LLC v. Rounder Records Corp.*, 761 F. Supp. 2d 200, 208–09 (S.D.N.Y. 2011) ("The cases Napster cites holding that FED. R. CIV. P. 9(c) 'requires no more than a general statement by a plaintiff that all conditions precedent have been satisfied to successfully make out a claim' all predate *Twombly* and *Iqbal*.

Accordingly, Napster's claim for breach of the 2006 Agreement is dismissed for failure to

comply with the advance-consent provision." (citations omitted))).)  However, as the Third

Circuit recently held in *Hildebrand v. Allegheny County*, 757 F.3d 99, 112 (3d Cir. 2014), the

*Iqbal/Twombly* pleading standard applies to Federal Rule 8(a) not 9(c).  *Id.* ("Neither *Iqbal* nor

*Twombly* purport to alter Rule 9.  We see no indication that those cases sought to override the

plain language of Rule 9(c), and we therefore conclude that the pleading of conditions precedent

falls outside the strictures of *Iqbal* and *Twombly*.").

Given the liberal pleading standards of Rule 9(c), the Plaintiff has adequately alleged the

satisfaction of all conditions precedent.[18]  (*See* ECF Doc. # 11, ¶¶ 35, 80; ECF Doc. # 33, ¶¶ 30,

85)  Accordingly, the motions to dismiss on the basis of inadequate pleading under Federal Rule

9(c) are **DENIED**.

### D.    Sole Remedy Provisions

GreenPoint argues that subsection 9.3 of the GreenPoint Agreement sets forth the

Plaintiff's sole remedies for breaches of the representations and warranties made therein.  (*See*

GreenPoint/Summit Motion at 6 ("It is understood and agreed that the obligations of the Seller

set forth in this Subsection 9.3 to cure, repurchase or substitute for a defective Mortgage Loan

and to indemnify the Purchaser and Successor Servicer . . . constitute the sole remedies of the

Purchaser and Successor Servicer respecting a breach of the foregoing representations and

warranties." (quoting GreenPoint MLPWA §9.3)).)  According to GreenPoint, this "sole

---

[18]     UBS also argues that the Plaintiff's indemnification claim should be dismissed because RFC failed to
provide UBS notice of third-party claims.  (*See* UBS Motion at 9.)  As a preliminary matter, the Plaintiff also alleges
that the Defendants failed to notify RFC of loan defects, thereby breaching their representations and warranties.
(*See, e.g.*, HSBC Compl. ¶¶ 23(b), 83–85.)  The alleged pleading deficiency of RFC's failure to provide notice to
UBS or any other Defendant is satisfied by the Plaintiff's allegation that all conditions precedent have been satisfied
and, in any event, the parties' competing allegations of deficient notice requires fact-finding not appropriate in
ruling on a motion to dismiss.  Accordingly, this argument fails.

remedy" provision in the GreenPoint Agreement bars the Plaintiff's claims for monetary damages.  (*See id.* at 9.)

The Plaintiff contends that "courts consistently hold that the sole remedy provision 'permit[s] money damages where repurchase is or may be impossible.'"  (GreenPoint/Summit Opp. at 8–9 (citations omitted)).  According to the Plaintiff, repurchase is impossible because the loans sold by GreenPoint to RFC were thereafter securitized or sold, and therefore money damages may be obtained for claims relating to such loans.  (*Id.* at 9.)  The Plaintiff asserts that its right to seek money damages is consistent with the terms of the GreenPoint Agreement (*id.*), which provides that "[a]ll rights and remedies of [RFC] are distinct from, and cumulative with, any other rights or remedies . . . afforded by law or equity" (*id.* at 10 (citing GreenPoint Agmt. § 17)).

"For a court to grant specific performance, performance by the defendant must be possible."  *Ace Securities Corporation Home Equity Loan Trust, Series 2007-HE3 ex rel. HSBC Bank USA, National Association v. DB Structured Products, Incorporated*, 5 F. Supp. 3d 543, 551 (S.D.N.Y. 2014) (citing *Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 11 Civ. 4062 (JPO), 2013 WL 372149, at *8 (S.D.N.Y. Jan. 31, 2013)).  Because specific performance is an equitable remedy, damages may be awarded in lieu of equitable relief where specific performance is impossible or impracticable.  *Id.* (citation omitted).  Several courts in the Second Circuit have held that a sole remedy provision does not bar a plaintiff from seeking monetary damages where specific performance of the sole remedy provision is impossible.  *See, e.g.*, *id.* at 555–56; *MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Sec. Inc.*, No. 12 Civ. 7322 (HB), 2013 WL 4399210, at *3 (S.D.N.Y. Aug. 15, 2013) ("At this stage, I also decline to foreclose the possibility of awarding damages in lieu of specific performance.

Generally, when specific performance of the agreement is not possible, the parties are left to whatever legal or equitable remedies they may have." (citation and internal quotation marks omitted)).

Whether it is impossible for Plaintiff to repurchase the loans underlying its claims against GreenPoint requires a factual determination not appropriately made at the motion to dismiss stage. *See Rivas Paniagua v. World Airways Inc.*, No. 87 Civ. 0055 (PKL), 1987 WL 5121, at *1 (S.D.N.Y. June 2, 1987) ("The availability of the defense of impossibility . . . clearly depends on factual issues which have yet to be determined and which are not before the Court at this juncture."). Thus, it is premature to rule whether the Plaintiff may be entitled to monetary damages for breaches of representations and warranties made in the GreenPoint Agreement. GreenPoint's motion to dismiss is therefore **DENIED** to the extent it seeks dismissal on the basis that the sole remedy provision of the GreenPoint Agreement bars the Plaintiff's claims.

