**Hearing Date:  July 30, 2015**
**Opposition Deadline: June 30, 2015**
**Reply Deadline:  July 16, 2015**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE RESCAP LIQUIDATING TRUST MORTGAGE PURCHASE LITIGATION | Case No. 12-12020 (MG) (Ch. 11) Adv. Proc. No. 14-07900 (MG) |

*This document relates to*:

Residential Funding Co. v. HSBC Mortg. Corp. (USA), Adv. Proc. No. 14-01915 (MG)

Residential Funding Co. v. UBS Real Estate Secs., Inc., Adv. Proc. No. 14-01926 (MG)

ResCap Liquidating Trust v. Summit Fin. Mortg. LLC, Adv. Proc. No. 14-01996 (MG)

ResCap Liquidating Trust v. Mortg. Investors Grp., Inc., Adv. Proc. No. 14-02004 (MG)

Residential Funding Co. v. SunTrust Mortg. Inc., Adv. Proc. No. 13-1820 (MG)

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO MODIFY ORDER APPOINTING MEDIATOR**

## <u>TABLE OF CONTENTS</u>

BACKGROUND ....................................................................................................... 3

    A.    The Debtors' Pre-Petition Settlement With Certain RMBS Trusts. ...................... 3

    B.    The Unsecured Creditors Object To The Original RMBS Settlement. .................. 4

    C.    The Debtors And The Committee Reach A Global Settlement. ........................... 6

    D.    Plaintiff Seeks Indemnity, But Objects To Discovery Of The Global
          Settlement. ....................................................................................................... 7

    E.    Third Parties Have Objected to Producing Settlement-Related Discovery. ......... 11

ARGUMENT ......................................................................................................... 11

I.    THE COURT SHOULD MODIFY ITS MEDIATION ORDER TO PERMIT
     DISCOVERY OF SETTLEMENT COMMUNICATIONS ............................................. 11

    A.    Defendants Have A Special Need For Mediation Communications. ................... 12

    B.    Barring Discovery Of Mediation Communications Would Be Unfair. ................ 17

    C.    Defendants' Need For The Evidence Outweighs Any Confidentiality
          Interest. ........................................................................................................... 19

II.    PLAINTIFF'S OTHER OBJECTIONS ARE MERITLESS. ........................................... 22

    A.    Rule 408 Does Not Govern The Scope Of Permissible Discovery. .................... 22

    B.    General Order M-390 Does Not Bar Modification Of The Mediation
          Order. .............................................................................................................. 23

    C.    Plaintiff's Undue Burden Claim Is Completely Unsupported. ........................... 24

    D.    Plaintiff's Objection To Communications Outside Of Mediation Is
          Unfounded. ...................................................................................................... 24

CONCLUSION ....................................................................................................... 25

## TABLE OF AUTHORITIES

### CASES

*Atlantic Richfield Co. v. Interst. Oil Transp. Co.*, 784 F.2d 106 (2d Cir. 1986) ....................16, 19

*Bank Brussels Lambert v. Chase Manhattan Bank, N.A.*, 1996 WL 71507
    (S.D.N.Y. Feb. 20, 1996) ................................................................................................20, 23

*Bernard v. Galen Grp., Inc.*, 901 F. Supp. 778 (S.D.N.Y. 1995) ...........................................19, 20

*Bradfield v. Mid-Continent Cas. Co.*, 15 F.3d 1253 (M.D. Fla. 2014) .........................................14

*Carey Transp., Inc. v. Greyhound Corp.*, 80 B.R. 646 (S.D.N.Y. 1987) .....................................12

*Century Indem. Co. v. Aero-Motive Co.*, 336 F. Supp. 2d 739 (W.D. Mich. 2004) .....................23

*CFTC v. NRG Energy, Inc.*, 457 F.3d 776 (8th Cir. 2006) ...........................................................16

*Conoco Inc. v. Boh Brothers Construction Co.*, 191 F.R.D. 107 (W.D. La. 1998) ......................14

*Cooper v. Meridian Yachts, Ltd.*, 2008 WL 2229552 (S.D. Fla. May 28, 2008) ...................14, 15

*DH Holdings Corp. v. Marconi Corp. PLC*, 809 N.Y.S.2d 404 (Sup. Ct., N.Y.
    Cnty. 2005) ..................................................................................................................................14

*FDIC v. White*, 76 F. Supp. 2d 736 (N.D. Tex. 1999) ..................................................................23

*First Fid. Bancorp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 1992 WL 55742
    (E.D. Pa. Mar. 13, 1992) ............................................................................................................15

*Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122 (9th Cir. 2003) ...............................21, 22

*Franklin United Methodist Home, Inc. v. Lancaster Pollard & Co.*, 909 F. Supp.
    2d 1037 (S.D. Ind. 2012) .....................................................................................................21, 23

*Glass v. IDS Fin. Servs., Inc.*, 778 F. Supp. 1029 (D. Minn. 1991) ..........................................7, 12

*Greenwich Film Prods., S.A. v. DRG Records, Inc.*, 1996 WL 502336 (S.D.N.Y.
    Sept. 5, 1996) ........................................................................................................................22, 23

*In re Initial Pub. Offering Sec. Litig.*, 2004 WL 60290 (S.D.N.Y. Jan. 12, 2004) .................22, 23

*In re Residential Cap'l, LLC*, No. 12-12020 (MG), #6066 (Bankr. S.D.N.Y. Dec.
    11, 2013) ............................................................................................................................ *passim*

*In re Teligent, Inc.*, 417 B.R. 197 (Bankr. S.D.N.Y. 2009) ..........................................................17

*In re Teligent Servs., Inc.*, 2010 WL 2034509 (S.D.N.Y. May 13, 2010) ....................................17

*Jackson Nat'l Life Ins. Co. v. Workman Sec. Corp.*, 803 F. Supp. 2d 1006 (D. Minn. 2011)................................................................................................12

*Koch Indus., Inc. v. Hoechst AG*, 727 F. Supp. 2d 199 (S.D.N.Y. 2010) ....................................15

*Lamar Adver. of S.D., Inc. v. Kay*, 267 F.R.D. 568 (D.S.D. 2010)................................................15

*Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006)....................................20, 21

*Miller v. Shugart*, 316 N.W.2d 729 (Minn. 1982) ........................................................................16

*NLRB v. Joseph Macaluso, Inc.*, 618 F.2d 51 (9th Cir. 1980) .......................................................19

*Osgood v. Med., Inc.*, 415 N.W.2d 896 (Minn. Ct. App. 1987) ....................................................12

*Savage & Assocs., P.C. v. K&L Gates LLP (In re Teligent, Inc.)*, 640 F.3d 53 (2d Cir. 2011) .......................................................................................................................... *passim*

*SEC v. TheStreet.Com*, 273 F.3d 222 (2d Cir. 2001)....................................................................20

*Shannon v. N.Y.C. Transit Auth.*, 2001 WL 286727 (S.D.N.Y. Mar. 22, 2001)...........................24

*Sumpter v. DPH Holdings Corp. (In re DPH Holdings Corp.)*, 468 B.R. 603 (S.D.N.Y. 2012) .....................................................................................................................16

*Torain v. Clear Channel Broad., Inc.*, 651 F. Supp. 2d 125 (S.D.N.Y. 2009) .............................12

