**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| | Chapter 11 |
| RESIDENTIAL CAPITAL, LLC, *et al.*, | Case No. 12-12020 (MG) |
| | (Jointly Administered) |
| Debtors. | |

| | |
|---|---|
| In re: | |
| RESCAP LIQUIDATING TRUST MORTGAGE PURCHASE LITIGATION | Adv. Proc. No. 14-07900 (MG) |

| | |
|---|---|
| RESIDENTIAL FUNDING COMPANY, LLC, | |
| Plaintiff, | |
| – against – | Adv. Proc. No. 14-01915 (MG) |
| HSBC MORTGAGE CORP. (USA), | |
| Defendant. | |

| | |
|---|---|
| RESIDENTIAL FUNDING COMPANY, LLC, | |
| Plaintiff, | |
| – against – | Adv. Proc. No. 14-01926 (MG) |
| UBS REAL ESTATE SECURITIES, INC., | |
| Defendant. | |

| | |
|---|---|
| RESCAP LIQUIDATING TRUST, | |
| Plaintiff, | |
| – against – | Adv. Proc. No. 14-01996 (MG) |
| SUMMIT FINANCIAL MORTGAGE, LLC, *et ano.*, | |
| Defendants. | |

RESCAP LIQUIDATING TRUST,

                                        Plaintiff,

        – against –                                        Adv. Proc. No. 14-02004 (MG)

MORTGAGE INVESTORS GROUP, INC., *et al.*,

                                        Defendants.

RESIDENTIAL FUNDING COMPANY, LLC,

                                        Plaintiff,

        – against –                                        Adv. Proc. No. 13-01820 (MG)

SUNTRUST MORTGAGE, INC.,

                                        Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO MODIFY MEDIATION ORDER

*A P P E A R A N C E S:*

WILLIAMS & CONNOLLY LLP
*Attorneys for Defendant HSBC Mortgage Corp. (USA)*
725 Twelfth Street, N.W.
Washington, DC 20005
By:     R. Hackney Wiegmann, Esq.
        Andrew W. Rudge, Esq.
        Matthew V. Johnson, Esq.
        Jesse Smallwood, Esq.
        Krista Anderson, Esq.

ALSTON & BIRD LLP
*Attorneys for Defendant SunTrust Mortgage, Inc.*
90 Park Avenue
New York, New York 10016
By:     John P. Doherty, Esq.
        Jennifer Susan Kozar, Esq.
        James S. D'Ambra, Jr., Esq.

MURPHY & MCGONIGLE, PC
*Attorneys for Defendants Summit Financial Mortgage LLC*
*and Summit Community Bank, Inc.*
1185 Avenue of the Americas, 21st Floor
New York, New York 10036
By:    James A. Murphy, Esq.
        Cameron S. Matheson, Esq.
        Theodore R. Snyder, Esq.

PALMER, LOMBARDI & DONOHUE, LLP
*Attorneys for Defendant Mortgage Investors Group,*
*a General Partnership*
515 South Flower Street
Suite 2100
Los Angeles, California 90071
By:    Roland P. Reynolds, Esq.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
*Attorneys for Defendant UBS Real Estate Securities, Inc.*
Four Times Square
New York, New York 10036
By:    Robert A. Fumerton, Esq.
        Alexander C. Drylewski, Esq.

QUINN EMANUEL URQUHART & SULLIVAN, LLP
*Attorneys for Plaintiffs the ResCap Liquidating Trust and*
*Residential Funding Company, LLC*
51 Madison Avenue, 22nd Floor
New York, New York 10010
By:    Peter E. Calamari, Esq.
        Isaac Nesser, Esq.
        David Elsberg, Esq.
        Matthew Scheck, Esq.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
*Attorneys for Plaintiffs the ResCap Liquidating Trust and*
*Residential Funding Company, LLC*
1177 Avenue of the Americas
New York, New York 10036
By:    Kenneth H. Eckstein, Esq.
        Douglas H. Mannal Esq.
        Philip Bentley, Esq.

CARPENTER LIPPS & LELAND LLP
*Attorneys for Plaintiffs the ResCap Liquidating Trust and*
*Residential Funding Company, LLC*

280 Plaza, Suite 130
280 North High Street
Columbus, Ohio 43215
By:     Jeffrey A. Lipps, Esq. (*pro hac vice*)
        Jennifer A.L. Battle, Esq. (*pro hac vice*)

MORRISON & FOERSTER LLP
*Attorneys for Plaintiffs the ResCap Liquidating Trust and*
*Residential Funding Company, LLC*
1290 Avenue of the Americas
New York, New York 10104
By:     Todd M. Goren, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

        The ResCap Liquidating Trust (the "Trust" or the "Plaintiff") or its predecessor in

interest, Residential Funding Company, LLC f/k/a Residential Funding Corporation ("RFC"),

filed adversary proceedings against the defendants (the "Defendants")[1] asserting breach of

contract and indemnification claims arising out of the Defendants' sale of allegedly defective

residential mortgage loans to RFC.  RFC subsequently sold the loans to whole loan purchasers or

pooled and sold the loans into residential mortgage-backed securitization ("RMBS") trusts.  A

number of lawsuits were filed against RFC challenging its role in securitizing allegedly defective

loans before the chapter 11 cases were filed.  After RFC and its debtor-affiliates (the "Debtors")

filed their chapter 11 cases in May 2012, hundreds of proofs of claim, alleging billions of dollars

of damages, were filed against RFC based on the allegedly defective loans..

        RFC ultimately resolved its RMBS-related liabilities in a global settlement negotiated

during the lengthy Court-ordered mediation in the Debtors' chapter 11 cases (the "Global

Settlement").  The Global Settlement is a central element of the Debtors' confirmed chapter 11

---

[1]        The Defendants are:  (1) HSBC Mortgage Corp. (USA) ("HSBC"); (2) UBS Real Estate Securities
Inc.("UBS"); (3) Summit Financial Mortgage LLC and Summit Community Bank, Inc. (together, "Summit");
(4) Mortgage Investors Group, Inc., Mortgage Investors Group, a general partnership, and American Real Estate
Corporation (collectively, "MIG"); and (5) SunTrust Mortgage Inc. ("Suntrust").

2

plan (the "Plan").[2]  Now the Trust seeks to recoup these losses and liabilities resulting from the

Global Settlement and the Plan by asserting breach of contract and indemnification claims

against the Defendants and others.[3]

In the pending adversary proceedings the Trust filed against the Defendants, the

Defendants seek discovery of oral and written communications of the parties that participated in

the mediation relating to the RMBS claims that were resolved in the Global Settlement.  In light

of the objection and refusal of the Plaintiff and other parties to the mediation to provide the

requested discovery based on the Mediation Order entered by the Court  (*see* "Mediation Order,"

Case No. 12-12020, ECF Doc. # 2519), the Defendants filed a motion requesting that the Court

modify the Mediation Order (the "Motion," ECF Doc. # 86).[4]  The Mediation Order appointed

my colleague, Hon. James M. Peck, as the mediator, and it set forth the procedures—especially

confidentiality—governing the mediation.  Specifically, the Defendants seek to modify the

Mediation Order so they can take discovery of mediation communications concerning the Global

Settlement; the Mediation Order protects the communications from disclosure.  According to the

Defendants, to obtain indemnification from them, the Plaintiff must prove the reasonableness of

the Global Settlement and communications concerning the Global Settlement are "critical" to

that very issue.