### E.    Breach of Contract Claims

#### 1.    Timeliness

The Defendants contend that the Plaintiff's breach of contract claims are time-barred because the three-year statute of limitations for breach of contract claims under the laws of Delaware—RFC's state of organization—is applicable under New York's borrowing statute. (*See* Defs.' Mot. at 15–16.) They argue that, even assuming that RFC's bankruptcy filing tolled the applicable statute of limitations, all breach of contract claims relating to loans purchased before May 14, 2009—virtually all subject loans—are untimely. (*Id.* at 17.) Alternatively, the Defendants argue that the Plaintiff's breach of contract claims relating to loans acquired before May 14, 2006 are time-barred because the Agreements contain choice-of-law provisions requiring the application of the six-year statutes of limitations under either Minnesota or New

York law.  (*Id.* at 20.)  As set forth below, the Court **DENIES** in part and **GRANTS** in part the

Defendants' motion to dismiss:  the Plaintiff's claims for loans sold to RFC on or after May 14,

2006 are timely, but Plaintiff's claims relating to loans sold to RFC before May 14, 2006 are

barred as untimely.

A choice of law provision in a contract generally does not govern the applicable statute of

limitations to a cause of action arising out of that contract.  *See Portfolio Recovery Assocs., LLC

v. King*, 927 N.E.2d 1059, 1061 (N.Y. 2010).  "Choice of law provisions typically apply only to

substantive issues, and statutes of limitations are considered procedural because they are deemed

as pertaining to the remedy rather than the right."  *Id.* (citations and internal quotation marks

omitted).  As such, the choice of law provision in the Agreements the Defendants rely on are not

dispositive.  Instead, the Court must look to applicable New York and other states' laws.

New York's borrowing statute is applicable here and provides that:

> An action based upon a cause of action accruing without the state
> cannot be commenced after the expiration of the time limited by
> the laws of either the state or the place without the state where the
> cause of action accrued, except that where the cause of action
> accrued in favor of a resident of the state the time limited by the
> laws of the state shall apply.

N.Y. C.P.L.R. § 202.  Pursuant to this statute, "[w]hen a nonresident sues on a cause of action

accruing outside New York . . . the cause of action [must] be timely under the limitation periods

of both New York and the jurisdiction where the cause of action accrued."  *Global Fin. Corp. v.

Triarc Corp.*, 715 N.E.3d 482, 484 (N.Y. 1999).  New York's borrowing statute prevents forum

shopping by requiring application of the shortest available statute of limitations.  *See Statek

Corp. v. Dev. Specialists, Inc. (In re Coudert Bros. LLP)*, 673 F.3d 180, 190 (2d Cir. 2012).  "If

New York's statute of limitations is shorter than the statute of limitations of the place where the

cause of action accrued, New York courts should apply the local rule; if the foreign statute of

limitations is shorter, then that is what controls." *Id.*

A cause of action accrues when and where the applicable injury occurs. *Global Fin.*

*Corp.*, 715 N.E.2d at 485. "When an alleged injury is purely economic, the place of injury

usually is where the plaintiff resides and sustains the economic impact of the loss." *Id.* (citations

omitted). A limited exception to this rule applies "[w]here a plaintiff maintains a separate

financial base and [] the impact of the financial loss is felt at that location." *Robb Evans &*

*Assocs. LLC v. Sun Am. Life Ins.*, No. 10 Civ. 5999 (GBD), 2012 WL 488257, at *4 (S.D.N.Y.

Feb. 14, 2012) (citation omitted). This exception "applies only in the extremely rare case where

the party has offered unusual circumstances evincing that economic injury occurred at a place

other than the plaintiff's residence." *Id.* (citation omitted).

To determine where a business organization sustains its injury, "'one looks to its state of

incorporation or principal place of business.'" *Cameron v. LR Credit 22, LLC*, 998 F. Supp. 2d

293, 300 (S.D.N.Y. 2014) (citing *Global Fin. Corp.*, 715 N.E.2d at 485). A corporation may

accordingly sustain economic injuries in both its state of incorporation and principal place of

business when those states differ, *see Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d

Cir. 2002) (finding that Nevada corporation with offices in California sustained economic injury

in both states, but refraining from deciding which state's statute of limitations rules apply as both

rules were effectively the same); however, few courts have been faced with deciding which

statute of limitations rules apply where there are conflicting rules among a corporation's state of

incorporation and principal place of business.

"Under the New York borrowing statute, a business's principal place of business

constitutes the sole residency of that business entity." *Woori Bank v. Merrill Lynch*, 923 F.

Supp. 2d 491, 494 (S.D.N.Y. 2013) (citation omitted); *see also BPP Illinois, LLC v. Royal Bank of Scot. Grp., PLC*, No. 13 Civ. 0638 (JMF), 2013 WL 6003701, at *5 (S.D.N.Y. Nov. 13, 2013) (holding that for purposes of applying New York's borrowing statute, "the residence of an LP or LLC is determined not by the citizenship of its members, but rather by the location of its principal office").  When faced with conflicting statutes of limitations among a corporation's state of incorporation and principal place of business, courts applying New York's borrowing statute have found that a cause of action accrues in the place where the economic injury is suffered to a greater extent.  *See, e.g.*, *RSM Prod. Corp. v. Fridman*, No. 06 Civ. 11512 (DLC), 2007 WL 2295897, at *4 (S.D.N.Y. 2007 Aug. 10, 2007) (finding that a Texas corporation with a principal place of business did not sustain tortious interference with contract injuries in its state of incorporation); *Pricaspian Dev. Corp. (Texas) v. Royal Dutch Shell, plc*, No. 08 Civ. 9726 (DLC), 2009 WL 1564110, at *8 (S.D.N.Y. June 3, 2009) ("Since [plaintiff] operates in Colorado, any injuries it sustained took place in Colorado.").

The Defendants argue that the New York borrowing statute "mandate[es] use of the *shortest* statute of limitations available."  (*See* Defs.' Motion at 15 (emphasis in original) (quoting *McCleod v. Travelers Indem. Co.*, No. 12 Civ. 176 (GBD), 2012 WL 5210945, at *1 n.2 (S.D.N.Y. Oct. 19, 2012)) (internal quotation marks omitted).)  This argument mischaracterizes the statute, which only mandates application of the shorter of New York's statute of limitations and the applicable statute of limitations of the state where the claim accrued.  *Global Fin. Corp.*, 715 N.E.2d at 484.  Asserting that the claim accrues in the state with the shortest applicable statute of limitations is a *non sequitur*.