*Tribune Co. v. Purcigliotti*, 1996 WL 337277 (S.D.N.Y. June 19, 1996)....................................22

*U.S. Fid. & Guar. Co. v. Dick Corp./Barton Malow*, 215 F.R.D. 503 (W.D. Pa. 2003) ............................................................................................................................25

*United States v. U. Pac. R.R.*, 2007 WL 1500551 (E.D. Cal. May 23, 2007) ..............................25

*UnitedHealth Group Inc. v. Columbia Casualty Co.*, 47 F. Supp. 3d 863 (D. Minn. 2014)...............................................................................................................13, 15

*Zurich Reins. (UK) Ltd. v. Canadian Pac. Ltd.*, 613 N.W.2d 760 (Minn. Ct. App. 2000) ............................................................................................................................13

## OTHER AUTHORITIES

11 U.S.C. § 1141(d)(1)(A)............................................................................................................16

11 U.S.C. §§ 101(5), 101(12) ......................................................................................................16

28 U.S.C. §§ 652(a), 652(d).........................................................................................................23

Federal Rule of Civil Procedure 26(b)(1) ...................................................................................22

Federal Rule of Evidence 408 ................................................................................................. *passim*

Southern District of New York Bankruptcy Rule General Order M-390 ............................ *passim*

Plaintiff is engaged in a coordinated campaign to obtain indemnification from Defendants and other mortgage originators for billions of dollars in allowed claims approved in a global settlement of a bankruptcy ("Global Settlement"). That Global Settlement provided for the allowance, priority, and allocation of claims for more than 1,000 trusts of residential mortgage-backed securities ("RMBS"). Anderson Decl., Ex. A ("Ex. __") at 40 (*In re Resid'l Cap'l, LLC*, No. 12-12020 (MG) ("*ResCap*"), #6066 (Bankr. S.D.N.Y. Dec. 11, 2013) ("Findings of Fact" or "FoF")). Plaintiff alleges that the "Global Settlement" was "fair and reasonable," and resulted from a "lengthy and intensive mediation" through which Residential Funding Company, LLC ("RFC") "resolve[d] its RMBS-related liabilities." HSBC Sec. Am. Compl. ("Compl.") ¶ 9. Plaintiff must prove the reasonableness of the Global Settlement in each case in which it seeks indemnity. Plaintiff's claims place directly at issue the reasonableness of the Global Settlement, making the parties' communications about that settlement critical. During the bankruptcy, however, the Bankruptcy Court entered the typical Order prohibiting the disclosure of mediation communications absent court authorization. *See* Ex. B (*ResCap*) ("Mediation Order").

 In these subsequent cases, Defendants posed narrowly tailored requests for certain information and documents relating to the reasonableness of the settlement, including the Debtors' communications with the Chapter 11 parties. Ex. C (Defs.' Requests for Production ("RFP"), July 23, 2014, Nos. 91-92). Plaintiff objected, citing the Court's Mediation Order, Federal Rule of Evidence 408, and General Order M-390 of this Court's Rules. Ex. D (Pltf.'s Resp. to RFP Nos. 91-92, Aug. 22, 2014). Plaintiff also objected to producing settlement-related communications that occurred before mediation, claiming "undu[e] burden[]." Ex. E at 1 (Feb. 18, 2015 McDaniel email to Ahmad). Defendants here and in the related Minnesota actions also have served subpoenas on third parties seeking discovery of the Global Settlement, but the

subpoenaed parties have objected, citing the Mediation Order.  The objections of Plaintiff and

these third parties do not justify denying Defendants this critical discovery.

    *First*, the Mediation Order does not preclude this Court from authorizing the limited

disclosure of mediation communications, as it expressly states that disclosure may be authorized

by the Court.  Ex. B ¶ 4.  Here, Plaintiff has placed directly at issue the reasonableness of the

Global Settlement by suing for indemnification for almost the entire settlement amount, giving

rise to a special need for discovery of communications that occurred between the mediating

parties.  Plaintiff bears the burden of proving the reasonableness of the amount and allocation of

the Global Settlement.  As the purported indemnitors, Defendants have a unique interest in the

process that yielded the Global Settlement.  Any confidentiality concerns are at their weakest

here, as Defendants do not seek any discovery from the mediator or to use mediation

communications in the proceeding in which the communication occurred.  Indeed, the impetus

for the confidentiality provision in the Mediation Order was to prevent public disclosure of

material non-public information relating to the pending bankruptcy, not to bar relevant discovery

in a subsequent proceeding concerning indemnification for the settlement.  Any confidentiality

concerns can easily be accommodated by issuing a Protective Order preserving confidentiality

but allowing Defendants access to this highly relevant discovery.

    *Second*, Plaintiff's invocation of Rule 408 and General Order M-390 to bar discovery is

meritless.  Rule 408 is a rule of evidence governing admissibility at trial; it does not govern the

scope of discovery.  And, even if it did, settlement communications are admissible under Rule

408 to prove, and disprove, the reasonableness of a settlement for which indemnification is

sought.  Plaintiff's reliance on General Order M-390 also is misguided, as it gives no guidance

on whether the Court should modify its existing Order to permit access to relevant discovery.

*Third*, communications that the Chapter 11 parties exchanged outside of mediation are highly relevant.  Plaintiff claims it would be "unduly burdensome" to produce settlement communications exchanged *before* mediation, but this bare assertion does not allow Plaintiff to ignore its discovery obligations, and it rings particularly hollow here, where these communications are plainly relevant and easily located in the correspondence or settlement files of specific lawyers and business persons.  Settlement communications outside of mediation (but during the time frame of mediation) similarly are relevant, and nothing bars their production.

## BACKGROUND

### A.    The Debtors' Pre-Petition Settlement With Certain RMBS Trusts.

Prior to Residential Capital, LLC ("ResCap") filing for bankruptcy in May 2012, two groups of institutional investors ("Institutional Investors") had asserted contract claims on behalf of RMBS trusts against ResCap and its subsidiaries (collectively, "Debtors") for breaches of agreements related to the Debtors' RMBS.  Ex. A at 41 (FoF).  The Institutional Investors also asserted claims against the Debtors' parent, Ally Financial ("Ally").  *Id*.  From the outset of negotiations, Ally required any resolution of RFC's bankruptcy to include a release of all claims related to the Debtors' business, including potential claims that could be asserted against Ally by the Debtors or creditors.  *See* Ex.  F (Carpenter Direct ¶ 17).

With Ally's support, the Debtors entered into pre-petition settlement agreements with the Institutional Investors covering 392 RMBS trusts sponsored by the Debtors between 2004 and 2007 for an allowed unsecured claim of $8.7 billion ("Original RMBS Settlement").  Ex. A at 42 (FoF); ███████████████████████████████.  At the time of this settlement, there had been no verdict or finding of liability against the Debtors.  *See* Ex. H at 10 (*ResCap*), #2825 (Bankr. S.D.N.Y. Feb. 1, 2013) ("Committee Obj.").

███████████████████████████████████████████

3

████████████████████.  The Debtors reached a pre-petition settlement with Ally requiring it to provide monetary and non-monetary contributions to support the Debtors up to and during the Debtors' Chapter 11 cases, including a $750 million cash contribution and $200 million in financing, in exchange for a release of all claims against Ally.  Ex. A at 25-26 (FoF); Ex. J at 98 (Devine Tr.); ████████████████████████████████.  This agreement was recorded in a Plan Sponsor Agreement ("Prepetition PSA").  Ex. A at 25 (FoF).