---

[2]      The Plan refers to *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* (Case No. 12-12020, ECF Doc. # 6030), confirmed by the Court on December 11, 2013 (the "Confirmation Order," Case No. 12-12020, ECF Doc. # 6065).  The Plan became effective on December 17, 2013.  (*See* Case No. 12-12020, ECF Doc. # 6137.)

[3]      The Trust or RFC commenced a number of similar federal and state court actions against other defendants in Minnesota (the "Minnesota Actions").

[4]      The Motion is supported by the declaration of Krista Anderson (the "Anderson Decl.," ECF Doc. # 87). Except as otherwise indicated herein, all citations to the docket relate to Adv. Proc. No. 14-07900.

Objections to the Motion (the "Objections") were filed by the Plaintiff (the "Pl.'s Obj.,"

ECF Doc. # 90),[5] the Debtors' non-debtor parent, Ally Financial, Inc. ("Ally") (the "Ally Obj.,"

ECF Doc. # 90), and others.[6]  The Defendants filed a reply (the "Reply," ECF Doc. # 101).[7]

Additionally, a group of sixty-seven defendants in the Minnesota Actions (collectively, the

"Minnesota Defendants") filed a statement in support of the Motion and the Reply (the "MN

Defs.' Stmt," ECF Doc. # 105).[8]

The parties agree that the standard governing modification of the Mediation Order is the

three-part test set forth in *Savage & Associates, P.C. v. K&L Gates LLP (In re Teligent, Inc.)*,

640 F.3d 53 (2d Cir. 2011).  The parties dispute whether the Defendants have satisfied their

burden under *Teligent*.

The Court held a hearing on the Motion on July 30, 2015.  At the conclusion of the

hearing, the Court denied the Motion on the record, holding that the Defendants failed to

establish that modification of the Mediation Order is warranted under the *Teligent* three-prong

test.  The Court stated that a written opinion further explaining the Court's ruling would follow.

---

[5]    The Plaintiff's Objection is supported by the declaration of Jennifer A.L. Battle (the "Battle Decl.," ECF Doc. # 92).  The Plaintiff's Objection is joined by:  (i) the Steering Committee Group of RMBS Holders (ECF Doc. # 95); and (ii) New Jersey Carpenters Health Fund, Cambridge Place Investment Management Inc., and Union Central Life Insurance Company, Ameritas Life Insurance Corp., and Acacia Life Insurance Company (ECF Doc. # 94).

[6]    Other Objections were filed by:  (1) Allstate Insurance Company, Allstate Life Insurance Company, and Allstate New Jersey Insurance Company (collectively, "Allstate") (the "Allstate Obj.," ECF Doc. # 89); (2) Financial Guaranty Insurance Company ("FGIC") (the "FGIC Obj.," ECF Doc. # 98); (3) MBIA Insurance Corporation ("MBIA") (the "MBIA Obj.," ECF Doc. # 100); and (4) Paulson & Co. Inc. ("Paulson") (the "Paulson Obj.," ECF Doc. # 96).

[7]    The Reply is supported by the supplemental declaration of Krista Anderson (the "Anderson Supp.," ECF Doc. # 102).

[8]    The Minnesota Defendants' Statement is supported by the declaration of Jorge M. Gutierrez, Jr. (the "Gutierrez Decl.," ECF Doc. # 106).

# I.    **BACKGROUND**

## A.    **Factual Background**[9]

### 1.    *The Original RMBS Settlement*

Before the Debtors filed their chapter 11 cases on May 14, 2012 (the "Petition Date"),
two groups of institutional investors (the "Institutional Investors") asserted claims on behalf of
RMBS trusts (the "RMBS Trusts") against some of the Debtors and Ally arising out of alleged
breaches of representations and warranties made by RFC when it sold loans to the RMBS Trusts.
(*See* Motion at 3; "FoF," Anderson Decl. Ex. A at 41.)  Before the Petition Date, the Debtors
initially requested that Ally contribute $8–9 billion to their future bankruptcy estates.  (*See*
Motion at 3–4; *see* Anderson Decl. Ex. I at 130:18–131:12 (John Mack deposition transcript).)
Ultimately, the parties reached a prepetition proposed settlement requiring Ally to support the
Debtors up to and during their chapter 11 cases, including by providing a $750 million cash
contribution and $200 million in additional financing, in exchange for a release of all claims
against Ally.  (Motion at 4; *see* FoF at 25–26.)  This settlement was incorporated into a plan
sponsor agreement (the "Prepetition PSA," Case No. 12-12020, ECF Doc. # 6–8).  (Motion at 4;
*see* FoF at 25.)

With Ally's support, the Debtors also entered into prepetition settlement agreements with
the Institutional Investors (the "Original RMBS Settlement") (Motion at 3), which was
incorporated into the Prepetition PSA (*see* Prepetition PSA Ex. 4 at 24).  Under the Original
RMBS Settlement, the RMBS Trusts would have received an $8.7 billion allowed unsecured
claim in the expected chapter 11 filings, resolving claims relating to 392 RMBS Trusts
sponsored by the Debtors between 2004 and 2007 (the "Original RMBS Settlement").  (*See*

---

[9]    The facts recited herein are the Defendants' characterization of the facts, as set forth in the Motion.

Motion at 3; FoF at 42; Anderson Decl. Ex. G (May 9, 2012 email from Ally's counsel to Debtors' counsel).)  The Original RMBS Settlement further provided that the $8.7 billion allowed claim was to be allocated among the settling RMBS Trusts in accordance with certain formulas (the "Original RMBS Allocation Protocol").  ("Pfeiffer Declaration," Case No. 12-12020, ECF Doc. # 5682 ¶ 11.)  At the time the parties entered into the Original RMBS Settlement, there had been no verdict or finding of liability against the Debtors' on account of the RMBS-related claims.  (Motion at 3; *see* "UCC Obj.," Anderson Decl. Ex. H at 10.)

After the Petition Date, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "UCC") on May 16, 2012.  (Motion at 4; *see* FoF at 26.)  The UCC identified various issues with the Prepetition PSA, including that it:  (1) did not resolve $4 billion of monoline insurer claims; (2) did not resolve securities claims, including more than $2.4 billion in private securities claims, $13 billion in class action securities claims, and securities claims held by the Federal Housing Finance Agency; (3) was not supported by holders of more than $1 billion of senior unsecured notes; (4) did not address hundreds of millions of dollars of claims by individual and class action mortgage borrowers; and (5) did not address RMBS issued before 2004.  (Motion at 4; *see* FoF at 26–27.)  Accordingly, the UCC sought extensive discovery from the Debtors, Ally, and the Institutional Investors, each of whom produced settlement communications related to the Original RMBS Settlement.  (Motion at 4; *see* Anderson Decl. Ex. M at 2 (Institutional Investors' opposition to motion to compel production).)

The Debtors moved for entry of an order approving the Original RMBS Settlement (as amended, the "Original RMBS 9019 Motion").  (*See* Case No. 12-12020, ECF Doc. ## 320, 1176, 1887.)  In light of the then-pending Original RMBS 9019 Motion, certain trustees of the RMBS Trusts (each, an "RMBS Trustee") retained Duff & Phelps, LLC ("Duff & Phelps") to

assist with the identification, quantification, litigation, and/or resolution of the RMBS Trusts' claims. (Pfeiffer Decl. ¶ 12.)