Consistent with New York law, the Court finds that the Plaintiff's breach of contract claims accrued in Minnesota—the state in which RFC had its principal place of business and

where RFC suffered economic injuries (i.e., monetary damages arising out of Defendants'

alleged breaches of the Agreements). The Defendants have not argued that RFC maintained a

separate financial base where it suffered its economic losses. While they argued at the Hearing

that RFC suffered economic injuries in Delaware as a result of the entity's dissolution through

bankruptcy (*see* Nov. 20 Hrg. Tr. 36:20–37:8), this argument is unconvincing.

Because the breach of contract claims accrued in Minnesota, the statute of limitations of

either Minnesota or New York applies for purposes of New York's borrowing statute. Both

states have six-year statutes of limitations for breach of contract claims. *See* MINN. STAT.

§ 541.05(1); N.Y.C.P.L.R. § 213(2). The Court therefore finds that New York's statute of

limitations applies to the Plaintiff's breach of contract claims. *See Stuart v. Am. Cyanamid Co.*,

158 F.3d 622, 627 (2d Cir. 1998) (noting that "New York courts generally apply New York's

statutes of limitations," subject to New York's borrowing statute).

In New York, the limitations period for breach of contract claims begins to run when the

claim accrues, ordinarily upon the breach. *Guilbert v. Gardner*, 480 F.3d 140, 149 (2d Cir.

2007) (citing *Ely-Cruikshank Co. v. Bank of Montreal*, 615 N.E.2d 985, 986 (N.Y. 1993)). The

Plaintiff argues that its claims for all loans—including those sold to RFC before May 14, 2006,

six years before its bankruptcy filing—are timely under the "continuing obligation" doctrine,

pursuant to which the Defendants are required to notify RFC of any defects in the loans sold to

RFC on a continuing basis. (Pl.'s Opp. at 17.) The Plaintiff contends that under Minnesota law,

the Client Guide expressly extends the statute of limitations applicable to the Plaintiff's breach of

contract claims, as the Client Guide provides that RFC's remedies for breach of the applicable

representations and warranties will "continue . . . for the remaining life of the Loans." (*Id.*

at 20.) Additionally, the Plaintiff argues that whether the Defendants had knowledge of any

defects in the loans at issue—an essential point to establishing an affirmative statute of limitations defense—is a factual issue that is not appropriate to resolve on a motion to dismiss. (*Id.* at 19.)

The Defendants argue that the Plaintiff's breach of contract claims premised on loans sold before May 14, 2006 are time-barred. (Defs.' Mot. at 21.) Specifically, the Defendants assert that they have no continuing obligation with respect to the loans sold to RFC, because the Client Guide provides that the representations and warranties made therein "are made *as of each Funding Date* . . . unless the specific representation or warranty provides to the contrary" (*id.* at 17 (emphasis in original) (citing Client Guide § A200, ¶ 4)), and the Plaintiff has not identified any such representation or warranty (*see id.*). Moreover, the Plaintiff has not alleged that the Defendants have acquired any information post-closing that would trigger this obligation. (*See id.* at 18.) According to the Defendants, the Plaintiff essentially argues that equitable estoppel or tolling prevents the Defendants from asserting that the claims are untimely, based on their alleged failure to notify RFC of post-closing loan defects; however, the Plaintiff has failed to adequately invoke equitable estoppel because it has not alleged that the Defendants in any way prevented the Plaintiff from discovering any defects in the loans. (*See id.* at 18–20.) Finally, the Defendants argue that collateral estoppel precludes the Plaintiff from bringing breach of contract claims relating to loans sold before May 14, 2006, because the Minnesota Court has held that identical claims are time-barred in two similar cases.[19] (*See id.* at 22.)

The Plaintiff argues that the Defendants' arguments against the applicability of the continuing obligation doctrine are ineffectual. (Pl.'s Opp. at 21.) First, the Plaintiff argues that

---

[19]    Specifically, the Defendants rely on the Minnesota Court's decisions rendered in *Residential Funding Company, LLC v. Embrace Home Loans, Inc.*, 27 F. Supp. 3d 980 (D. Minn. 2014) and *Residential Funding Company, LLC v. Mortg. Access Corp.*, Civil No. 13-3499 (DSD/FLN), 2014 WL 3577403 (D. Minn. July 21, 2014). (*See* Defs.' Mot. at 22.)

the fact that the Defendants' representations and warranties "[we]re made *as of each Funding Date*" is irrelevant to whether the Defendants breached the applicable contracts on a continuing basis (*id.* (quoting Defs.' Mot. at 17)), because whether the Defendants' breached the Agreements at the time they sold each defective loan to RFC has no bearing on whether the Defendants "also *continually* breached the [Agreements] by failing to notify RFC of those breaches" (*id.* (emphasis in original)).  Second, determining whether the Defendants acquired any information triggering their obligation to inform RFC of loans defects post-closing entails resolving factual questions inappropriately resolved on a motion to dismiss.  (*See id.* at 22.)  According to the Plaintiff, the "Defendants' equitable estoppel argument is a red herring" (*id.*); the Plaintiff does not contend that the Defendants' conduct prevented the timely assertion of claims, but rather it argues that its claims are timely because the applicable terms of the Agreements obligated the Defendants to continuously apprise RFC of material loan defects, which they failed to do (*id.*).  Finally, the Plaintiff contends that they are not collaterally estopped from asserting that their claims relating to loans sold to RFC prior to May 14, 2006 are timely based on two decisions of the Minnesota Court because no final judgment has been entered in those cases, and the Minnesota Court has refused to dismiss such claims as untimely in other cases.[20]  (*Id.* at 23.)