**B.     The Unsecured Creditors Object To The Original RMBS Settlement.**

On May 16, 2012, the Court appointed an Official Committee of Unsecured Creditors ("Committee") composed of members of each major creditor constituency not a party to the Prepetition PSA.  Ex. A at 26 (FoF); Ex. L (*ResCap*), #102 (Bankr. S.D.N.Y. May 16, 2012). The Committee identified deficiencies in the Prepetition PSA, including that: (1) it did not resolve $4 billion in monoline insurer claims; (2) it did not resolve securities claims, including over $2.4 billion in private securities claims, $13 billion in class action securities claims, and securities claims held by the FHFA; (3) it was not supported by holders of more than $1 billion in senior unsecured notes; (4) it did not address hundreds of millions of dollars in claims by individual and class action borrowers; and (5) it did not address RMBS issued before 2004.  Ex. A at 26-27 (FoF).  The Committee sought extensive discovery from the Debtors, Ally, and the Institutional Investors, all of which produced settlement communications regarding the Original RMBS Settlement.  Ex. M at 2 (*ResCap*), #1597 (Bankr. S.D.N.Y. Sept. 26, 2012) ("GB Resp.").

After reviewing millions of pages of documents, Ex. A at 28 (FoF), the Committee filed an objection to the Debtors' motion to approve the Original RMBS Settlement.  Ex. H (Committee Obj.). The Committee's expert, Professor Bradford Cornell, found that the trusts had incurred $16.5 billion in gross losses on materially defective loans – a fraction of the $45 billion postulated by the Debtors' expert, Frank Sillman.  *Id*. at 25, 29.  The Committee's objections

4

raised substantial questions regarding the Original RMBS Settlement and Prepetition PSA.

*First*, the Committee pointed to substantial evidence that the $8.7 billion settlement failed to account for the Debtors' legal defenses, including loss causation, statute of limitations, and election of remedies.  Ex. H at 5-6 (Committee Obj.).  Professor Cornell estimated that those defenses reduced the Debtors' potential liability by more than $6.5 billon.  *Id*. at 29.

*Second*, the Committee raised significant questions regarding the terms of Ally's contribution.  The Committee observed that a key condition of Ally's support for the Original RMBS Settlement was the Institutional Investors' agreement to a Plan Support Agreement giving Ally broad estate and third-party releases and capping Ally's cash contribution to the Debtors at $750 million.  *Id*. at 14-21.  The Committee pointed to substantial evidence indicating that Ally engineered the Original RMBS Settlement and agreed to endorse an RMBS allowed claim amount that was billions of dollars more than was warranted.  *Id*.

*Third*, the Committee raised serious questions about the reliability of the Debtors' expert's analysis of the reasonableness of the Original RMBS Settlement.  *Id*. at 23-28.  The Committee pointed out that the Debtors' expert, Mr. Sillman, did not estimate what portion of the trusts' losses were caused by breaches of representation or warranty or would result in put-back liability.  *Id*. at 25.  The Committee observed that the "breach rate" and "agree rate" Mr. Sillman used to estimate the Debtors' liability were derived from his estimate of the average "breach" and "agree" rates he had observed when advising clients in other put-back negotiations.  *Id*.  According to the Committee, Mr. Sillman's average "breach" and "agree" rates (41% and 46%) were dramatically higher than the Debtors' observed rates (4% and 18.6%).  *Id*. at 25-27.

The Committee also asserted that the Debtors' legal expert, Jeffrey Lipps, had failed to provide analysis to support the amount of the Original RMBS Settlement.  *Id*. at 4.  The

Committee contended that certain of Mr. Lipps' observations undercut the reasonableness of the Original RMBS Settlement, including that: (1) the "overwhelming majority" of loans in trusts did not breach a representation or warranty; (2) the governing contracts required a "material and adverse" effect for a breach to be actionable, raising significant defenses to liability; (3) the "true cause" of trust losses was the "massive economic downturn beginning in late 2007;" and (4) New York's six-year statute of limitations may bar put-back claims. *Id*. at 4, 23-24.

### C.     The Debtors And The Committee Reach A Global Settlement.

On December 26, 2012, the Court appointed Judge James Peck as mediator. Ex. A at 3 (FoF). In April and May 2013, Judge Peck held several mediation sessions to address the Committee's objections, which ultimately resulted in the Global Settlement, embodied in a Plan Support Agreement, Plan Term Sheet, and Supplemental Term Sheet. *Id*. at 3, 31-34. The Global Settlement resolved "all of the Debtors' RMBS-related liabilities for more than $10 billion in allowed claims" granted to the RMBS trusts to which the Debtors had sold loans and other entities that had asserted claims against the Debtors. Compl. ¶ 76. The Global Settlement reduced the total allowed claim amount for the RMBS Trusts from $8.7 billion to $7.3 billion[1] and expanded the released claims to cover over 1,000 RMBS trusts. Ex. A at 43-44 (FoF). Ally agreed to increase its contribution to $2.1 billion "in exchange for a global release of all estate and third party claims made against Ally." *Id*. at 34. The Court approved the Debtors' entry into the Plan Support Agreement on June 26, 2013. *Id*. at 36.

A group of Junior Secured Noteholders ("Ad Hoc Group") did not support the Plan, and they litigated two adversary proceedings with the Plan proponents regarding the Ad Hoc Group's liens, the size of their allowed claims, and post-petition interest. *Id*. at 3-4. The Ad Hoc Group

---

[1] The Global Settlement allocated approximately $7 billion of the $7.3 billion to the RFC Debtors. Ex. N at Art. IV.B.c.2. (*ResCap*), #6065-1 (Bankr. S.D.N.Y. Dec. 11, 2013) ("Plan").

also challenged the reasonableness of the Global Settlement, claiming it was "not[] principled" because it was "reverse engineered" to give consenting claimants "the recovery they had negotiated." Ex. O at 3 (*ResCap*), #5443-1 (Bankr. S.D.N.Y. Oct. 22, 2013) ("Ad Hoc Comm. Obj."). Further mediation led to an additional settlement with the Ad Hoc Group on December 3, 2013. Ex. A at 5, 117 (FoF).

On December 11, 2013, the Court confirmed the Second Amended Joint Chapter 11 Plan. Ex. P (*ResCap*), #6065 (Bankr. S.D.N.Y. Dec. 11, 2013) ("Confirmation Order"). The Confirmation Order authorized creation of a "Liquidating Trust" into which RFC transferred all assets, including its interest in any cause of action "that was or could have been commenced by" RFC. Ex. N at Art. VI.C. (Plan); Ex. Q § 2.3 (Liquidating Trust Agreement). The Plan provided that creditors receive "Cash" or "Units" in the Liquidating Trust in "full and final satisfaction" of the RMBS-related claims allowed in the bankruptcy. Ex. N at Art. III.D. (Plan).

**D.    Plaintiff Seeks Indemnity, But Objects To Discovery Of The Global Settlement.**

Upon entry of the Confirmation Order, RFC and the Liquidating Trust filed scores of lawsuits in federal and state courts against originators from which RFC had purchased loans. RFC alleged that Defendants were "obligated to indemnify RFC for all liabilities and losses incurred by RFC as a result of breaches of . . . representations and warranties." Compl. ¶ 10. RFC claimed that each defendant was liable to it or the Liquidating Trust for a portion of the "over $10 billion in allowed claims" approved in the Global Settlement. *Id.* ¶¶ 88-89.