The UCC objected to the Original RMBS 9019 Motion, raising questions regarding the propriety of the Original RMBS Settlement. (*See* Motion at 4–5; *see generally* UCC Obj.) The UCC's expert concluded that the RMBS trusts covered under the Original RMBS Settlement had incurred $16.5 billion in gross losses on materially defective loans (Motion at 4; *see* UCC Obj. at 29), an amount far less than the $45 billion advanced by the Debtors' expert in concluding that the Original RMBS Settlement was reasonable (Motion at 4; *see* UCC Obj. at 25). Among other things, the UCC challenged the opinions of the Debtors' experts and argued that the amount of the Original RMBS Settlement failed to account for the Debtors' various legal defenses. (Motion at 5; *see* UCC Obj. at 5–6.) The UCC also called into question the terms of Ally's contribution, presenting evidence that Ally "engineered the Original RMBS Settlement and agreed to endorse an RMBS allowed claim amount that was billions of dollars more than was warranted." (Motion at 5; *see* UCC Obj. at 14–21.)

Before the Original RMBS 9019 Motion was heard (*see* UCC Obj. at 1), the Debtors, Ally, and the UCC "determined that formal mediation could accelerate negotiations between the parties, forestall years of burdensome and costly litigation, and push the cases towards resolution" (FoF at 31). Accordingly, the Debtors, with the support of the UCC, requested that the Court appoint a mediator to assist in plan negotiations. (*Id.*) On December 26, 2012, the Court entered the Mediation Order appointing Hon. James Peck as mediator. (Motion at 6; FoF at 31.)

2.     *The Global Settlement*

Judge Peck held several mediation sessions in April and May 2013 to address the UCC's

objections to the Original RMBS Settlement and Prepetition PSA, ultimately culminating in the

parties entering into the Global Settlement, which was embodied in a plan support agreement

(the "Postpetition PSA") and ultimately the Plan.  (Motion at 6 *see* FoF at 31–34.)  Under the

Global Settlement, Ally was required to increase its contribution to $2.1 billion "in exchange for

a global release of all estate and third party claims made against [it]."  (Motion at 6 (quoting FoF

at 34).)  The Global Settlement also resolved "all of the Debtors' RMBS-related liabilities for

more than $10 billion in allowed claims" granted to various entities that had asserted claims

against the Debtors, including the RMBS Trusts to which the Debtors sold loans.  (Motion at 6

(quoting "Second Amended Complaint," Adv. Proc. No. 14-01915, ECF Doc. # 45 ¶ 76).)  The

Global Settlement expanded the released claims to cover more than 1,000 RMBS Trusts; the

total allowed claim amount for the RMBS Trusts was reduced from $8.7 billion under the

Original RMBS Settlement to an aggregate allowed amount of $7.3 billion.  (*See id.*; FoF at 43–

44.)  The Court approved the Debtors' entry into the Postpetition PSA on June 26, 2013.

(Motion at 6; *see* FoF at 36.)  But the Global Settlement remained subject to confirmation of the

Plan.  (*See* "Plan Term Sheet," Case No. 12-12020, ECF Doc. # 3814-4, Ex. A at 1.)

The Plan was opposed by an ad hoc group of Junior Secured Noteholders (the "JSN Ad

Hoc Group"); the JSN Ad Hoc Group litigated two adversary proceedings with the Debtors and

the UCC (together, the "Plan Proponents") regarding the extent of the JSN Ad Hoc Group's liens

and the allowed amount of its claims, including its entitlement to postpetition interest.  (*See*

Motion; FoF at 3–4.)  The JSN Ad Hoc Group also contested the reasonableness of the Global

Settlement, asserting that "it was 'reverse engineered' to give consenting claimants 'the recovery

they had negotiated.'" (Motion at 7 (quoting Anderson Decl. Ex. O at 3 (JSN Ad Hoc Group

objection to Plan)).)  The Plan Proponents, the JSN Ad Hoc Group, and Wells Fargo Bank,

N.A.[10] engaged in further mediation (FoF at 5), ultimately resulting in the parties entering into a

settlement on December 3, 2013 (Motion at 7), which was then incorporated into the Plan (FoF

at 117).

On December 11, 2013, the Court entered the Confirmation Order, which confirmed the

Plan and authorized the creation of the Trust, "into which RFC transferred all assets, including

its interest in any cause of action 'that was or could have been commenced by' RFC." (Motion

at 7 (quoting Anderson Decl. Ex. Q § 2.3 (Liquidating Trust Agreement)) (citing Plan, art.

VI.C).)  Under the Plan, creditors received "Cash" or "Units" in the Trust "in 'full and final

satisfaction' of the RMBS-related claims allowed in the bankruptcy." (*Id.* (quoting Plan, art.

III.D).)  The Plan allowed the RMBS Trusts' claims in the aggregate amounts of:  (i) $209.8

million against the GMACM Debtors;[11] and (ii) approximately $7.1 billion against the RFC

Debtors.[12]  (Plan, art. IV.C.2(a).)  These allowed amounts were developed in the mediation and

resulted in the agreed distributions to the RMBS Trusts; "[h]owever, there were certain

significant differences between the '[a]llowed amounts' and the claims of the RMBS Trusts as

determined by [Duff & Phelps]" as well as "disputes between the Debtors and the RMBS

Trustees regarding which Debtor was responsible for certain of those claims."  (Pfeiffer Decl.

¶ 29.)  Accordingly, the Plan included a protocol (the "Plan RMBS Allocation Protocol") that

---

[10]    Wells Fargo Bank, N.A. had objected to the Plan in its capacities as First Priority Collateral Agent, Third
Priority Collateral Agent, and Collateral Control Agent for the Junior Secured Notes.  (FoF at 5.)

[11]    As defined in the Plan, the "GMACM Debtors" consisted of Debtor subsidiaries of GMAC Residential
Holding Company, LLC.  (Plan, art. I.A.128, 130.)

[12]    As defined in the Plan, the "RFC Debtors" included RFC and other Debtor subsidiaries of Debtor GMAC-
RFC Holding Company, LLC.  (Plan, art. I.A.253, 255.)

allowed the RMBS Trustees, "after completing due diligence, to use their completed due

diligence and [Duff & Phelps]'s final calculations of the RMBS Claims to re-allocate the Units

that will be distributed" based on the amounts allowed against the GMACM Debtors and the

RFC Debtors, respectively.  (Pfeiffer Decl. ¶ 30.)  In connection with Plan confirmation, Duff &

Phelps concluded that the "claims of the RMBS Trusts, and the distributions thereon, [we]re

properly and fairly allocated under the Plan to the RMBS Trusts."  (*Id.* ¶ 33.)  However, Duff &

Phelps needed to perform further calculations after the Effective Date pursuant to the Plan

RMBS Allocation Protocol.  (*See id.* ¶¶ 29–32.)