---

[20]    Five different judges in the Minnesota Court have addressed the "continuing obligation" argument in ruling on motions to dismiss:  three judges granted motions to dismiss claims related to loans purchased pre-May 14, 2006, *see Community West Bank*, 2014 WL 5207485, at *8–9 (Tunheim, J.); *Mortgage Access Corp.*, 2014 WL 3577403, at *5 (Doty, J.); *Residential Funding Co. v. Americash*, Civil No. 13-3460 (DSD/JJG), 2014 WL 3577312, at *5 (D. Minn. July 21, 2014) (Doty, J.); *Embrace Home Loans*, 27 F. Supp. 3d at 983–83 (Magnuson, J.), and two denied motions to dismiss such claims, *see Residential Funding Co. v. CTX Mortgage Co.*, Case No. 14-cv-1710 (DSD) (D. Minn. Jan. 23, 2015), ECF Doc. # 64 (Doty, J.); *Stearns Lending*, 2014 WL 4186486, at *5 (Montgomery, J.); *Broadview*, 2014 WL 4104819, at *7 (Montgomery, J.).

Additionally, one judge granted motions to dismiss claims related to loans purchased pre-May 14, 2006 as time-barred without addressing the continuing obligation argument since it was raised for the first time at the hearing and did not give the defendants fair notice of the plaintiff's continuing breach theory.  *See Residential Funding Co. v. Mortgage Outlet, Inc.*, Case Nos. 13-CV-3447 (PJS/JSM), 2014 WL 4954645, at *5 (D. Minn. Oct. 1, 2014).

For the reasons explained in the text, this Court is not bound by any of these decisions.

As a preliminary matter, the Court agrees that collateral estoppel does not apply to the

Plaintiff's breach of contract claims.  Because the earlier decisions on which the Defendants rely

were diversity cases rendered by the Minnesota Court, Minnesota preclusion law applies.  *Taylor

v. Sturgell*, 553 U.S. 880, 891 n.4 (2008) ("For judgments in diversity cases, federal law

incorporates the rules of preclusion applied by the State in which the rendering court sits." (citing

*Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001))).  Under Minnesota law,

collateral estoppel applies when:

> (1) the issue was identical to one in a prior adjudication; (2) there
> was a final judgment on the merits; (3) the estopped party was a
> party or in privity with a party to the prior adjudication; and (4) the
> estopped party was given a full and fair opportunity to be heard on
> the adjudicated issue.

*State v. Lemmer*, 736 N.W.2d 650, 659 (Minn. 2007) (quoting *Willems v. Comm'r of Pub. Safety*,

333 N.W.2d 619, 621 (Minn. 1983)).

"[F]or res judicata purposes, a judgment becomes final when it is entered in the district

court and it remains final, despite a pending appeal, until it is reversed, vacated or otherwise

modified."  *Brown-Wilbert, Inc. v. Copeland Buhl & Co., P.L.L.P.*, 732 N.W.2d 209, 221 (Minn.

2007).  Federal Rule 54(b) provides:

> [a]ny order or other decision, however designated, that adjudicates
> fewer than all the claims or the rights and liabilities of fewer than
> all the parties does not end the action as to any of the claims or
> parties and may be revised at any time before the entry of a
> judgment adjudicating all the claims and all the parties' rights and
> liabilities.

FED. R. CIV. P. 54(b).  *Id.* 58.  Both *Embrace Home Loans* and *Mortgage Access Corp.* were

dismissed only in part.  *See Embrace Home Loans*, 27 F. Supp. 3d at 988 (granting in part and

denying in part defendants' motions to dismiss); *Mortgage Access Corp.*, 2014 WL 3577403, at

*5 (denying defendant's motion to dismiss as moot, and granting in part and denying in part

defendant's motion to dismiss).  Because the Minnesota Court's decisions in *Embrace Home Loans* and *Mortgage Access Corp.* therefore do not constitute final judgments on the merits, these decisions do not have collateral estoppel effect.  Additionally, it would be unjust to collaterally estop the Plaintiff from asserting claims relating to loans sold prior to May 14, 2006 on the basis of these two decisions, in light of the fact that the Minnesota Court has refused to dismiss similar claims as untimely in other decisions.  *See Johnson v. LaSalle Bank Nat'l Ass'n*, 663 F. Supp. 2d 747, 765 (D. Minn. 2009) ("Because the doctrine of collateral estoppel is not rigidly applied, the focus is on whether the application of collateral estoppel will work an injustice on the party against whom estoppel is urged." (citations omitted)); *see also Stearns Lending, Inc.*, 2014 WL 4186486, at *5; *Broadview*, 2014 WL 4104819, at *7.

However, the Court concludes that the Plaintiff's breach of contract claims relating to loans sold to RFC before May 14, 2006 are untimely under New York and Minnesota law.  The Plaintiff argues that the Defendants breached their representations and warranties on a continuing basis, such that the breach of contract claims relating to loans sold to RFC before May 14, 2006 accrued at some point after closing (and after May 14, 2006) and are therefore timely.  In support, the Plaintiff alleges that, pursuant to the Client Guide, the Defendants represented and warranted that they "will comply with all provisions of this Client Guide and the Program Documents, and will promptly notify GMAC-RFC of any occurrence, act, or omission regarding [Defendant], the Loan, the Mortgaged Property or the Mortgagor of which [Defendant] has knowledge, which . . . may materially affect [Defendant], the Loan, the Mortgaged Property or the Mortgagor."  (*See, e.g.*, HSBC Compl. ¶ 23(b) (quoting Client Guide § A201(M)).)  The Plaintiff also alleges that GreenPoint and UBS represented and warranted that they would promptly notify RFC of their discovery of any breach of their representations and warranties

made in the GreenPoint Agreement and the UBS Agreement, respectively.  (*See* GreenPoint

Compl. § 19 (citing GreenPoint Agmt. § 9.3 (setting forth that representations and warranties

shall survive the sale of the loans)); UBS Compl. § 21 (citing UBS Agmt. § 3.03 (same)).)  The

Plaintiff also alleges that the Defendants, as underwriters of the loans, "knew or should have

known of the defects in the loans it sold to RFC."  (*See, e.g.*, *id.*).  Additionally, the loan defects

on which the Plaintiff's breach of contract claims are premised all relate to defects that occur at

time they are underwritten rather than a later date.  *See Americash*,, 2014 WL 3577312, at *5

(dismissing for lack of timeliness RFC's breach of contract claims relating to loans sold to RFC

before May 14, 2006 because the alleged defects of such loans "occur at the time a loan is

underwritten, not at some later date").  For example, the Complaints allege defects relating to

"income misrepresentation, employment misrepresentation, appraisal misrepresentations or

inaccuracies, undisclosed debt, and missing or inaccurate documents, among others." (*See, e.g.*,

HSBC Compl. ¶ 47.)