Plaintiff alleged that the Global Settlement was reasonable, and it must prove that element to prevail on its indemnification claim. *See, e.g., Glass v. IDS Fin. Servs., Inc.*, 778 F. Supp. 1029, 1083 (D. Minn. 1991). To address this element, Defendants sought discovery of key documents relating to the settlement, including communications between the Chapter 11 parties and documents relating to the Mediation. Ex. C (RFP, Nos. 91-92). Plaintiff objected to

7

producing "any communications, documents or other materials exchanged or discussed in the

Plan Mediation," citing Federal Rule of Evidence 408, General Order M-390, the Court's

Mediation Order, the attorney-client privilege, and the work product doctrine, and asserting that

the request was "overly broad and not reasonably calculated to lead to the discovery of

admissible evidence." Ex. D (Pltf.'s Resp. to RFP Nos. 91-92). Plaintiff also refused to produce

settlement communications prior to the December 26, 2012 Mediation Order, claiming "undu[e]

burden[]." Ex. E at 1 (Feb. 18, 2015 McDaniel email to Ahmad).

> General Order M-390 generally provides that mediations are confidential:
>
> Any statements made by the mediator, by the parties or by others during the
> mediation process shall not be divulged by any of the participants in the
> mediation (or their agents) or by the mediator to the court or to any third party.
> All . . . documents received or made by a mediator . . . shall be confidential and
> shall not be provided to the court, unless they would be otherwise admissible.

S.D.N.Y. Bankr. R. Gen'l Order M-390. The Court's Mediation Order, however, prohibits

disclosure of mediation documents "*unless . . . authorized by this Court*:"

> Without limiting the applicability of Local Rule 9019-1 or General Order M-390,
> all (a) discussions among any of the Mediation Parties, including discussions with
> or in the presence of the Mediator, (b) any mediation statements and any other
> documents or information provided to the Mediator or the Mediation Parties in the
> course of the mediation, and (c) correspondence, draft resolutions, offers, and
> counteroffers produced for or as a result of the mediation shall be strictly
> confidential and shall not be admissible for any purpose in any judicial or
> administrative proceeding, and no person or party participating in the mediation,
> whether a direct participant or member of a committee or group, including
> counsel for any Mediation Party or any other party, shall in any way disclose to
> any non-party or to any court, including, without limitation, in any pleading or
> other submission to any court, any such discussion, mediation statement, other
> document or information, correspondence, resolution, offer or counteroffer that
> may be made or provided in connection with the mediation, *unless* otherwise
> available and not subject to a separate confidentiality agreement that would
> prevent its disclosure or as *authorized by this Court*.

Ex. B (emphases added). The Mediation Order provides that, "to the extent any part of this

Order shall conflict with . . . General Order M-390, the terms and provisions of this Order shall

govern." *Id*.  The Mediation Order's confidentiality provision was intended to prevent "public"

disclosure of "material non-public information," such as an RMBS "waterfall."  Ex. R at 65-66

(*ResCap*), #2523 (Bankr. S.D.N.Y. Dec. 23, 2012) (Debtors' counsel) ("Mediation Hearing").

Defendants informed Plaintiff that they would "ask the Court to lift the confidentiality

restrictions imposed by the Mediation Order."  Ex. S at 5 (Nov. 26, 2014 Ahmad Ltr. to Nesser).

Plaintiff stated it was "unable to evaluate in the abstract whether it will oppose Defendants'

threatened motion," but reaffirmed its intent (as set forth in its complaints) to rely on the

mediation:  "*Plaintiff did not advise during the meet-and-confers that it does not intend to rely in*

*any way on the Plan Mediation*.  Rather, Plaintiff stated that it does not intend to rely on any

documents it will not produce and it cannot produce any documents subject to the Mediation

Order."  Ex. T at 4-5 & n.3 (Dec. 30, 2014 Alden Ltr. to Ahmad) (emphasis added).



---

[2] *See* Ex. W at 69, 73 (Ally Apr. 27, 2012 Form 10-Q discloses $811 million reserve; estimates
ResCap's "reasonably possible losses" related to "litigation matters and potential repurchase
obligations and related claims . . . could be between $0 and $4 billion over existing accruals").



_____

3

Debtors' expert Sillman used a defect rate                                In the Global Settlement,
(43.5%).                                                                    . Ex. AA (Sillman Direct)
                                                                           .



To date, Defendants have not obtained similar discovery of the Global Settlement.

**E.    Third Parties Have Objected to Producing Settlement-Related Discovery.**

Third parties also have objected to producing documents, citing the Mediation Order. For example, Duff & Phelps, a consulting firm that analyzed 6,500 at-issue loans and advised certain RMBS trustees regarding the Global Settlement, Ex. DD at 7 (Pfeiffer Decl.) (Nov. 12, 2013), refused to produce any documents, asserting they "may not be disclosed" under the Mediation Order.  Ex. EE (Mar. 26, 2015 Macfie Ltr.).  Other third parties similarly have objected.  *See*, *e.g.*, Ex. FF (Ally); Ex. GG (FGIC); Ex. HH (Paulson); Ex. II (Sillman).

<u>**ARGUMENT**</u>

**I.    THE COURT SHOULD MODIFY ITS MEDIATION ORDER TO PERMIT DISCOVERY OF SETTLEMENT COMMUNICATIONS.**

The Court should modify its Mediation Order to permit discovery of settlement communications.  Under the Second Circuit's decision in *Savage & Assocs., P.C. v. K&L Gates LLP* (*In re Teligent, Inc.*), 640 F.3d 53, 58 (2d Cir. 2011), a party seeking disclosure of confidential mediation communications must demonstrate three elements:  "(1) a special need for

the confidential material, (2) resulting unfairness from a lack of discovery, and (3) that the need

for the evidence outweighs the interest in maintaining confidentiality." Each prong is met here.

### A.    Defendants Have A Special Need For Mediation Communications.

Plaintiff has placed directly at issue the reasonableness of the Global Settlement by suing

for indemnification for the settlement amount.  When seeking indemnity for a settlement, the

party seeking indemnification must demonstrate that (1) "the settlement amount was reasonable

and prudent," and (2) "the party could have been held liable for that settlement amount." *Glass*,

778 F. Supp. at 1083; *Osgood v. Med., Inc.*, 415 N.W.2d 896, 903 (Minn. Ct. App. 1987); *see

also Carey Transp., Inc. v. Greyhound Corp.*, 80 B.R. 646, 652 (S.D.N.Y. 1987).  "What is

reasonable and prudent involves a consideration of the facts bearing on the liability and damage

aspects of plaintiff's claims, as well as the risks of going to trial," *Jackson Nat'l Life Ins. Co. v.

Workman Sec. Corp.*, 803 F. Supp. 2d 1006, 1012 (D. Minn. 2011) (internal quotation marks

omitted), including proof of the amount of money demanded, how the indemnitee estimated

potential damages, the theories of liability and defenses considered, how it calculated litigation

costs, and expert testimony assessing damages, *see*, *e.g.*, *Torain v. Clear Channel Broad., Inc.*,

651 F. Supp. 2d 125, 154-55 (S.D.N.Y. 2009) (denying summary judgment where indemnitee

failed to adduce such evidence).  If, for example, the indemnitee "failed to address or appreciate

valid defenses," a court may conclude that the settlement amount was not reasonable.  *Id*. at 155

n.24.  Where, as here, the reasonableness of the Global Settlement is an element of Plaintiff's

claim, that claim places directly at issue the subject matter and content of the communications

exchanged in the settlement negotiations.