### 3.      *The Plaintiff's Claims and the Discovery Dispute*

Upon entry of the Confirmation Order, RFC and the Trust filed a number of lawsuits in

federal and state courts against originators from which RFC had purchased loans, including the

Defendants.  (*See id.*)  The Plaintiff alleges that the Defendants breached representations and

warranties in the agreements selling the loans to RFC and are therefore:  (i) obligated to

indemnify RFC for its losses and liabilities incurred as a result of such breaches; and (ii) liable

for a portion of the RMBS-related allowed claims in excess of the $10 billion approved in the

Global Settlement.  (*See id.*)

The Defendants contend that the Plaintiff must prove the reasonableness of the Global

Settlement to prevail on its indemnification claims.  (*See id.* (citation omitted).)  Accordingly, the

Defendants requested that the Plaintiff produce key documents relating to the Global Settlement,

including documents relating to the mediation and communications between the parties to the

mediation.  (*Id.*; *see* "Defs.' RFP," Anderson Decl. Ex. C ¶¶ 91–92.)  The Plaintiff objected to

the production of "any communications, documents, or other materials exchanged or discussed in

the Plan Mediation" (Motion at 7–8 (quoting "Pl.'s RFP Resp.," Anderson Decl. Ex. D at 51)),

citing Federal Rule of Evidence ("FRE") 408, General Order M-390, the Mediation Order, attorney-client privilege, and the work-product doctrine (*id.* at 8 (quoting Pl.'s RFP Resp. at 51)). The Plaintiff also asserted that the Defendants' request was "overly broad and not reasonably calculated to lead to the discovery of admissible evidence." (*Id.* (quoting Pl.'s RFP Resp. at 51).) Furthermore, the Plaintiff refused to produce settlement communications predating the entry of the Mediation Order on the basis that such production would be unduly burdensome. (*See id.*; Anderson Decl. Ex. E at 1 (Feb. 18, 2015 email from Plaintiff's counsel to Defendants' counsel).) According to the Defendants, third parties, including Duff & Phelps, have also objected to producing documents on the basis that they "may not be disclosed" under the Mediation Order. (Motion at 11 (quoting Anderson Decl. Ex. EE (Mar. 26, 2015 Duff & Phelps letter objection to subpoena)).)

In November 2014, the Defendants informed the Plaintiff that they would request the Court to lift the Mediation Order's confidentiality restrictions. (*See* Motion at 9; Anderson Decl. Ex. S at 5 (Nov. 26, 2014 letter from Defendants' counsel to Plaintiff's counsel).) In response, the "Plaintiff stated it was 'unable to evaluate in the abstract whether it will oppose [the] Defendants' threatened motion . . . .'" (Motion at 9 (quoting Anderson Decl. Ex. T at 4 (Dec. 30, 2014 letter from Plaintiff's counsel to Defendants' counsel)).) The Plaintiff stated that "it does not intend to rely on any documents it will not produce and it cannot produce any documents subject to the Mediation Order." (*Id.* (quoting Anderson Decl. Ex. T at 5 n.3).)

According to the Defendants, the Plaintiff has produced documents relating to the Original RMBS Settlement, which "raise serious questions concerning the reasonableness of that settlement." (*Id.*) The Defendants assert that these documents suggest that the Institutional Investors obtained "an inflated settlement" because, among other things, "allowed claims have

significantly less value than cash . . . ." (*Id.* at 10 (citations omitted).)  The Defendants have not yet obtained similar discovery relating to the Global Settlement.  (*Id.* at 11.)

## B.       The Motion

The Defendants argue that the Court should modify the Mediation Order to permit discovery of communications concerning the Global Settlement, including communications related to mediation.  (*See id.* at 11–22.)  The Defendants assert that they have established each prong of the *Teligent* standard for modification of a mediation order because:  (1) they have a special need to obtain the mediation communications (*see id.* at 12–16); (2) it would be unfair to bar discovery of the mediation communications (*see id.* at 17–19); and (3) their need to obtain the mediation communications outweighs any interest in maintaining confidentiality (*see id.* at 19–22).

## C.       The Objections

### 1.       The Plaintiff's Objection[13]

The Plaintiff asserts that the Defendants fail to meet their burden of establishing that relief from the Mediation Order is warranted under the three-prong *Teligent* test.  (*See* Pl.'s Obj. at 1, 3–4.)  First, the Plaintiff contends that the assurance of confidentiality in mediation communications is an important policy concern (*see id.* at 1), and neither the Plaintiff nor any other mediation participant can unilaterally waive the Mediation Order's protections that reflect and foster this policy concern (*see id.* at 2).  Even if the Mediation Order's protections could be unilaterally waived, the Plaintiff argues, the Plaintiff did not waive such protections by putting the reasonableness of the Global Settlement at issue.  (*Id.*)  Second, the Plaintiff contends that the

---

[13]       Allstate, FGIC, Paulson, and MBIA generally join in the arguments made in Plaintiff's Objection and argue that granting the Defendants the relief sought in the Motion would compromise their expectations of confidentiality in mediation communications.  (*See generally* Allstate Obj.; FGIC Obj.; Paulson Obj.; MBIA Obj.)

Defendants falsely assume that the reasonableness of the Global Settlement should be measured by the mediation participants' subjective expressions, when the test of the Global Settlement's reasonableness is objective and focuses on "facts bearing on liability, damages, and the risks of going to trial." (*Id.*) Finally, the Plaintiff argues that the Defendants' reliance on the UCC's objection to the Original RMBS Settlement is misguided, noting that the scope and terms of the two settlements were substantially different, the Original RMBS Settlement did not implicate confidentiality interests because it was not governed by a mediation order, and, in any event, the Defendants may still make any argument in opposition to the Original RMBS Settlement on the basis of the existing record. (*Id.* at 3.)

        2.     *The Ally Objection*

Ally advances four arguments in opposition to the Motion. First, Ally argues that the Defendants' request for undefined, expansive relief is facially deficient. (*See* Ally Obj. at 6–7.) Second, Ally argues that the unidentified mediation materials are not critical (as opposed to merely relevant) to the Plaintiff's indemnification actions (*see id.* at 7), and therefore, the Defendants cannot establish that their inability to obtain the mediation materials prevents them from defending the Plaintiff's claims (*id.* at 8). Third, Ally insists that the Defendants must seek their requested information from non-confidential sources and they have failed to indicate how they have taken steps to obtain such information through other means. (*Id.* at 12.) Finally, Ally contends that modification of the Mediation Order would undermine future bankruptcy mediations by compromising the integrity of the confidentiality protections that the mediation parties expected it would provide. (*See id.* at 14–18.)

### D.      The Reply

The Defendants reiterate that they have established that relief is warranted under the

*Teligent* standard.  First, the Defendants assert that they have a special need for the mediation

communications, arguing that:  (i) the Plaintiff's argument that they cannot unilaterally "waive"

mediation confidentiality is a straw man argument because the Defendants never argued or

suggested that the Plaintiff waived anything (Reply at 1); (ii) the Plaintiff's indemnification

claim put at issue "whether there is a 'special need' for communications between settling parties

to determine whether the [Global Settlement] was reasonable and prudent and RFC could have

been held liable for the settlement amount" (*id.* at 2 (citation omitted)); (iii) the mediation

communications are critical to assessing the reasonableness of the Global Settlement (*see id.* at

3–9); (iv) the mediation communications are critical to assessing which part of the Global

Settlement is allocated to a covered claim (*see id.* at 9–10); and (v) the mediation

communications are critical to determining whether RFC acted in good faith in entering into the

Global Settlement (*see id.* at 10–11).  Second, the Defendants argue that the relief requested in

the Motion is fair to all parties, but it would be unfair to deny the Defendants access to mediation

communications to which they otherwise could have been privy if RFC had provided them with

prior notice of the indemnity claims.  (*See id.* at 12–14.)  Finally, the Defendants contend that a

balance of interests favors limited disclosure of mediation communications among "adverse

parties" (*id.* at 15 (quoting Motion at 20)), especially since the Motion requests that the materials

be placed under a protective order so they are not made available to the public (*see id.* at 15

(citing Motion at 2, 21)).