Under New York and Minnesota law, a breach of contract claim accrues at the time of the

breach, whether or not the plaintiff was aware of the breach.  *Guilbert*, 480 F.3d at 149 (citing

*Ely-Cruikshank Co.*, 615 N.E.2d at 986); *accord Rapp v. Green Tree Servicing, LLC*, 302 F.R.D.

505, 511 (D. Minn. 2014) (citing *Estate of Riedel v. Life Care Ret. Cmtys., Inc.*, 505 N.W.2d 78,

81 (Minn. Ct. App. 1993)).  For contracts "requir[ing] continuing performance over a period of

time, each successive breach may begin the statute of limitations running anew."  *Guilbert*, 480

F.3d at 150 (citing cases); *see also Levin v. C.O.M.B. Co.*, 441 N.W.2d 801, 803 (Minn. 1989)

("[Plaintiff] complains of a series of breaches . . . each of which breaches could have occurred

only at the close or at some date after the close of a contract year.  Thus, [plaintiff] asserts

separate causes of action with different accrual dates.").

"When a plaintiff alleges that a representation or warranty was false, the relevant breach is the false representation or warranty, and the plaintiff has a legal right to demand payment as of the date it was made." *Ace*, 5 F. Supp. 3d at 552 (citing cases holding "that a defendant's failure to repurchase a breached loan does not affect when the plaintiff's claim accrues, and therefore does not constitute a separate breach of contract"); *see Ace Sec. Corp. v. DB Structured Prods., Inc.*, 112 A.D.3d 522, 522–23 (N.Y. App. Div. 2013) (holding that plaintiff's breach of representations and warranties claims relating to mortgage loans sold to plaintiff by defendant were untimely because "the claims accrued on the closing date of the [mortgage loan purchase agreement], . . . when any breach of the representations and warranties contained therein occurred" (citations omitted)).  The Defendants' continued warranties to provide notice of loan defects to RFC do not alter the date on which the Plaintiff's claims accrued under the circumstances.  *Cf. Lehman XS Trust, Series 2006-FN ex rel. U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 991 F. Supp. 2d 472, 478 (S.D.N.Y. 2014) ("[Defendant]'s alleged failure to comply with its cure or repurchase obligations does not give rise to a separate breach of contract at the time of refusal because 'New York law . . . does not recognize pre-suit remedial provisions as constituting separate promises which can serve as the basis for independent causes of action.'" (citation omitted)); *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 837 (Minn. 2011) ("That [plaintiff] did not fully appreciate the effects of [defendant]'s April 2005 breach until some years later does not postpone the accrual of his cause of action based on that breach or transform [defendant]'s wrongful conduct in April 2005 into a continuing breach of an ongoing obligation that could give rise to separate causes of action.").

As alleged in the Complaints, the Plaintiff's breach of contract claims all relate to loan defects that occur at origination, and therefore these claims accrued on the closing date of these

loans—the date the Defendants' false representations and warranties concerning these loans were made. *See Ace*, 5 F. Supp. 3d at 552. Contract provisions that provide that representations and warranties survive a closing and impose a continuing disclosure obligation prevent causes of action that have already accrued from lapsing.[21] Breach of this continuous disclosure obligation could state a viable claim if a representation or warranty protected against some post-sale defect, but none was alleged here. While judges in Minnesota have split on this issue, the Court concludes that the claims relating to loans that were sold to RFC before May 14, 2006 are untimely under the New York statute of limitations. *See* N.Y. C.P.L.R. § 213(2). The Court accordingly **GRANTS** the Defendants' motions to dismiss the Plaintiff's breach of contract claims to the extent they relate to loans sold to RFC prior to May 14, 2006.[22]

### 2.    *Failure to State a Claim*

The Defendants assert that the Plaintiff has not adequately pleaded its claims, arguing that the Plaintiff's broad allegations about the allegedly defective loans sold to RFC do not provide the level of specificity required under the Federal Rules and the *Twombly/Iqbal* pleading standards. (*See* Defs.' Motion at 24–25 ("Plaintiff's internal 'review' concerns only a small

---

[21]    "These survival provisions limit the time period during which an actionable breach can occur or be discovered." *Gerdau Ameristeel U.S. Inc. v. Ameron Int'l Corp.*, No. 13 Civ. 07169 (LGS), 2014 WL 3639176, at *5 (S.D.N.Y. July 22, 2014) (citing *W. Filter Corp. v. Argan, Inc.*, 540 F.3d 947, 952–54 (9th Cir. 2008)). "Unless the parties agree to a survival clause—extending the representations and warranties past the closing date—the breaching party cannot be sued for damages post-closing for their later discovered breach." *Argan*, 540 F.3d at 952.