Moreover, Plaintiff has placed directly at issue how the Global Settlement was allocated.

Where an indemnitee seeks indemnification for a multi-claim settlement, it must prove what part

of the settlement should be allocated to each indemnitor.  In *UnitedHealth Group Inc. v.

12

*Columbia Casualty Co.*, 47 F. Supp. 3d 863 (D. Minn. 2014), for example, the court held that the insured bore the burden of proving what portion of a settlement that resolved two separate lawsuits should be allocated to each lawsuit in its indemnification case against the insurer when only one of the lawsuits included claims covered by an insurance policy. *Id*. at 873-74. The court held that the insured "cannot rely on events that occurred or on information that it learned after the Settlement was reached to show how a reasonable party in its position would have allocated at the time that the Settlement was reached." *Id*. at 873. Rather, the insured may introduce three types of evidence, all rooted in "what was known to the insured at the time of settlement." *Id*. at 874; *see also Zurich Reins. (UK) Ltd. v. Canadian Pac. Ltd.*, 613 N.W.2d 760, 764-65 (Minn. Ct. App. 2000) (relying on attorney testimony about "settlement discussions" and "damage evaluations" prepared during negotiations to determine whether settlement included punitive damages). Here, the Global Settlement encompasses claims by over 1,000 RMBS trusts. Plaintiff can only use information known to the Debtors at the time of the Global Settlement to prove the allocation of the settlement to each Defendant. Contemporaneous communications between the Chapter 11 parties provide critical evidence of what was known to the Debtors at the time of settlement. By withholding this discovery, Plaintiff is withholding unique, highly probative evidence.

The Debtors' experts and third parties also possess highly pertinent settlement communications. For example, some RMBS trustees retained experts, such as Duff & Phelps, to help them identify and quantify their RMBS claims and to allocate the Global Settlement. *See* Ex. DD at 6-7 (Pfeiffer Decl.) (Nov. 12, 2013). At Duff & Phelps' recommendation, the Chapter 11 parties allocated the settlement based on losses and rates of breach of representations and warranties. *Id*. at 7. Duff & Phelps reviewed more than 6,500 mortgage files to estimate these

13

rates. *Id*. This evidence is highly relevant to the reasonableness of the settlement.

Defendants have an acute need for this documentary record. In indemnification cases, it is well-settled that a plaintiff cannot both prosecute an indemnification claim and, at the same time, deny a defendant access to the documentary record leading up to the settlement. For example, in *Conoco Inc. v. Boh Brothers Construction Co*., 191 F.R.D. 107, 119 (W.D. La. 1998), the court held that the indemnitor was entitled to discovery of communications from the indemnitee's mediation because, "by seeking indemnity," the plaintiff has "placed at issue the basis for its liability, its liability analysis, and the reasonableness of the settlement paid." In *DH Holdings Corp. v. Marconi Corp. PLC*, 809 N.Y.S.2d 404 (Sup. Ct., N.Y. Cnty. 2005), the court similarly ordered production of memoranda drafted by the indemnitee analyzing liability and potential damages in the underlying settlement, emphasizing that an indemnitor is entitled to discovery of the confidential "documentary record leading to . . . settlement:"

> The heart of this matter is to determine if the settlement was appropriate, and, if so, was it reasonable. *Inquiries that, of necessity, place these documents at issue*. It is insufficient to respond, as plaintiffs have done, that the rationale for the settlement, and its reasonableness, can be tested . . . without the privileged documents. Nor is the testimony of Gilbarco's Touchcom Litigation attorney sufficient. This testimony, as to reasonableness and necessity, *should be scrutinized through the lens of relevant, contemporaneous documents prepared in connection with*, and to accomplish, *the settlement* of the Touchcom Litigation. It seems to me that *the plaintiffs cannot on the one hand seek indemnification for the settlement and costs, and on the other hand refuse to produce the documentary record leading to such settlement*.

*Id*. at 407 (emphases added); *see also*, *e.g.*, *Bradfield v. Mid-Continent Cas. Co.*, 15 F.3d 1253, 1257 (M.D. Fla. 2014) (indemnitor entitled to discovery of mediation and settlement "so that it can effectively challenge the reasonableness of the settlement"); *Cooper v. Meridian Yachts, Ltd*., 2008 WL 2229552, at *11 (S.D. Fla. May 28, 2008) (indemnitor entitled to discovery of confidential matter concerning "substance and motivation behind the settlement").

14

The Chapter 11 parties' subjective beliefs regarding settlement also are relevant to the reasonableness and allocation of the settlement. As the court held in *UnitedHealth Group*, "allocation is an objective inquiry" and, thus, while "subjective evidence would not be dispositive, . . . it would nevertheless be relevant." 47 F. Supp. 3d at 874; *see also Lamar Adver. of S.D., Inc. v. Kay*, 267 F.R.D. 568, 573 (D.S.D. 2010) ("opinions, mental impressions, and thought processes regarding the settlement" from "integral" settlement participants were "most certainly relevant to the issue of whether the settlement was or was not reasonable"); *First Fid. Bancorp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 1992 WL 55742, at *2 (E.D. Pa. Mar. 13, 1992) (affirming Order granting insurer's motion to compel production of confidential settlement communications, holding they were "extremely probative in assessing whether a reasonable person would have settled under the circumstances").

Defendants' need for discovery of the documentary record leading up to the Global Settlement is particularly critical here, where RFC no longer is a going concern, filed for bankruptcy, made *de minimis* payments in the Global Settlement, and did not have a full-fledged stake in the consideration paid. "[C]ourts can presume an indemnitee's good faith where the indemnitee's self-interest would require it to seek a favorable settlement, such as where an indemnitee faces potential liability for some or all of [third party] plaintiffs' damages." *Koch Indus., Inc. v. Hoechst AG*, 727 F. Supp. 2d 199, 225 (S.D.N.Y. 2010) (internal quotation marks omitted). Where, however, an indemnitee has little of its own funds at stake and is funding the settlement with an indemnitor's checkbook, there is no reason to presume an indemnitee's good faith. As the Second Circuit observed, a court's finding in an earlier action that a settlement was "fair and reasonable" is not given "much weight" where the indemnitee is "perhaps thinking it incurred no risk because it could look to [the indemnitor] for indemnity" and failed "to give

15

notice to the indemnitor sufficient for it to have some say over whether its funds were being well-spent." *Atlantic Richfield Co. v. Interst. Oil Transp. Co.*, 784 F.2d 106, 115 (2d Cir. 1986) (internal quotation marks omitted). That is particularly true when a settlement is reached before trial, depriving the court of an "adversarial presentation." *Id*. at 115-16; *see Miller v. Shugart*, 316 N.W.2d 729, 735-36 (Minn. 1982) (settlement reached in "trial" has different "*bona fides*" than one reached pre-trial; "stipulated judgment was not conclusive on the insurer").