### E.    The Minnesota Defendants' Statement

The Minnesota Defendants support the Motion and assert that the adverse parties'

mediation communications are critical to issues underlying the Trust's claims against them.

(MN Defs.' Stmt at 1.)  The Minnesota Defendants also argue that communications not made in

mediation are not subject to mediation confidentiality under the terms of the Mediation Order,

and therefore the Plaintiff should not be allowed to invoke the Mediation Order's confidentiality

protections with respect to:  "(1) communications between the Chapter 11 parties made outside

of mediation sessions; (2) facts known to the parties (whether or not contained in documents

prepared for and used in mediation sessions); and (3) information known by third-parties only

tangentially connected to the mediation."  (*Id.* at 2.)

## II.    DISCUSSION

In the Second Circuit, "[a] party seeking disclosure of confidential mediation

communications must demonstrate (1) a special need for the confidential material, (2) resulting

unfairness from a lack of discovery, and (3) that the need for the evidence outweighs the interest

in maintaining confidentiality."  *Teligent*, 640 F.3d at 58 (citations omitted).  A movant seeking

to modify a protective order has "a very high bar to overcome," *Dandong v. Pinnacle

Performance Ltd.*, No. 10 Civ. 8086 (LBS), 2012 WL 4793870, at *5 (S.D.N.Y. Oct. 9, 2012),

and must establish all three elements of this three-part test "to warrant disclosure of otherwise

non-discoverable documents," *Teligent*, 640 F.2d at 58.

As explained more fully below, the Court concludes that the Defendants have failed to

establish any element of the *Teligent* three-prong test and therefore **DENIES** their Motion to

modify the Mediation Order.  First, the Defendants have not established they have a special need

for communications protected under the Mediation Order to defend against the Plaintiffs' claims

under either Minnesota or New York law.[14]  Second, the Defendants have not demonstrated that

it would be unfair to prohibit them from obtaining mediation communications covered by the

Mediation Order.  Finally, the Defendants have not established that their need to obtain

mediation communications outweighs the strong interest in maintaining the confidentiality

protections afforded by the Mediation Order.

**A.    The Defendants Have Not Established a Special Need for Mediation Communications**

Under the first prong of the *Teligent* test, a movant seeking to modify a protective order

must establish "improvidence in the grant of the order or some extraordinary circumstance or

compelling need."  *Teligent*, 640 F.3d at 59 (quoting *SEC v. TheStreet.com*, 273 F.3d 222, 229

(2d Cir. 2001)); *see Iridium India Telecom Ltd. v. Motorola, Inc.*, 165 F. App'x 878, 880 (2d Cir.

2005) (affirming denial of motion to modify protective order on the basis that movant "had not

shown a compelling need or extraordinary circumstances necessary to modify the protective

order"); *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 296 (2d Cir. 1979) (holding that a

protective order granted pursuant to Federal Rule of Civil Procedure 26(c) should not be

modified "absent a showing of improvidence" in the grant of the order "or some extraordinary

circumstance or compelling need"); *see also Dandong*, 2012 WL 4793870, at *5 ("When courts

in [the Second Circuit] determine that a party has relied on a protective order, it is very difficult

for movants to modify that order."); *TheStreet.com*, 273 F.3d at 229 (noting the "strong

presumption against the modification of a protective order").

---

[14]    As set forth in the opinion granting in part and denying in part the Defendants' motions to dismiss these adversary proceedings, the Court previously held that New York law applies to the fraud-based indemnity claims against Suntrust and UBS and Minnesota law applies to the fraud-based indemnity claims against HSBC, MIG, and Summit.  *See Residential Funding Co., LLC v. HSBC Mortg. Corp. (USA) (In re Residential Capital, LLC)*, 524 B.R. 563, 596 (Bankr. S.D.N.Y. 2015).

The Defendants contend that they have a "special need" for mediation communications because they are critical to defending against the Plaintiff's indemnity claims. (*See* Motion at 12; Reply at 2.) First, the Defendants assert that an element of the Plaintiff's indemnity claims is the reasonableness of the Global Settlement, and therefore the Plaintiff "places directly at issue the subject matter and content of the communications exchanged in the settlement negotiations." (Motion at 12.) According to the Defendants, a "party seeking indemnification must demonstrate that (1) 'the settlement amount was reasonable and prudent,' and (2) 'the party could have been held liable for that settlement amount.'" (*Id.* (quoting *Glass v. IDS Fin. Servs., Inc.*, 778 F. Supp. 1029, 1083 (D. Minn. 1991)).) A determination of the reasonableness of a settlement involves a consideration of various facts, "including proof of the amount of money demanded, how the indemnitee estimated potential damages, the theories of liability and defenses considered, how it calculated litigation costs, and expert testimony assessing damages." (*Id.* (citing *Torain v. Clear Channel Broad., Inc.*, 651 F. Supp. 2d 125, 154–55 (S.D.N.Y. 2009)).) The Defendants claim that they have "an acute need" for documents germane to the reasonableness of the Global Settlement because "it is well-settled [in indemnification cases] that a plaintiff cannot both prosecute an indemnification claim and, at the same time, deny a defendant access to the documentary record leading up to the settlement." (*Id.* at 14.)

Second, the Defendants assert that the allocation of the Global Settlement among covered and non-covered claims is also directly at issue because a plaintiff seeking indemnification for a multi-claim settlement "must prove what part of the settlement should be allocated to each indemnitor." (*Id.*) According to the Defendants, an indemnitee cannot prove the allocation of a settlement by performing a post hoc analysis but rather must use information known to the indemnitee at the time of the settlement to prove allocation. (*See id.* at 13.) The Defendants

17

argue that the Plaintiff "is withholding unique, highly probative evidence" by not producing evidence of contemporaneous communications between the parties at the time of the Global Settlement.  (*Id.*)  Furthermore, the Defendants assert that the Debtors' experts and third parties possess "highly pertinent" settlement communications (*id.*), including communications related to Duff & Phelps's analyses performed in connection with allocation of the Global Settlement and the Plan RMBS Allocation Protocol (*see id.* at 13–14).

Third, the Defendants contend that they have "a special and compelling need" for mediation communications in light of the circumstances leading up to the Global Settlement. (*Id.* at 16.)  While an indemnitee's good faith in entering into a settlement can be presumed where it's "self-interest would require it to seek a favorable settlement" (*id.* at 15 (quoting *Koch Indus., Inc. v. Hoechst AG*, 727 F. Supp. 2d 199, 225 (S.D.N.Y. 2010))), the Defendants argue that the presumption of good faith does not apply to RFC because it "no longer [wa]s a going concern, filed for bankruptcy, made *de minimis* payments in the Global Settlement, and did not have a full-fledged stake in the consideration paid" (*id.*).