[22]    The Court rejects the Plaintiff's argument that section A209(C) of the Client Guide effectively extends the statute of limitations applicable to its breach of contract claims for the life of the loans. (*See* Pl.'s Opp. at 20 (citing Client Guide § A209(C)).) This section of the Client Guide provides that "remedies for breach of the representations, warranties and covenants shall survive the sale and delivery of the Loan to [RFC] . . . and will continue in full force and effect for the remaining life of the Loans." (*Id.* (citing Client Guide § A209(C)).) To the extent the Plaintiff asserts that this provision evidences the parties' contractually agreed extension of the applicable statute of limitations, the Court finds this extension provision unreasonable; under the Plaintiff's logic, 15-year mortgage loans sold to RFC pursuant to the Client Guide would have a 15 year statute of limitations an unreasonably long extension of the statutory limitations period. *See Peggy Rose Revocable Trust v. Eppich*, 640 N.W.2d 601, 606 (Minn. 2002) ("Parties may limit the time within which legal claims may be brought provided there is no statute specifically prohibiting the use of a different limitations period in such a case and the time fixed is not unreasonable.").

fraction of loans sold by each Defendant, and each [] Complaint recites but a handful of

allegedly defective loans from 'internal' reviews.").)  Indeed, the Defendants contend that the

Plaintiff makes conclusory allegations regarding "widespread" loan defects (*id.* at 25), which fail

to provide the Defendants with adequate notice of their claims (Defs.' Reply at 13–14), and do

not amount to "a connection between the alleged contractual breaches and . . . alleged losses" (*id.*

at 15).

The Plaintiff responds that the Complaints "contain numerous factual allegations

supporting its claims, including those specifically addressing Defendants and the defective loans

they sold to RFC."  (Opp. at 25 (summarizing factual allegations).)  Moreover, the Plaintiff

contends that it is not required to plead specific defects with respect to each loan underlying its

claims, noting that the policy of allowing plaintiffs to plead a "short and plain" statement under

Rule 8(a) would be undermined if such specificity were required in cases of this magnitude.  (*See*

*id.* at 29.)

In *Ace*, the court held that a plaintiff asserting claims for breach of representations and

warranties in connection with pools of allegedly defective RMBS need not make specific

allegations with respect to each loan at issue.  *See Ace*, 5 F. Supp. 3d at 559–60.  The court found

that the plaintiff's "[c]omplaints do not simply assert, without more, that a certain number of

loans were in breach of the representations and warranties.  Instead, they say which

representations and warranties were breached, and how."  *Id.* at *12.

In similar cases RFC filed in Minnesota, the Minnesota Court has held, citing *Ace*

approvingly, that Federal Rule 8(a) did not require RFC to plead "loan-by-loan specificity" at the

motion to dismiss stage.  *Broadview*, 2014 WL 4104819, at *5; *accord Stearns Lending*, 2014

WL 4186486, at *3.  The Minnesota Court rejected the defendants' argument that RFC's

complaint failed to provide them with fair notice of the nature of RFC's claims, finding that "RFC allege[d] Defendants served as the primary underwriters for the loans, and the complaints have at least identified the loans potentially at issue." *Broadview*, 2014 WL 4104819, at *5; *accord Stearns Lending*, 2014 WL 4186486, at *4.  Additionally, the Minnesota Court found that RFC stated plausible claims, noting that "[t]he higher than normal delinquency and default rates of Defendants' loans plausibly demonstrate[d] a failure in underwriting procedures," *Broadview*, 2014 WL 4104819, at *6, and "[t]he bankruptcy court . . . approved a settlement of over $10 billion against RFC, which suggest[ed] the investments derived from fault loans," *id.*; *accord Stearns Lending*, 2014 WL 4186486, at *4.

　　As in *Broadview* and *Stearns Lending*, the Plaintiff has identified the loans sold to RFC by the Defendants.  (*See* GreenPoint Compl. Exs. B-1, B-2; HSBC Compl. Exs. C-1, C-2; MIG Compl. Exs. C-1, C-2; Summit Compl. Exs. C-1, C-2; Suntrust Compl. Exs. C-1, C-2; UBS Compl. Exs. B-1, B-2.)  Additionally, the Plaintiff has alleged specific defects with respect to a sample of each universe of loans.  (*See* GreenPoint Compl. ¶ 50; HSBC Compl. ¶ 48; MIG Compl. ¶ 54; Summit Compl. ¶ 52; Suntrust Compl. ¶ 51; UBS Compl. ¶ 47.)  The Complaints further allege higher than normal delinquency and default rates on the loans sold by the Defendants to RFC (*see* GreenPoint Compl. ¶ 47; HSBC Compl. ¶ 46; MIG Compl. ¶ 51; Summit Compl. ¶ 49; Suntrust Compl. ¶ 49; UBS Compl. ¶ 44), and that RFC suffered losses relating to those defective loans (*see* GreenPoint Compl. ¶ 74; HSBC Compl. ¶ 76; MIG Compl. ¶ 84; Summit Compl. ¶ 80; Suntrust Compl. ¶ 76; UBS Compl. ¶ 78).  Accordingly, the Court concludes that at this stage of the pleadings, the Plaintiff has adequately pleaded their claims with specificity.  The Defendants' motions to dismiss on the basis of inadequate pleading are **DENIED**.

### F.      Indemnification Claims

The Defendants argue that the Plaintiff's indemnification claims should be dismissed to the extent that they relate to claims resolved in the Bankruptcy Settlement, which arose out of securities law, fraud, or other intentional tort claims asserted against RFC.  (Defs.' Mot. at 10; Defs.' Reply at 2.)  According to the Defendants, indemnification of such claims is barred as a matter of law.  (Defs.' Mot. at 10, 13; Defs.' Reply at 2.)

Because no finding has been made as to RFC's liability on the underlying claims for which the Plaintiff seeks indemnity, the Court disagrees.  The Defendants' motion to dismiss is therefore **DENIED** with respect to the Plaintiff's indemnification claims.

### 1.      Securities Claims

Indemnification for liability on securities claims is generally disfavored by courts, as indemnification may subvert the anti-fraud policies underlying federal securities laws.  *See Credit Suisse First Boston, LLC v. Intershop Commc'ns AG*, 407 F. Supp. 2d 541, 546 (S.D.N.Y. 2006).  In its landmark decision, *Globus v. Law Research Service, Incorporated*, 418 F.2d 1276 (2d Cir. 1969), the Second Circuit held that indemnification is properly denied where an underwriter was determined to have actual knowledge of material misstatements in a registration statement.  *Id.* at 1288.  The Second Circuit held that underwriters, like controlling persons, are prohibited from being indemnified by an issuer under section 11 of the Securities Act of 1933 (the "1933 Act").  *Id.* (finding that "underwriters should be treated equally with controlling persons and hence prohibited from obtaining indemnity from the issuer").  "While the Second Circuit expressly noted in *Globus* that it was only considering the case where the underwriter had committed a sin graver than ordinary negligence, its analysis of public policy was explicitly based on Section 11 of the 1933 Act which establishes negligence as a basis for liability."  *Credit Suisse First Boston*, 407 F. Supp. 2d at 547 (citation and internal quotation marks omitted).