Here, the Debtors had little financial stake in the Global Settlement; the Plan reflects that they made at most two cash contributions in connection with their RMBS-related liabilities – $100 million to the N.J. Carpenters Funds, and $24 million to the FHFA. Ex. N at Arts. III.D.3(g)(ii), (k)(ii), IV.A.a. (Plan); Ex. P at 37-38 (Confirmation Order). The Debtors apparently made no other out-of-pocket payments. Pursuant to the Confirmation Order and well-established bankruptcy law, confirmation of the Plan released RFC from all liabilities arising before December 17, 2013, including all liabilities underlying the Global Settlement. Ex. P at 56-57 (Confirmation Order); 11 U.S.C. §§ 1141(d)(1)(A), 101(5), 101(12); *CFTC v. NRG Energy, Inc.*, 457 F.3d 776, 779 (8th Cir. 2006); *Sumpter v. DPH Holdings Corp. (In re DPH Holdings Corp.)*, 468 B.R. 603, 615 (S.D.N.Y. 2012). Although the Plan allowed certain claims and provided for distribution of units in a Liquidating Trust, those actions occurred in "full and final satisfaction, settlement, release, and discharge of and in exchange for such [] Allowed Claim[s]." Ex. N at Art. III.D. (Plan). As a petitioner in a liquidating bankruptcy, RFC did not expect to survive as a going concern, much less fund the settlement. Defendants have a special and compelling need for discovery of settlement communications where, as here, it is not presumed that RFC's self-interest led it to seek a reasonable settlement.[4]

---

[4] The denial of mediation discovery in *Teligent* reflects a different claim in a different

### B.      Barring Discovery Of Mediation Communications Would Be Unfair.

Barring discovery in these cases would be tremendously unfair.  Not only has Plaintiff

placed at issue the reasonableness of the Global Settlement, but there are substantial questions

concerning the settlement, and Defendants otherwise lack access to this critical information.

Substantial questions exist concerning the reasonableness of the settlement.  The

Committee raised significant questions concerning the reasonableness of the Original RMBS

Settlement, including whether: (1) it failed to account for legal defenses, such as loss causation,

statute of limitations, and election of remedies, which would have reduced the Debtor's liability

by billions of dollars; (2) Ally agreed to a higher recovery for Institutional Investors in return for

broad estate and third-party releases and a cap on its contribution to the estate; and (3) the

Debtors' experts failed to perform analyses to support the settlement, such as estimating the

losses caused by breaches of representations or warranties or that would result in put-back

liability.  *See*, *e.g.*, Ex. H at 5-6, 14-18, 23-28 (Committee Obj.).  Following approval of the

---

circumstance.  There, the defendant, a law firm, had drafted a severance agreement for Teligent's
CEO before Teligent declared bankruptcy.  *Teligent*, 640 F.3d at 55.  The Unsecured Claims
Estate Representative sued the CEO in an adversary proceeding, claiming he was liable for a $12
million loan because he had resigned from Teligent.  *Id.* at 55-56.  The CEO lost a $12 million
judgment at trial, the Estate Representative sued the CEO and his wife for fraudulent transfer of
property, the Estate Representative and CEO (represented by new counsel) mediated and invited
the law firm to participate (it did not), the Estate Representative and CEO settled the adversary
proceeding and fraudulent transfer suit for $6 million, and the CEO sued the law firm for
malpractice (with the Estate taking a 50% interest in a recovery).  *Id.* at 56.  The law firm moved
to lift mediation confidentiality, but the Second Circuit upheld the denial of that motion, finding
no error in the conclusion that the firm "failed to demonstrate a special or compelling need" for
all mediation communications or "resulting unfairness" absent that discovery.  *Id.* at 59.  Unlike
here, the legal malpractice claim in *Teligent* put at issue whether the law firm violated the
standard of care when representing the CEO, an issue on which the settlement was not relevant;
the law firm sought "the mediator's testimony," 417 B.R. 197, 205 (Bankr. S.D.N.Y. 2009); the
settlement occurred after trial, and payment was less than the judgment; and the law firm argued
that the discovery "'may be relevant'" to causation, mitigation, and damages, *id.*; 2010 WL
2034509, at *3, *7 (S.D.N.Y. May 13, 2010).  Plaintiff's indemnification claim, in contrast,
adjudicates whether the pre-trial settlement is reasonable: it arises directly from the settlement, it
is inextricably intertwined with the settlement, and settlement communications are critical to
determining the merits of the claim.

Global Settlement, the Ad Hoc Group raised similar questions.  *See*, *e.g.*, Ex. O  at 3 (Ad Hoc

Comm. Obj.) (there was "nothing principled" about the Global Settlement; it was "reverse

engineered" to give consenting claimants "the recovery they had negotiated").

Plaintiff's limited production fails to answer these questions.



If not amended, the Mediation Order shields from

discovery the documentary record leading up to the Global Settlement, depriving Defendants of

important evidence of whether the Global Settlement resolved substantial questions concerning

the reasonableness of the Original RMBS Settlement.  It is fundamentally unfair to deny

Defendants discovery of the very process through which the Debtors arrived at the Global

Settlement, evidence that Defendants cannot obtain elsewhere.  *Cf. Teligent*, 640 F.3d at 59

(Unfairness not demonstrated where, unlike here, "the evidence" was "available through other

means," such as "responses to interrogatories or depositions").

Notably, the Committee in the bankruptcy proceeding was afforded far greater discovery

to probe the reasonableness of the Original RMBS Settlement than Defendants have had here, as

the Debtors produced their settlement communications regarding the Original RMBS Settlement.

Ex. M at 2 (GB Resp.).  There is no reason the Mediation Order cannot be amended to allow the

same here.  Declining to do so would place this entire category of evidence relating to the Global

Settlement beyond reach, unfairly prejudicing Defendants' ability to contest the reasonableness and allocation of the settlement.

Denying such access is particularly unfair here, as an indemnitor that receives notice of a proceeding and an impending settlement can stay informed of both.  In contrast, where, as here, the indemnitee nowhere alleges that it provided notice, the indemnitor is excluded from the underlying proceeding and settlement, lacks basic insight into each, and its need for discovery of each is at its height.  *See Atlantic Richfield*, 784 F.2d at 115 ("[B]y failing to give notice," indemnitee prevented indemnitor from having "some say over whether its funds were being well-spent").  Depriving indemnitors of access to mediation communications after an indemnitee has failed to provide notice of a proceeding and settlement is doubly unfair.

### C.    Defendants' Need For The Evidence Outweighs Any Confidentiality Interest.

Finally, Defendants' need for mediation communications outweighs any interest in barring their discovery.  Confidentiality concerns here are at their nadir, the need for the discovery is at its zenith, and there is a mechanism for accommodating any competing concerns.