The Plaintiff argues that the indemnity claims do not "put mediation communications 'directly at issue' simply because the reasonableness of the Global Settlement is purportedly an element of an indemnity claim."  (Pl.'s Obj. at 7 (quoting Motion at 12).)  In support, the Plaintiff cites cases addressing "at issue" waiver of the attorney-client privilege, which occurs when a party asserts a claim or defense he intends to prove with privileged materials—here, the Plaintiffs do not intend to rely on such materials.  (*See id.* at 8 (citations omitted).)  The Plaintiff also argues that the Second Circuit's controlling decision in *Teligent* is directly on point and cuts against the Defendants' argument that they have a special need for mediation communications. (*See id.*)

18

Additionally, the Plaintiff argues that the reasonableness of an indemnitee's settlement is determined under an objective standard, and the Defendants have not explained why they have a special need for confidential mediation materials in light of this objective standard. (*See id.* at 11.) Indeed, the Plaintiff notes that this Court ruled on the reasonableness of the Global Settlement without access to the mediation materials (*see id.* (citing Conf. Order at 34)), and other courts have assessed the reasonableness of aspects of the Global Settlement without such materials (*see id.* at 12 n.4 (citations omitted)). Furthermore, the Plaintiff contends that allocation issues and RFC's good faith in entering into the Global Settlement can be assessed without modifying the Mediation Order. (*See id.* at 14–17.)

Finally, the Plaintiff highlights that the Court has consistently rejected attempts to lift the Mediation Order in prior proceedings (*see id.* at 6–7 (citations omitted)), and even "made it a point to notify [the] Defendants of [such] holdings" (*id.* at 7 (citation omitted)). Moreover, Plaintiff points out that several of the Defendants have previously stated on the record that the reasonableness of the Global Settlement will not be a significant issue in these actions in connection with their motions to withdraw the reference, belying their current assertion that they have a special need for mediation materials now. (*See id.* at 13–14 (citations omitted).)

Under Minnesota law, a party seeking indemnity for a settlement entered into before trial must establish two things: "that the settlement amount was reasonable and prudent, and that the party could have been held liable for that settlement amount." *Glass*, 778 F. Supp. at 1083 (citing *Osgood v. Med., Inc.*, 415 N.W.2d 896, 903 (Minn. Ct. App. 1987)). Courts apply an objective test to determine whether a settlement is reasonable and prudent. *Vetter v. Subotnik*, 844 F. Supp. 1352, 1355 (D. Minn. 1992) (citing *Miller v. Shugart*, 316 N.W.2d 729, 735 (Minn. 1982)). Specifically, "[t]he test as to whether the settlement is reasonable and prudent is what a

19

reasonably prudent person in the position of the defendant would have settled for on the merits of

plaintiff's claim." *Glass*, 778 F. Supp. at 1084 (quoting *Miller*, 316 N.W.2d at 735); *see Vetter*,

844 F. Supp. at 1355 ("Because the test is objective, the Court does not ask whether the

defendant believed the settlement to be reasonable at the time he entered into it."). In making

this determination, courts consider "the facts bearing on the liability and damage aspects of

plaintiff's claims, as well as the risks of going to trial." *Glass*, 778 F. Supp. at 1084 (quoting

*Miller*, 316 N.W.2d at 735). "[T]he Court is entitled to consider not only customary evidence on

liability and damages 'but also other evidence, such as expert opinion of trial lawyers evaluating

the "customary" evidence.'" *Vetter*, 844 F. Supp. at 1355 (quoting *Alton M. Johnson Co. v.

M.A.I. Co.*, 463 N.W.2d 277, 279 (Minn. 1990)). Allocating a settlement between covered and

uncovered claims also entails "an objective inquiry," focused on how a reasonable person in the

position of the indemnitee would have allocated the claims at the time the settlement was

reached "in light of the information available to [the indemnitee] at that time." *UnitedHealth

Grp. Inc. v. Columbia Cas. Co.*, 47 F. Supp. 3d 863, 872 (D. Minn. 2014).

Under New York law, an indemnitee who fails to provide an indemnitor notice of a

settlement cannot recover reimbursement without "establish[ing] that there was liability, without

a good defense, and that the amount of the settlement was reasonable." *Chase Manhattan Bank

v. 264 Water St. Assocs.*, 222 A.D.2d 229, 231 (N.Y. App. Div. 1995) (citing *Feuer v. Menkes

Feuer, Inc.*, 8 A.D.2d 294, 299 (N.Y. App. Div. 1959)). However, if the indemnitor does receive

notice of the underlying action, "the general rule is that the indemnitor will be bound by any

reasonable good faith settlement the indemnitee might thereafter make." *Deutsche Bank Tr. Co.

of Ams. v. Tri-Links Inv. Tr.*, 74 A.D.3d 32, 39 (N.Y. App. Div. 2010) (quoting *Coleman v. J.R.'s

Tavern*, 212 A.D.2d 568, 568 (N.Y. App. Div. 1995)). "[T]he test of reasonableness applies not

to the fact of liability but only to the amount that may be paid by way of settlement of such

liability." *Feuer*, 8 A.D.2d at 299; *see Luria Bros. & Co. v. Alliance Assurance Co., Ltd.*, 780

F.2d 1082, 1091 (2d Cir. 1986) (holding that an indemnitee's settlement must be "in an amount

reasonable in view of the size of possible recovery and degree of probability of claimant's

success against the [indemnitee]" (quoting *Damanti v. A/S Inger*, 314 F.2d 395, 397 (2d Cir.

1963), *cert. denied*, 375 U.S. 834 (1963))).

 The Defendants and the Plaintiff support their positions by citing to case law addressing

the "at issue" waiver of privileged communications.  (*See* Motion at 14; Pl.'s Obj. at 7–11.)  In

*Tri-Links*, a New York state appellate court explained the "at issue" waiver of privilege:

> "At issue" waiver of privilege occurs where a party affirmatively
> places the subject matter of its own privileged communication at
> issue in litigation, so that invasion of the privilege is required to
> determine the validity of a claim or defense of the party asserting
> the privilege, and application of the privilege would deprive the
> adversary of vital information.

*Tri-Links*, 74 A.D.3d at 63 (citations omitted).  However, "at issue" waiver occurs only "when

the party has asserted a claim or defense that he intends to prove by use of the privileged

materials."  *Id.* at 64 (quoting *N. River Ins. Co. v. Columbia Cas. Co.*, Case No. 90 Civ. 2518

(MJL), 1995 WL 5792, at *6 (S.D.N.Y. Jan. 5, 1995)).  "[T]hat a privileged communication

contains information relevant to issues the parties are litigating does not, without more, place the

contents of the privileged communication itself 'at issue' in the lawsuit; if that were the case, a

privilege would have little effect."  *Id.* (citation omitted).

 In *Metropolitan Life Insurance Company v. Aetna Casualty & Surety Company*, 730 A.2d

51 (Conn. 1999), the Connecticut Supreme Court reversed the trial court's order requiring an

insured to disclose privileged documents related to a settlement it entered into with claimants

after its insurers refused to defend the underlying claims.  *See id.* at 53–56.  In reaching this

conclusion, the court held that the "at issue" waiver of privilege did not apply: "[a]lthough the

[insured]'s compliance with the requirement in its policy to make reasonable settlements is at

issue, that fact does not place the privileged documents at issue." *Id.* at 61.  While the court held

that "the reasonableness of the settlements [wa]s directly at issue" *id.* at 62, the court noted that

an objective standard is applied to determine the reasonableness of the settlements, *id.*, and

therefore "the exact communications between the [insured] and its attorneys regarding the

decision to settle, which would aid only in a subjective determination, [we]re not at issue." *Id.*

In *PETCO Animal Supplies Stores, Incorporated v. Insurance Company of North*

*America*, Case No. 10-682 (JSM), 2011 WL 2490298 (D. Minn. June 10, 2011), the district court

held that an insured did not waive attorney-client privilege by entering into a "*Miller-Shugart*"

settlement.[15]  The court concluded that the test for determining the reasonableness of such

settlement is objective and there was no evidence to suggest that the insured "intend[ed] to rely

on advice of its counsel to establish the reasonableness of the settlement." *Id.* at *24.  Similarly,

in *OneBeacon Insurance Company v. Forman International, Limited*, Case No. 04 Civ. 2271