44

Accordingly, courts since *Globus* have precluded indemnification of securities claims involving ordinary negligence on the part of the indemnitee. *Id.* (citing cases).

While courts in the Second Circuit are generally in agreement that indemnification "is not available in a case where the party seeking indemnification has knowingly and willfully violated the federal securities laws," *see Fromer v. Yogel*, 50 F. Supp. 2d 227, 238 (S.D.N.Y. 1999) (citing cases), it is unclear whether indemnity claims for alleged securities law violations may proceed where the indemnitee was not at fault, *id.* ("The Second Circuit has suggested that indemnity claims under the Exchange Act may proceed where the wrong committed by those seeking indemnity is no greater than ordinary negligence." (citing *Globus*, 418 F.2d at 1288)).

Some courts in this circuit have refused to bar indemnification claims for securities law violations as a matter of law, finding that the indemnitee "is entitled to an opportunity to prove that he was without fault and is therefore entitled to indemnity." *Greenwald v. Am. Medcare Corp.*, 666 F. Supp. 489, 493 (S.D.N.Y. 1987) (citations omitted); *see Bernstein v. Crazy Eddie, Inc.*, 702 F. Supp. 962, 984 (E.D.N.Y. 1988), *vacated on other grounds*, *In re Crazy Eddie Sec. Litig.*, 714 F. Supp. 1285 (E.D.N.Y. 1989) ("If [the cross-claimant] can prove that cross-claim defendants acted with actual knowledge of falsity or reckless disregard for the trust, they may be required to indemnify it for liability it incurs as a result of their actions. Whether cross-claim defendants acted with the requisite state of mind is, of course, a question of fact to be determined at trial." (citations and internal quotation marks omitted)); *Donaldson Lufkin & Jenrette Sec. Corp. v. Star Techs., Inc.*, 561 N.Y.S.2d 371, 374 (N.Y. Sup. Ct. 1990) (denying motion for summary judgment on indemnification claim brought by underwriter who settled underlying securities claims, finding that underwriter was entitled to prove it was without fault and therefore entitled to indemnity).

The Defendants argue that the reasoning in *In re Livent Securities Litigation*, 193 F. Supp. 2d 750 (S.D.N.Y. 2002) is compelling.  (*See* Defs.' Reply at 3.)  In *Livent*, the court "held that indemnification for securities law claims is simply unavailable because the indemnitor is either going to 'be found not liable for the alleged fraud, in which case there would be no liability to indemnify,' or it will 'be found liable to plaintiffs for securities violation,' in which case 'indemnification is unwarranted.'"  (*Id.* (quoting *Livent*, 193 F. Supp. 2d at 754).)  However, *Livent* involved certain defendants' cross- and third-party indemnity claims where a determination of the defendants' liability for securities fraud had not yet been determined or resolved.  *See Livent*, 193 F. Supp. 2d at 754–55.

RFC's exposure to RMBS-related losses has been fixed by the Bankruptcy Settlement, but its liability on the underlying securities claims has not been adjudicated.  As such, a trier of fact must determine whether RFC was without fault with respect to the underlying securities claims.  The Court therefore concludes that at this stage of the Adversary Proceedings, the Plaintiff's indemnification claims are not barred as a matter of law because RFC has not yet been found liable for violations of securities laws.  *Greenwald*, 666 F. Supp. at 493 (denying motion to dismiss indemnification claims against defendant who had not yet been found liable for violation of securities laws).  The Defendants' motion to dismiss the Plaintiff's indemnification claims relating to securities law claims resolved in the Bankruptcy Settlement is therefore **DENIED**.

### 2.    *State Law Fraud-Based Claims*

As a preliminary matter, the Court must first determine which state's substantive law applies to the Plaintiff's indemnity claims based on state law fraud.  *See Friedman v. Hartmann*, 787 F. Supp. 411, 420 (S.D.N.Y. 1992).  While a contract's choice of law provision does not apply to procedural rights, *see King*, 927 N.E.2d at 1061, "a contractual choice-of-law provision

is generally binding on a party claiming rights under a contract." *CIH Int'l Holdings, LLC v. BT United States, LLC*, 821 F. Supp. 2d 604, 610 (S.D.N.Y. 2011) (citing *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000)); *Finucane v. Interior Constr. Corp.*, 264 A.D.2d 618, 620 (N.Y. App. Div. 1999) ("Where, as here, the parties have agreed on the law that will govern their contract, it is the policy of the courts of this State to enforce that choice of law, provide that (a) the law of the State has a 'reasonable relationship' to the agreement and (b) the law chosen does not violate a fundamental public policy of New York." (internal citations omitted)) (finding that Oklahoma choice of law provision in indemnity enforceable, notwithstanding "Oklahoma's more permissive view on indemnification provisions").

The Agreements between RFC and each of GreenPoint, Suntrust, and UBS all contain choice of law provisions designating that New York law applies.  (*See* GreenPoint Agmt. § 30; Suntrust ECF Doc. # 11-1, ¶ 9; UBS Agmt. § 5.02.)  However, the Agreements between RFC and each of HSBC, MIG, and Summit are governed by Minnesota law.  (*See* HSBC ECF Doc. # 27-1, ¶ 12; MIG ECF Doc. # 18-1, ¶ 12; Summit ECF Doc. # 30-1, ¶12.)  Accordingly, the Court determines that New York law applies to the Plaintiff's fraud-based indemnification claims against UBS, Suntrust, and GreenPoint, but Minnesota law applies to the fraud-based indemnity claims against HSBC, MIG, and Summit.