*First*, two of the public policy considerations underlying the confidentiality of mediation communications – protecting mediators from discovery, and protecting parties from their own mediation statements improperly being used against them in that case – are non-existent here. Defendants do not seek any discovery of the mediator.  *Cf. NLRB v. Joseph Macaluso, Inc.*, 618 F.2d 51, 56 (9th Cir. 1980) (approving revocation of subpoena seeking testimony from mediator).  Nor do Defendants seek to use a party's statements in the case in which the statement was made.  *Cf. Bernard v. Galen Grp., Inc.*, 901 F. Supp. 778, 784 (S.D.N.Y. 1995) (sanctioning attorney for disclosing to court "details of the mediation" to "undermine" mediation "in this case").  Courts recognize that concerns attendant to the disclosure of settlement communications are significantly lessened after a settlement is "completed."  *Bank Brussels Lambert v. Chase*

19

*Manhattan Bank, N.A.*, 1996 WL 71507, at *3 n.1 (S.D.N.Y. Feb. 20, 1996).  Here, Defendants

seek discovery of settlement communications between adverse parties for use in a different

proceeding in which the reasonableness of that settlement is at issue.  No mediator will be

subject to discovery, and no mediation communication will be used in the mediated case; these

core concerns simply are not implicated here.  Indeed, the impetus for the Debtors' request for

confidentiality – to prevent "public" disclosure of "material non-public information," Ex. R at

65-66 (Mediation Hearing) – is not even a concern.  Plaintiff cynically seeks to leverage

mediation confidentiality intended for a different purpose to block highly relevant discovery on

an issue it knew it would have to prove if it sought indemnity.  Far from serving a public policy,

Plaintiff's opposition to modifying the Mediation Order most serves its narrow self-interest.

 *Second*, as set forth above, Defendants' need for these materials is palpable.

 *Third*, once Plaintiff placed the subject of the mediation at issue, it could not reasonably

expect that Defendants would be barred from obtaining discovery concerning the mediation.  As

discussed above, a party seeking indemnification must prove that the settlement was reasonable,

and the indemnitor is entitled to probe its reasonableness.  Where a litigant "could not reasonably

have relied on the continuation of a protective order[,] a court may properly permit modification

of the order."  *SEC v. TheStreet.Com*, 273 F.3d 222, 231 (2d Cir. 2001).  That is particularly true

here, where the Mediation Order itself reflected the Court's ability to modify it.  *See Lugosch v.

Pyramid Co. of Onondaga*, 435 F.3d 110, 126 (2d Cir. 2006) ("[I]t is difficult to see how the

defendants can reasonably argue . . . reliance" on a protective order which "specifically

contemplates that relief from the provisions of the order may be sought at any time").  Moreover,

even if Plaintiff believed the Mediation Order would prevent *public* disclosure of mediation

communications, Plaintiff's claim seeking indemnity for billions of dollars from Defendants

makes any expectation that *Defendants* would be barred access to such communications

unreasonable.  Further, as discussed above, a party seeking indemnity for a multi-claim

settlement must prove the appropriate allocation of the settlement based on information known to

it at the time of settlement.  Plaintiff could not reasonably expect that Defendants would be

prevented from obtaining access to contemporaneous evidence of information known to RFC.

 *Fourth*, to the extent Plaintiff has an interest in barring public disclosure of mediation

communications, the Court can accommodate that interest through a Protective Order limiting

the use and dissemination of these materials.  In *Franklin United Methodist Home, Inc. v.

Lancaster Pollard & Co.*, 909 F. Supp. 2d 1037, 1045-47 (S.D. Ind. 2012), for example, the

court modified a mediation protective order entered by the Bankruptcy Court in the Southern

District of New York to permit discovery of documents relating to the Lehman Bankruptcy ADR

negotiations and restricting the use of those documents to that case.[5]  As one federal court of

appeals held, "any legitimate interest in continued secrecy as against the public at large can be

accommodated by placing the collateral litigants under the same restrictions on use and

disclosure contained in the original protective order."  *Foltz v. State Farm Mut. Auto. Ins. Co.*,

331 F.3d 1122, 1133 (9th Cir. 2003) (alterations and internal quotation marks omitted).[6]  If a

---

[5] The *Franklin* court considered four factors:  (1) whether the order was entered by agreement or
through the court's "resolution of the parties' disputes;" (2) whether discovery was sought from
the party against which restrictions of the protective order applied or from the producer of the
documents; (3) whether the case in which the protective order issued was pending; and (4)
whether it was possible to incorporate in the modification order terms that furthered the goals of
the protective order.  909 F. Supp. 2d at 1045.  These factors favor modification here:  (1) the
Mediation Order was largely uncontested; (2) Defendants seek communications between adverse
parties; (3) the bankruptcy plan has been confirmed; and (4) the Court can issue a protective
order preserving confidentiality.

[6] In *Foltz*, the court considered two factors when modifying the protective order:  (1) "the
relevance of the protected discovery to the collateral proceedings;" and (2) the "reliance interest
of the party opposing modification."  331 F.3d at 1133.  Those factors favor modification:  the

protective order can protect the confidentiality of a business' trade secrets, it can protect mediation communications in a resolved bankruptcy.

There is no reason a protective order cannot be used here to prevent public disclosure of mediation communications. Placing this discovery under a protective order strikes a common-sense middle ground, preserving confidentiality against public disclosure, but allowing indemnitors access to highly relevant information. Defendants' need for discovery regarding the reasonableness of the Global Settlement outweighs any interest in withholding mediation communications, and any confidentiality concerns easily can be accommodated.

## II.    PLAINTIFF'S OTHER OBJECTIONS ARE MERITLESS.

Plaintiff's remaining objections to producing highly relevant materials are makeweight.

### A.    Rule 408 Does Not Govern The Scope Of Permissible Discovery.

Plaintiff's reliance on Rule of Evidence 408 to withhold settlement communications is meritless. It is black-letter law that "the scope of discovery permitted by Rule 26(b)(1) is not limited by Federal Rule of Evidence 408." *In re Initial Pub. Offering Sec. Litig.*, 2004 WL 60290, at *3 (S.D.N.Y. Jan. 12, 2004) (capitals deleted). Rule 408 "neither governs nor precludes" discovery of settlement communications. *Tribune Co. v. Purcigliotti*, 1996 WL 337277, at *1 (S.D.N.Y. June 19, 1996). Rather, as a rule governing the admissibility of evidence at trial, Rule 408 provides only that evidence of a compromise or attempted compromise "is not admissible to prove liability for or invalidity of the claim or its amount." *Id.* at *1 (internal quotation marks omitted). The Rule says nothing about whether settlement communications are *discoverable*. In fact, Rule 408 allows parties to introduce settlement evidence at trial for purposes other than proving liability or damages. *See*, *e.g.*, *Greenwich Film*

---

settlement communications are relevant, and any reliance interest is minimal when the Mediation Order states it can be changed and a protective order can protect any confidentiality concerns.

*Prods., S.A. v. DRG Records, Inc.*, 1996 WL 502336, at *2 (S.D.N.Y. Sept. 5, 1996) (settlement

position admissible to prove attorney's fees); *Century Indem. Co. v. Aero-Motive Co.*, 336 F.

Supp. 2d 739, 749 (W.D. Mich. 2004) (settlement offer admissible "to rebut [plaintiff's] claim

that the settlement amount was reasonable"); *Bank Brussels*, 1996 WL 71507, at *3 (Rule 408

"is not designed to lock away settlement documents"). A rule approving the admission of

settlement evidence is not properly invoked to bar its discovery.

Rule 408 does not limit discovery; "the discovery of settlement materials" is governed by

the same standard as all "other documents under the Federal Rules of Civil Procedure." *In re

Initial Pub. Offering*, 2004 WL 60290, at *2. Plaintiff's contrary assertion is meritless.