(RWS), 2006 WL 3771010 (S.D.N.Y. Dec. 15, 2006), the district court held that the "at issue"

waiver doctrine did not apply to the issue of the reasonableness of an indemnitee's settlement;

"[t]he content of any legal advice would . . . not necessarily be at issue in determining the

reasonableness of any settlement."  *Id.* at *10.  However, where an indemnitee seeks

indemnification for a settlement and costs, including attorney's fees and expenses, the "at issue"

doctrine may permit discovery of privileged documents because the "plaintiff unquestionably

---

[15]     A "*Miller-Shugart*" settlement is described as follows:  "When an insurance carrier denies coverage for a
liability claim brought by its insured, the insured and plaintiff may agree to entry of judgment against the insured, on
the condition that the judgment is collectible only from the insurer."  *Id.* at *5 (citing *Miller*, 316 N.W.2d at 734;
*Peterson v. Wilson Twp.*, 672 N.W.2d 556, 557 n.1 (Minn. 2003)).

must demonstrate that the settlement and fees were reasonable . . . ." *DH Holdings Corp. v. Marconi Corp. PLC*, 809 N.Y.S.2d 404, 407 (N.Y. Sup. Ct. 2005).

The "at issue" waiver doctrine is not applicable here. The attorney-client privilege "belongs solely to the client and may only be waived by him," *Bulow v. Bulow (In re von Bulow)*, 828 F.2d 94, 100 (2d Cir. 1987), notwithstanding that "[a] client may . . . by his actions impliedly waive the privilege or consent to disclosure," *id.* (citations omitted). By contrast, the confidentiality provisions in a protective order benefit all protected parties; one party's waiver does not sufficiently permit disclosure over the other parties' objections. *Savage & Associates, P.C. v. Mandl (In re Teligent, Inc.)*, 417 B.R. 197, 209 (Bankr. S.D.N.Y. 2009) ("The confidentiality provisions in the General Mediation Order and the Teligent Mediation Order belong to the parties and the mediator, and Mandl cannot waive it on their behalf.").

The *Teligent* bankruptcy court noted that the standard applicable to a party's request for discovery of confidential mediation communications is "similar . . . to what a litigant must show to obtain factual work product from his adversary." *Id.* at 208 (citations omitted). The court observed that "[t]he party seeking discovery of confidential mediation communications must show more than mere relevance to a pending action." *Id.* "Instead, it must demonstrate a special need and resulting unfairness, *i.e.,* that the evidence is critical, not otherwise available, and the need for the evidence outweighs the interest in maintaining confidentiality." *Id.*

The Defendants have not established a special need to obtain confidential mediation communications. In ruling on a claim for indemnity of liability resolved by settlement, courts in Minnesota and New York apply an objective test to determine the reasonableness of the settlement, the allocation of the settlement, and the indemnitee's good faith in settling. The Defendants argue that they "have a special need for mediation communications because they are

23

the most probative evidence of what was known to the Debtors at the time of settlement."

(Reply at 9.)  While contemporaneous communications made in the course of settlement may be

*relevant* to the Plaintiff's indemnity claims, these claims can be resolved without relying on

documents evidencing RFC's subjective beliefs and opinions regarding the Global Settlement.

But relevance is not the standard for jettisoning the mediation privilege.  Numerous parties

participated in the months-long mediation overseen by a sitting bankruptcy judge in these

extremely complicated cases.  The parties participated in good faith reliance on the Mediation

Order that protected written and oral communications.  The Defendants' ritual incantation that

mediation communications are "critical" or "essential" to their defense carries little weight when

both New York and Minnesota law make clear that an objective test for evaluating the

reasonableness of the settlement controls.  Communications bearing on parties' subjective beliefs

regarding the reasonableness of the Global Settlement are not necessary to determine the

reasonableness of the settlement under an objective standard.  Consequently, the Defendants

have failed to establish they have a special need to obtain communications protected under the

Mediation Order.

> **B.      The Defendants Have Not Established that Barring Discovery of Mediation
> Communications Would Be Unfair**

Even if the Defendants could establish a critical need for the mediation materials, they

must also establish that barring discovery of such materials would be unfair.  *See Teligent*, 640

F.3d at 58.  In holding that the party seeking to obtain confidential mediation communications

failed to establish that a lack of discovery would be unfair, the *Teligent* bankruptcy court found

that the party could "obtain the evidence it sa[id] the [m]ediation[] communications may clarify

through other means if the communications are not otherwise privileged."  *Teligent*, 417 B.R. at

208 (noting that the party seeking mediation communications could obtain the same evidence through interrogatories or depositions).

The Defendants argue that it would be unfair to deny them discovery of evidence of the process through which the Debtors arrived at the Global Settlement because the Defendants cannot obtain such evidence elsewhere.  (Motion at 18.)  According to the Defendants, the documents produced by the Plaintiff fail to answer questions raised by the UCC regarding the reasonableness of the Original RMBS Settlement, including whether:  (1) the Debtors failed to consider certain legal defenses; (2) Ally agreed to a higher recovery for the Institutional Investors in exchange for broad releases and a cap on its contribution to the Debtors' estates; and (3) the Debtors' experts failed to perform certain analyses to support the settlement.  (*See id.* at 17–18.)  The Defendants assert that the Mediation Order deprives them of "important evidence of whether the Global Settlement resolved substantial questions concerning the reasonableness of the Original RMBS Settlement."  (*Id.* at 18.)  Moreover, the Defendants argue that denying them this evidence is particularly unfair in light of the fact that RFC and the Trust did not provide them notice of the underlying proceeding and settlement, thereby excluding them from participating in the mediation.  (*Id.* at 19; Reply at 13.)

The Plaintiff argues that the UCC's concerns with the Original RMBS Settlement— which were raised and resolved—are irrelevant, and, in any event, can be explored with the non-confidential materials provided to the Defendants.  (*See* Pl.'s Obj. at 18.)  The Plaintiff also challenges the Defendants' assertion that it would be unfair to deprive them of mediation communications on the basis that they were not provided notice of the underlying claims and the Global Settlement, arguing that RFC and/or the Trust did not need to provide notice or tender defense to bring its contractual indemnity claims, and at least three of the Defendants did not

object to the Plan despite being served with the Plan and Confirmation Order.  (*See id.* at 20.)  In any event, the Plaintiff contends that the Defendants fail to cite any authority "for the proposition that a lack of notice somehow alters the objective nature of the test of a settlement's reasonableness."  (*Id.* at 20–21.)