"New York law does not permit a party to indemnify itself against its own intentional torts." *Barbagallo v. Marcum LLP*, No. 11-CV-1358, 2012 WL 1664238, at *4 (E.D.N.Y. May 11, 2012) (citing *Austro v. Niagara Mohawk Power Corp.*, 487 N.E.2d 267, 267 (N.Y. 1985); *St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 86 (2d Cir. 2005); *Bank of N.Y. v. Neumann*, 216 A.D.2d 189, 190 (N.Y. App. Div. 1995)).  Indemnity for intentional

torts violates public policy and is therefore not permitted.  *See id.* ("An agreement between two private parties, no matter how explicit, cannot change the public policy of this State." (quoting *Pub. Serv. Mut. Ins. v. Goldfarb*, 425 N.E.2d 810, 814 (N.Y. 1981))).  However, the New York Court of Appeals has clarified that "the public policy exception for intentionally harmful conduct is a narrow one, under which it must be established not only that the insured acted intentionally but, further, that it acted with the intent to harm or injure others."  *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 992 N.E.2d 1076, 1081 (N.Y. 2013) (citing *Goldfarb*, 425 N.E.2d at 814); *see Austro v. Niagara Mohawk Power Corp.*, 487 N.E.2d 267, 267 (N.Y. 1985) ("Indemnification agreements are unenforceable as violative of public policy only to the extent that they purport to indemnify a party for damages flowing from the intentional causation of injury." (citation omitted)).  In *Gibbs-Alfano v. Burton*, 281 F.3d 12, 21 (2d Cir. 2002), the Second Circuit held that an indemnification clause remained enforceable where the "party seeking indemnification settled, without admitting liability, claims against it alleging intentional wrongdoing."  *Id.*  The Second Circuit found "in the absence of a judgment of intentional conduct on the part of the [indemnitees], . . . [no] reason under New York public policy to hold the Indemnification Clause unenforceable."  *Id.*

Here, as in *Gibbs-Alfano*, RFC settled the claims for which it seeks indemnification without admitting liability.  Thus, the Court concludes that the Plaintiff's indemnity claims may proceed under New York law and the Defendants' motion to dismiss is **DENIED** with respect to the indemnity claims against GreenPoint, Suntrust, and UBS.[23]

---

[23]    Additionally, Suntrust argues that the Plaintiff's indemnification claim is barred because "RFC has not pled that it incurred actual out-of-pocket losses, *i.e.*, made payments to its creditors."  (Suntrust Mot. at 8 (citing *Bank of India v. Trendi Sportswear, Inc.*, 89 Civ. 5996 (JSM), 2002 WL 84631 (S.D.N.Y. Jan. 18, 2002), *aff'd*, 64 F. App'x 827 (2d Cir. 2003)).)  However, the Plaintiff did allege that it suffered out of pocket losses.  (*See* Suntrust Opp. at 8–9 (citing Suntrust Compl. ¶¶ 53–55, 71, 77).)  Accordingly, this argument fails.

As for the indemnity claims against HSBC, MIG, and Summit, "Minnesota law suggests that intentional tortfeasors cannot enforce indemnification provisions." *Buffets, Inc. v. Leischow*, 732 F.3d 889, 896 (8th Cir. 2013) (citations omitted); *see also ACLU of Minn. v. Tarek ibn Ziyad Acad.*, 788 F. Supp. 2d 950, 967–68 (D. Minn. 2011) (holding that an indemnification clause "is enforceable if the clause '(1) is not ambiguous; (2) does not release intentional, willful, and wanton acts; and (3) does not violate public policy." (citation omitted)).  "Agreements seeking to indemnify the indemnitee for losses occasioned by its own negligence are not favored by the law and are not construed in favor of indemnification unless such intention is expressed in clear and unequivocal terms, or unless no other meaning can be ascribed to it." *Yang v. Voyagaire Houseboats, Inc.*, 701 N.W.2d 783, 791 (Minn. 2005) (quoting *Nat'l Hydro Sys. v. M.A. Mortenson Co.*, 529 N.W.2d 690, 694 (Minn. 1995)).  Additionally, Minnesota courts will not enforce indemnification provisions that are contrary to public policy.  *See id.*  "[A] contract is not void as against public policy in Minnesota unless it is injurious to the interests of the public or contravenes some established interest of society."  *Katun Corp. v. Clarke*, 484 F.3d 972, 976 (8th Cir. 2007) (citations and internal quotation marks omitted).

However, as under New York law, Minnesota law does not preclude indemnification of fraud claims where there has not been a threshold "finding of illegal or even intentional misconduct."  *St. Paul Fire & Marine Ins. Co. v. Perl*, 415 N.W.2d 663, 667 (Minn. 1987) (citations omitted); *see also Fireman's Fund Ins. Co. v. W. Nat'l Mut. Grp.*, 851 F. Supp. 1361, 1368–69 (D. Minn. 1994) (granting plaintiffs' motion for summary judgment, finding that willful misconduct exception in indemnification agreement did not apply in light of the plaintiffs' settlement of their antitrust claims because "[i]t has never been adjudged that the antitrust plaintiffs were liable by reason of willful misconduct").  Consequently and similar to the

49

indemnity claims governed by New York law, the Defendants' motion to dismiss is **DENIED**

with respect to the indemnity claims against HSBC, MIG, and Summit.

### III.    CONCLUSION

For the foregoing reasons, the Defendants' motions to dismiss are **DENIED** in part and

**GRANTED** in part.  The Defendants' motions to dismiss are **GRANTED** to the extent they seek

to bar the Plaintiff's breach of contract claims relating to loans acquired by RFC before May 14,

2006.  The Defendants' motions to dismiss are **DENIED** on all other grounds.

**IT IS SO ORDERED.**

Dated:  February 3, 2015
        New York, New York

_Martin Glenn_
MARTIN GLENN
United States Bankruptcy Judge