### B.    General Order M-390 Does Not Bar Modification Of The Mediation Order.

Plaintiff claims that mediation-related discovery violates General Order M-390.[7] General

Order M-390, however, is subject to the terms of the Mediation Order. *See* Ex. B ¶ 6 (Mediation

Order states that, "to the extent any part of this Order shall conflict with Local Rule 9019-1 or

General Order M-390, the terms and provisions of this Order shall govern"). The Mediation

Order states that the Court subsequently may authorize disclosure of mediation communications.

*Id*. ¶ 4 (prohibiting disclosure "unless . . . authorized by this Court"). General Order M-390 does

not provide a basis for declining to modify the Mediation Order.[8]

---

[7] The Alternative Dispute Resolution Act of 1988 directed the enactment of rules to govern "alternative dispute resolution" and to "provide for the confidentiality" of that process. 28 U.S.C. §§ 652(a), 652(d). By requiring confidentiality, Congress did not intend to bar later challenges to "the validity of a settlement agreement based on events that transpired at a mediation." *FDIC v. White*, 76 F. Supp. 2d 736, 738 (N.D. Tex. 1999). To hold otherwise "would effectively bar a party from raising well-established common law defenses such as fraud, duress, coercion, and mutual mistake. It is unlikely that Congress intended such a draconian result under the guise of preserving the integrity of the mediation process." *Id*.; *see also Franklin*, 909 F. Supp. 2d at 1045 (modifying bankruptcy court's mediation order to permit discovery of ADR documents).

[8] Nor do this Court's other Orders address the issue, as it has not had occasion to decide whether to modify the Mediation Order to allow indemnitors to obtain mediation communications in a

### C.    Plaintiff's Undue Burden Claim Is Completely Unsupported.

Plaintiff's assertion that it "would be unduly burdensome" to produce settlement-related communications from before the Mediation Order issued, Ex. E at 1 (Feb. 18, 2015 McDaniel email to Ahmad), is frivolous.  A party "cannot evade its discovery responsibility by simply intoning [the] familiar litany that the [discovery requests] are burdensome, oppressive or overly broad;" rather, the objecting party bears the burden "to explain its objections and to provide support therefore."  *Shannon v. N.Y.C. Transit Auth.*, 2001 WL 286727, at *1 (S.D.N.Y. Mar. 22, 2001) (internal quotation marks omitted).  As Plaintiff recently acknowledged in related proceedings, "[b]ald assertions of burden are not a basis to withhold relevant documents."  Ex. JJ at 4 (May 18, 2015 Ong Ltr. to D. Minn. Mag. J. Bowbeer).  Here, Plaintiff provides no support for its undue burden claim.  That is not surprising; communications relating to settlement likely reside in a finite number of files, including the correspondence or settlement files of specific lawyers and business persons who represented the Debtors in settlement.  It is not credible to claim that it would be unduly burdensome to search such easily located files for a limited and clearly defined universe of communications.

### D.    Plaintiff's Objection To Communications Outside Of Mediation Is Unfounded.

Finally, Plaintiff's objection to producing communications between the Chapter 11 parties that occurred outside of mediation but during its time frame (December 26, 2012 through December 11, 2013) is inconsistent with the Mediation Order, which is limited to communications exchanged in the course of mediation.  Ex. B ¶ 4.

The Mediation Order concerns four categories of documents:  (1) "mediation statements" and other documents "provided to the Mediator or the Mediation Parties in the course of the mediation;" (2) "correspondence, draft resolutions, offers, and counteroffers produced for or as a

subsequent proceeding where the indemnitee seeks indemnification for the settlement.

24

result of the mediation;" (3) "pleading or other submission to any court, any such discussion, mediation statement, other document or information, correspondence, resolution, offer or counteroffer that may be made or provided in connection with the mediation;" and (4) "discussions among any of the Mediation Parties, including discussions with or in the presence of the Mediator." *Id*. The Order defines "Mediation Parties" as the "parties involved in the mediation discussions." *Id*. Plaintiff cannot stretch this Order to shield communications made outside the course of mediation.

The confidentiality restrictions of General Order M-390 similarly apply only to information exchanged in the course of mediation. General Order M-390 applies to all "documents received or made by a mediator," and it makes certain aspects of the "mediation effort" confidential, including the "[v]iews expressed or suggestions made by any party with respect to a possible settlement," "[a]dmissions made by the other party in the course of the mediation proceedings," and "[p]roposals made or views expressed by the mediator." Confidentiality does not extend to communications made outside of mediation.[9]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court to modify its Mediation Order to allow discovery of the Chapter 11 parties' settlement communications.

---

[9] This limited scope is consistent with the case law, which does not extend mediation confidentiality to communications made outside mediation. *See, e.g.*, *U.S. Fid. & Guar. Co. v. Dick Corp./Barton Malow*, 215 F.R.D. 503, 506-07 (W.D. Pa. 2003) (Discussions "not occurring at a mediation proceeding are not privileged"); *United States v. U. Pac. R.R.*, 2007 WL 1500551, at *6 (E.D. Cal. May 23, 2007) (settlement communications not "prepared in connection with a formal mediation or court-ordered settlement conference" are discoverable).

Dated: June 3, 2015

Respectfully submitted,

| | |
|---|---|
| /s/  R. Hackney Wiegmann | /s/ John Doherty |
| R. Hackney Wiegmann (hwiegmann@wc.com) | John P. Doherty (john.doherty@alston.com) |
| Andrew W. Rudge (arudge@wc.com) | Jennifer Susan Kozar |
| Matthew V. Johnson (mjohnson@wc.com) | (jennifer.kozar@alston.com) |
| Jesse Smallwood (jsmallwood@wc.com) | James S. D'Ambra, Jr. |
| Krista Anderson (kmanderson@wc.com) | (jamesdambra@alston.com) |
| WILLIAMS & CONNOLLY LLP | ALSTON & BIRD LLP |
| 725 Twelfth Street, N.W. | 90 Park Avenue |
| Washington, DC 20005 | New York, NY 10016 |
| (202) 434-5000 | (212) 210-9400 |
| (202) 434-5029 (fax) | (212) 210-9444 (fax) |
| | |
| *Attorneys for Defendant HSBC Mortgage Corp. (USA)* | *Attorneys for Defendant SunTrust Mortgage, Inc.* |
| | |
| /s/ Cameron S. Matheson | /s/ Roland P. Reynolds |
| James A. Murphy (jmurphy@mmlawus.com) | Roland P. Reynolds |
| Cameron S. Matheson (cmatheson@mmlawus.com) | (rreynolds@pldlawyers.com) |
| Theodore R. Snyder (tsnyder@mmlawus.com) | PALMER, LOMBARDI & DONOHUE, LLP |
| MURPHY & MCGONIGLE, PC | 515 South Flower Street |
| 1185 Avenue of the Americas | Suite 2100 |
| 21st Floor | Los Angeles, CA 90071 |
| New York, NY 10036 | (213) 688-0430 |
| (212) 880-9999 | (213) 688-0440 (fax) |
| | |
| *Attorneys for Defendants Summit Financial Mortgage LLC and Summit Community Bank, Inc.* | *Attorney for Defendant Mortgage Investors Group, a general partnership* |

/s/ Robert A. Fumerton
Robert A. Fumerton (robert.fumerton@skadden.com)
Alexander C. Drylewski
(alexander.drylewski@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, NY 10036
(212) 735-3000
(212) 735-2000 (fax)

*Attorneys for Defendant UBS Real Estate Securities Inc.*