The Defendants respond that settlement communications relating to the Original RMBS Settlement were critical to the UCC's challenge to that settlement, demonstrating how such communications are "equally critical" to a challenge to the Global Settlement.  (Reply at 12.) The Defendants argue that the non-mediation materials produced do not contain all information critical to assessing the reasonableness of the Global Settlement, "including the settling parties' negotiations over amount, whether the Debtors agreed to a higher amount in exchange for other consideration, or other factors affecting negotiations."  (*Id.*)  According to the Defendants, this "critical information is contained only in mediation communications."  (*Id.*)  The Defendants further assert that whether the Plaintiffs were contractually required to provide notice of the underlying claims and the Global Settlement is not at issue; rather, the issue is whether it would be unfair to deprive the Defendants from accessing "mediation communications they otherwise could have been privy to."  (*Id.* ¶ 13.)  The Defendants argue that it is unfair to deny them access to mediation communications when they "were excluded from the underlying settlement, lack basic insight into it, and their need for discovery is at its height in that circumstance."  (*Id.*)

The Court concludes that the Defendants have not established that it would be unfair to deprive them of the mediation communications.  The Mediation Order does foreclose the Defendants from relying on other relevant evidence.  In light of the fact that an objective test applies to the reasonableness of the Global Settlement, it is not unfair to deprive the Defendants from accessing the mediation materials.  Indeed, denying the Defendants access to mediation

communications does not prejudice their ability to challenge the reasonableness of the Global

Settlement; they remain free to challenge the merits of the claims subject to the Global

Settlement and the defenses available at the time, and they can challenge the methodologies and

conclusions in the publicly available expert reports offered in support of the Global Settlement.

(*See* Pl.'s Obj. at 18–19.)

### C.    The Defendants Have Not Established Their Need for Mediation Communications Outweighs the Interest of Maintaining Mediation Confidentiality

Assuming, *arguendo*, that the Defendants satisfied the first two prongs of the *Teligent*

test, the Defendants would still need to establish that their need for such materials outweighs the

interest of maintaining mediation confidentiality.  *See Teligent*, 640 F.3d at 58.  The Court

concludes they have not done so.

In *Teligent*, the Second Circuit observed that "[c]onfidentiality is an important feature of

the mediation and other alternative dispute resolution processes."  *Id.* at 57.  "Promising

participants confidentiality in these proceedings promotes the free flow of information that may

result in the settlement of a dispute, and protecting the integrity of alternative dispute resolution

generally."  *Id.* at 57–58 (internal citations omitted).  Accordingly, parties' reliance on the

confidentiality provided under a mediation order "counsel[s] in favor of a presumption against

modification of the confidentiality provisions of protective orders entered in the context of

mediation."  *Id.* at 60.  "Were courts to cavalierly set aside confidentiality restrictions on

disclosure of communications made in the context of mediation, parties might be less frank and

forthcoming during the mediation process or might even limit their use of mediation altogether."

*Id.* at 59–60.

The Defendants advance four reasons why their need to obtain mediation

communications outweighs any confidentiality interest.  First, they argue that "two of the public

policy considerations underlying the confidentiality of mediation communications – protecting mediators from discovery, and protecting parties from their own mediation statements improperly being used against them in that case – are non-existent here." (Motion at 19.) Second, the Defendants assert that their need for mediation communications is "palpable." (*Id.* at 20.) Third, the Defendants argue that "once [the] Plaintiff placed the subject of the mediation at issue, it could not reasonably expect that [the] Defendants would be barred from obtaining discovery concerning the mediation." (*Id.*) According to the Defendants, the fact that the Plaintiff could not reasonably have relied on the continued protections of the Mediation Order is particularly true where, as here, the "Mediation Order itself reflected the Court's ability to modify it." (*Id.*) Finally, the Defendants argue that any interest in barring public disclosure of mediation materials can be accommodated through a protective order limiting the use and dissemination of such materials. (*Id.* at 21.)

The Plaintiff argues that the interest of "[p]rotecting confidentiality in mediations is not only about protecting the mediator and the parties in the particular case in which the mediation took place, but also about encouraging participants in future mediations to negotiate in the necessary spirit." (Pl.'s Obj. at 21.) Indeed, the Plaintiff asserts, the Defendants fail to address the "strong interests of the dozens of third parties at issue, or Judge Peck" (*id.* ¶ 23); however, these parties' interest in confidentiality of the mediation, which they expected would be maintained, would be frustrated by the Defendants' efforts to obtain mediation communications, regardless of whether they "seek materials directly from the mediator" (*id.*).

In response, the Defendants maintain that the mediation parties' reliance on confidentiality must be understood to include potential disclosure if the *Teligent* test is satisfied. (*See* Reply at 14.) The Defendants argue that their request for controlled access to mediation

materials between adverse parties balances the parties' interest in maintaining confidentiality with the Defendants' need for such materials. (*See id.* at 15.)

The Court has carefully balanced the facts and arguments presented by the parties. The Court finds and concludes that the Defendants have not established that their need for mediation materials outweighs the "important interest in protecting the confidentiality of the material." *Id.* at 59. The parties to the mediation expected the Mediation Order would ensure that their mediation communications remain confidential, and this expectation would be frustrated if the Defendants were granted the relief sought in the Motion.

**D.    The Scope of the Mediation Order**

In concluding that the Defendants have not established grounds for modifying the Mediation Order, the Court deems it appropriate to address the scope of communications protected under the Mediation Order. Based on the record before the Court, it appears that the parties dispute whether the Mediation Order shields: (1) communications between the mediation parties exchanged outside of mediation sessions; (2) disclosure of facts learned by parties outside of mediation through their own efforts; and (3) communications with Duff & Phelps regarding allocation issues.

First, communications among the mediation parties exchanged outside of mediation sessions are protected by the Mediation Order to the extent they were "produced for or as a result of the mediation." (Mediation Order ¶ 4.) The confidentiality protections provided by the Mediation Order extend to communications that occurred outside the geographical and temporal limits of the actual mediation sessions. To resolve the issues developed in mediation, the parties were expected to continue communicating and working towards a solution between mediation sessions. Therefore, communications between mediation parties in furtherance of mediation are

not outside the scope of the Mediation Order's protections solely because they were exchanged outside of the mediation sessions.

Second, the Mediation Order expressly does not preclude disclosure of facts learned by parties to the mediation through their own efforts. The Mediation Order protects disclosure of a mediation communication "*unless otherwise available* and not subject to a separate confidentiality agreement that would prevent its disclosure or as authorized by this Court." (*Id.* (emphasis added).) Information is "otherwise available" within the meaning of the Mediation Order if it can be gleaned from non-protected sources through independent research. Thus, no party is prevented from disclosing facts discussed in mediation if they are otherwise available and not protected.

Finally, the Mediation Order does not protect from disclosure all of Duff & Phelps's communications regarding allocation issues. As an initial matter, the Mediation Order does not extend to communications made after the close of mediation, which occurred no later than December 11, 2013, the date on which the Plan was confirmed. Consequently, Duff & Phelps's analyses performed pursuant to the Plan RMBS Allocation Protocol after the Effective Date are not protected under the Mediation Order. Additionally, it is not entirely clear that all of Duff & Phelps's communications concerning allocation exchanged before confirmation fall within the scope of the Mediation Order's protections from disclosure. To the extent that Duff & Phelps provided expert opinion testimony that the RMBS allowed claim was properly and fairly allocated, it cannot shield from discovery the facts considered and assumptions relied on in forming the opinions, whether those facts were learned during the mediation or otherwise. *See* Fed. R. Civ. P. 26(b)(4)(C)(ii)–(iii). But the issues concerning discovery from Duff & Phelps must remain open unless the parties resolve them on their own; the current record before the

Court is not sufficient to resolve issues relating to discovery from Duff & Phelps, which are not fully framed in any event by the current Motion.

### III. <u>CONCLUSION</u>

For the foregoing reasons, the Defendants' Motion is **DENIED.**

**IT IS SO ORDERED.**

Dated: August 28, 2015
        New York, New York

_____*Martin Glenn*_____
MARTIN GLENN
United States Bankruptcy Judge